Jonathan S. Henes
Joshua A. Sussberg
Sarah Hiltz Seewer (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Attorneys for the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CITADEL BROADCASTING CORPORATION, *et al.*, | Case No. 09-17422 (BRL) |
| Debtors. | Jointly Administered |

**FIRST MODIFIED DISCLOSURE STATEMENT FOR THE JOINT PLAN OF
REORGANIZATION OF CITADEL BROADCASTING CORPORATION AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ....................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ....................................................................................................3
        A.    What is chapter 11? ................................................................................3
        B.    Why are the Debtors sending me this Disclosure Statement? ....................................3
        C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is
              consummated? ....................................................................................3
        D.    What is the Plan all about? ........................................................................4
        E.    What happens to my recovery if the Plan is not confirmed, or does not go effective? ..........5
        F.    Are any regulatory approvals required to consummate the Plan? ................................5
        G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
              Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective
              Date" and "Consummation?" ......................................................................6
        H.    Where is the cash required to fund the Plan coming from? ......................................6
        I.    Are there risks to owning an Interest in Citadel upon emergence from chapter 11? ..............6
        J.    Is there potential litigation related to the Plan? ..................................................6
        K.    What rights will Reorganized Citadel's new stockholders have? ................................6
        L.    What is the Equity Incentive Program and how will it affect the distribution I receive
              under the Plan? ....................................................................................7
        M.    How will the release of the Avoidance Actions impact my recovery under the Plan? ............7
        N.    Will the final amount of Allowed Claims affect my recovery under the Plan? ..................7
        O.    How will claims asserted with respect to rejection damages affect my recovery under the
              Plan? ..............................................................................................7
        P.    Will there be releases granted to parties in interest as part of the Plan? ........................7
        Q.    What is the deadline to vote on the Plan? ........................................................7
        R.    How do I vote for or against the Plan? ............................................................8
        S.    Why is the Bankruptcy Court holding a Confirmation Hearing? ................................8
        T.    When is the Confirmation Hearing set to occur? ................................................8
        U.    What is the purpose of the Confirmation Hearing? ..............................................8
        V.    What is the effect of the Plan on the Debtors' ongoing business? ................................8
        W.    Will any party have significant influence over the corporate governance and operations of
              the Reorganized Debtors? ........................................................................8
        X.    Does Citadel recommend voting in favor of the Plan? ..........................................8

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW .............9

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS ....................................................9

VI.     RELIEF GRANTED DURING THE CHAPTER 11 CASES ................................................9

VII.    PROJECTED FINANCIAL INFORMATION ................................................................9

VIII.   RISK FACTORS ............................................................................................10
        A.    Risks Relating to Bankruptcy ....................................................................10
        B.    Risks Related to the Debtors' and Reorganized Debtors' Business ............................12
        C.    Risks Related to Regulation ......................................................................14

IX.     SOLICITATION AND VOTING PROCEDURES ...................................................................16

X.      CONFIRMATION OF THE PLAN.......................................................................................16
        A.      Requirements for Confirmation of the Plan ...........................................................16
        B.      Best Interests of Creditors/Liquidation Analysis ..................................................17
        C.      Feasibility................................................................................................................17
        D.      Acceptance by Impaired Classes.............................................................................18
        E.      Confirmation without Acceptance by All Impaired Classes ...................................18
        F.      Valuation of the Debtors .........................................................................................19

XI.     CERTAIN SECURITIES LAW MATTERS .........................................................................19
        A.      Plan Securities.........................................................................................................19
        B.      Issuance and Resale of Plan Securities under the Plan............................................19
        C.      Listing of New Common Stock ...............................................................................20

XII.    NOL MOTION ......................................................................................................................21

XIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN.....................................................................................................................................21
        A.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized
                Debtors....................................................................................................................22
        B.      Certain U.S. Federal Income Tax Consequences to Holders of Claims and Interests....24
        C.      FCC Trust.................................................................................................................27

XIV.    FCC TRUST INFORMATION..............................................................................................27
        A.      Generally..................................................................................................................27
        B.      Creation and Funding of the FCC Trust ..................................................................28
        C.      Appointment of the FCC Trustees ...........................................................................28
        D.      Contributions to the FCC Trust................................................................................28
        E.      Transferability of Beneficial Interests....................................................................28
        F.      Distributions; Withholding.......................................................................................28
        G.      Termination of the FCC Trust..................................................................................29

XV.     RECOMMENDATION .........................................................................................................30

## EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Declaration of Randy L. Taylor Pursuant to Rule 1007-2 of the Local
Bankruptcy Rules for the Southern District of New York in Support of First-
Day Pleadings

EXHIBIT C    FCC Considerations

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Financial Projections

EXHIBIT F    Valuation Analysis

EXHIBIT G    Liquidation Analysis

EXHIBIT H    Plan Release Provisions

## I.      INTRODUCTION

After extensive, good faith negotiations, the Plan incorporates a global settlement among the Debtors, the Senior Agent and the Committee (all as defined below).  As a result, each of the Debtors' major creditor constituencies is supportive of the Plan and the Debtors' expeditious emergence from chapter 11.

**THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THESE ESTATES AND PROVIDES THE BEST RECOVERY TO CREDITORS.  AT THIS TIME, THE DEBTORS DO NOT BELIEVE THAT THERE IS A VIABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES OTHER THAN THROUGH CONFIRMATION OF THE PLAN.  THE DEBTORS AND THE COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court (as defined herein).  The Debtors believe that the Plan (as defined herein) is in the best interests of all creditors and urge all holders of claims entitled to vote to vote in favor of the Plan.

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the Southern District of New York, the court in which Citadel Broadcasting Corporation  ("*Citadel*") and its debtor affiliates (collectively, the "*Debtors*"), filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*").**

**"Confirmation Hearing" means the hearing held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  References to the "Confirmation Date" are to the date upon which the Bankruptcy Court enters the order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.**

**References to the "Effective Date" are to the date selected by the Debtors that is after the date on which the order confirming the Plan becomes a Final Order (as defined in the Plan).**

**References to the "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for each Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 case pending for all of the Debtors in the Bankruptcy Court under Case No. 09-17442 (BRL).  References to the "Bankruptcy Rules" mean the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, and the general, local and chambers rules of the Bankruptcy Court.**

**References to a "Claim" are to any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.  References to "Interests" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code.  References to "Intercompany Interests" are to Interests in a Debtor held by another Debtor.**

**References to the "Committee" are to the statutory committee of unsecured creditors appointed in these cases by the United States Trustee for the Southern District of New York.**

**References to the "Plan" and the "Plan of Reorganization" are to the *First Modified Joint Plan of Reorganization of Citadel Broadcasting Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, a copy of which is attached as <u>Exhibit A</u> hereto and incorporated herein by reference.  All capitalized terms used but not otherwise defined herein will have the meaning ascribed to them in the Plan.**

**References to the "Plan Supplement" are to the compilation of documents and forms of documents, schedules and exhibits to the Plan, to be filed with the Bankruptcy Court before the Confirmation Hearing.**

**Unless the context requires otherwise, reference to "we," "our" and "us" are to the Debtors.**

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan shall govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "*SEC*") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement. Moreover, the Federal Communications Commission ("*FCC*") has not yet approved the ownership changes that would result if the Plan is ultimately confirmed.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933 (as amended, the "*Securities Act*"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration, other than section 1145 of the Bankruptcy Court, apply such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including, without limitation, the following, to be forward-looking statements: any future effects as a result of the pendency of the Chapter 11 Cases; the Reorganized Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows; projected dividends; financing plans; competitive position; business strategy; budgets; projected cost reductions; projected and estimated liability costs, including pension, retiree, tort and environmental costs and costs of environmental remediation; results of litigation; disruption of operations; plans and objectives of management for future operations; contractual obligations; off-balance sheet arrangements; growth opportunities for existing products and services; projected price increases; projected general market conditions; benefits from new technology; and effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation

to update any such statement.  These risks, uncertainties and factors include: the Debtors' ability to develop, confirm and consummate the Plan; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases; customer response to the Chapter 11 Cases; inability to have claims discharged/settled during the chapter 11 proceedings; general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; ability to implement cost reduction initiatives in a timely manner; ability to divest existing businesses; efficacy of new technology and facilities; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; general market conditions; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

### C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class") and their respective voting statuses and anticipated recoveries are set forth below.

The following chart is a summary of the classification and treatment of Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation and meet the conditions to consummate the Plan.

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | Secured Senior Claims | Impaired | Entitled to Vote | 82%[1] |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | 36%[2] |
| 5 | Section 510(b) Claims | Impaired | Deemed to Reject | 0% |
| 6 | Intercompany Claims | Unimpaired/ Impaired | Deemed to Accept/Deemed to Reject | N/A |
| 7 | Intercompany Interests | Unimpaired | Deemed to Accept | 100% |
| 8 | Citadel Interests[3] | Impaired | Deemed to Reject | 0% |

For purposes of allocating distributions between Holders of Senior Claims and Holders of General Unsecured Claims under the Plan, the value of the secured portion of the Senior Claims has been stipulated at an amount that is the difference between the total Senior Claims and the Senior Credit Deficiency Claim, or approximately $1.8772 billion.  The total recovery for Holders of Senior Claims (which aggregate $2,144,387,154.18), including recoveries on account of the Senior Credit Deficiency Claim included in Class 4, is approximately 76%.

### D.      What is the Plan all about?

The key terms of the Plan and the Debtors' overall restructuring are as follows:

- The Debtors' secured lenders (the "***Lenders***"), whose claims total $2,144,387,154.18, will receive on account of the secured portion of their claims a Pro Rata share of (i) a new term loan in the principal amount of $762.5 million, with a 5-year term and an interest rate of LIBOR + 800 (and a LIBOR floor of 3%); (ii) 90% of the new common stock (the "***New Common Stock***") of "***Reorganized Citadel***" (meaning Citadel Broadcasting Company as reorganized under and pursuant to the plan on and after the Effective Date), subject to dilution for distributions of New Common Stock under Reorganized Citadel's Equity Incentive Program; and (iii) Cash in an amount, if any, by which the aggregate amount of the Debtors' Unrestricted Cash (as defined in the Plan) on the Effective Date exceeds the sum of (X) $86,000,000 (representing the sum of (i) $36,000,000 payable to Class 4 and (ii) $50,000,000 (which is the amount of cash Reorganized Citadel will retain for normal operations) and (Y) the sum of estimated unpaid Fee Claims accrued as of the Effective Date; unpaid Cure Claims; accrued and unpaid Administrative Claims; fees payable in connection with the Debtors' entry into the New Term Loan, including professional fees payable to professionals of non-Debtors in connection therewith; unpaid Priority Non-Tax Claims; unpaid Priority Tax Claims; the Subordinated Notes Indentures Trustee Fee and the 1.875% Subordinated Notes Paying Agent Fee (all capitalized terms as defined in the Plan) (such amount to be distributed to the Lenders, if any, the "***Excess Cash***").

---

[1]     The estimated recovery percentage for the Secured Senior Claims is calculated based on the difference of the total Senior Claim amount and the stipulated amount of the Senior Credit Deficiency Claim.  The estimated recovery percentage does not include any recoveries from Excess Cash since the estimated Unrestricted Cash on the Effective Date is less than the aggregate requisite amount described in Article III.D.

[2]     The estimated recovery percentage for General Unsecured Claims is calculated based on a stipulated amount of the Senior Credit Deficiency Claim and the Debtors' current estimate for all other General Unsecured Claims.  *See* footnote 3.

[3]     The Plan defines "Interests" as any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, including, without limitation, rights to purchase restricted stock or interests.  The Plan defines "Citadel Interests" as Interests in Citadel.

- Holders of General Unsecured Claims, which the Debtors estimate to be approximately $343.5 million in the aggregate, including the Senior Credit Deficiency Claim in the stipulated amount of $267.2 million,[4] will receive (i) a Pro Rata share of 10% of the New Common Stock (subject to dilution for distributions of New Common Stock under Reorganized Citadel's Equity Incentive Program) and (ii) a Pro Rata share of $36 million in Cash.[5]

- Shares of New Common Stock will be distributed pursuant to an allocation mechanism designed to ensure compliance with the attribution and foreign ownership rules and regulations of the FCC (detailed on **Exhibit A** to the Plan).

- All equity interests in Citadel will be cancelled or extinguished on the Effective Date.

- Certain of the Debtors hold significant Intercompany Claims against other Debtors. Intercompany Claims arose from, among other things: payments made pursuant to the Senior Credit Agreement; the acquisition of radio stations; operating cash that is distributed from certain Debtors to their Debtor subsidiaries or to their Debtor parent; and allocations for taxes and corporate overhead. Any and all Intercompany Claims will be contributed, adjusted, paid, continued or discharged to the extent reasonably determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

    **E.**       **What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" beginning on page 17 and the Liquidation Analysis attached as **Exhibit G** to this Disclosure Statement.

    **F.**       **Are any regulatory approvals required to consummate the Plan?**

Yes. Citadel's radio broadcast operations are subject to significant regulation by the Federal Communications Commission (the "*FCC*") under chapter 5 of title 47 of the United States Code, 47 U.S.C. § 151 et seq., (as amended, the "*Communications Act*"). Approval of the FCC is required for the issuance, renewal, transfer, assignment or modification of station operating licenses. In particular, Citadel's business depends upon the Debtors' ability to continue to hold radio broadcasting licenses issued by the FCC. In connection with the Debtors' emergence from chapter 11, FCC approval for the proposed ownership change under the Plan must be secured. For a more detailed description of the FCC approval process and considerations attendant thereto, *see* **Exhibit C** to this Disclosure Statement.

---

[4]    For purposes of allocating distributions between Holders of Secured Claims and Holders of General Unsecured Claims under the Plan only, the amount of the Senior Credit Deficiency Claim has been stipulated to be $267.2 million, which was calculated to provide Holders of General Unsecured Claims (other than the Senior Credit Deficiency Claim) with a distribution of 2.22222% of the New Common Stock (calculated before dilution on account of the Equity Incentive Program). Based on the Debtors' current estimate for all other General Unsecured Claims (including the Subordinated Notes Claims in the amount of approximately $49.6 million but excluding the Senior Credit Deficiency Claim) of $76.3 million and given the Unsecured Claim Equity Distribution of 10% of the New Common Stock, the implied Senior Credit Deficiency Claim equals $267.2 million [$267.2 million = $76.3 million ÷ 2.22222% × (10% - 2.22222%)].

[5]    Based on the estimated amount of General Unsecured Claims, the Holders of the Senior Credit Deficiency Claims are estimated to receive $28.0 million of Cash and the Holders of all General Unsecured Claims (excluding the Senior Credit Deficiency Claim) are estimated to receive $8.0 million of Cash. To the extent that the actual amount of all other General Unsecured Claims (excluding the Senior Credit Deficiency Claim) varies from the Debtors' current estimate, the actual Cash distribution will not equal the estimated Cash distribution in the previous sentence due to the fixed stipulated amount of the Senior Credit Deficiency Claim.

**G.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective (the "***Effective Date***") or as soon as practicable thereafter.  *See* "Confirmation of the Plan," which begins on page 16, for a discussion of the conditions to consummation of the Plan.

**H.      Where is the cash required to fund the Plan coming from?**

As of April 30, 2010 (the "***Assumed Effective Date***"), the Debtors project to have approximately $34.4 million of cash on hand (which excludes approximately $5.4 million of restricted cash),[6] net of all cash payments to be made pursuant to the Plan.  The amount of cash actually on hand on the Effective Date, net of cash payments made pursuant to the Plan, could be different to the extent the Debtors' actual receipts and disbursements are different from the amounts set forth in the Projections.  *See* Article VII of this Disclosure Statement for additional information.

**I.      Are there risks to owning an Interest in Citadel upon emergence from chapter 11?**

Yes.  *See* "Risk Factors," which begins on page 10.

**J.      Is there potential litigation related to the Plan?**

Yes.  In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  Two shareholders objected to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well.  (*See* Article VIII.A(i).)  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* "Risk Factors — The Debtors may not be able to obtain Confirmation of the Plan," which begins on page 10.

**K.      What rights will Reorganized Citadel's new stockholders have?**

Holders of Senior Claims will receive a Pro Rata share of 90% of the New Common Stock of Reorganized Citadel (in addition to a Pro Rata share of the New Term Loan and a Pro Rata share of the Excess Cash), subject to dilution on account of the Equity Incentive Program.  In addition, Holders of General Unsecured Claims (including the Lenders' Senior Credit Deficiency Claim) will receive a Pro Rata share of (a) 10% of the New Common Stock of Reorganized Citadel, subject to dilution on account of the Equity Incentive Program; and (b) $36 million of Cash.  The allocation of New Common Stock and Special Warrants among Holders of Senior Claims and General Unsecured Claims will be made in accordance with the Equity Allocation Mechanism, which is attached as **<u>Exhibit A</u>** to the Plan.  In the event the Debtors determine to implement a liquidating trust (the "***FCC Trust***") to be in effect for any period before FCC approval of the Transfer of Control, the New Common Stock will be transferred to the FCC Trust and Holders of Senior Claims and General Unsecured Claims will receive beneficial interests in the FCC Trust instead of New Common Stock.

---

[6]      The estimated cash balance also excludes escrowed cash of $0.6 million related to utility deposits that may be released on the Effective Date.

    **L.**       **What is the Equity Incentive Program and how will it affect the distribution I receive under the Plan?**

       The Plan contemplates the implementation of the Equity Incentive Program, which will be included with the Plan Supplement and provide for New Common Stock of not less than 7.5% and no more than 10% (on a fully diluted basis) to be reserved for issuance as options.  Three-quarters of the options will have a strike price equal to the value of the New Common Stock on the Effective Date and will vest ratably over a three-year period; the remaining quarter will have a strike price set by the New Board at a significant premium to the Effective Date value, and will vest over a three-year period.  To the extent that New Common Stock is issued pursuant to the Equity Incentive Program, the value of New Common Stock distributed to creditors pursuant to the Plan will be diluted.

    **M.**       **How will the release of the Avoidance Actions impact my recovery under the Plan?**

       The Plan provides for the release of Avoidance Actions other than those that are specifically retained; any retained Avoidance Actions will be identified in the Plan Supplement.  The Debtors believe that pursuing Avoidance Actions against trade creditors, which constitute the vast majority of potential Avoidance Actions that could be pursued by the Debtors, would not result in a net benefit to the Debtors' estates, but instead could potentially harm the Reorganized Debtors' business relationships with their trade partners.  Additionally, many of the Avoidance Actions, if not released, would be subject to statutory and other defenses, including that the amounts sought to be avoided were paid in the ordinary course of business or were given in exchange for subsequent new value.  The Debtors do not believe that the release of Avoidance Actions will materially impact recoveries under the Plan.

    **N.**       **Will the final amount of Allowed Claims affect my recovery under the Plan?**

       The Debtors estimate that General Unsecured Claims, *excluding* the Subordinated Notes Claims (which total approximately $49.6 million) and the Senior Credit Deficiency Claim, total approximately $26.7 million.  On March 9, 2010, the Bankruptcy Court entered an order setting April 21, 2010 as the last date on which creditors can submit proofs of claim, and June 18, 2010 as the last date on which governmental units can submit proofs of claim [Docket No. 183].  Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.  Further, the Debtors may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.  These changes could affect recoveries for Holders of Claims in Class 4, and such changes could be material.

    **O.**       **How will claims asserted with respect to rejection damages affect my recovery under the Plan?**

       The Debtors' estimate of $26.7 million for General Unsecured Claims (which excludes the Senior Credit Deficiency Claim in the stipulated amount of $267.2 million and the Subordinated Notes Claims in the amount of approximately $49.6 million) includes approximately $4.9 million in estimated Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases.  To the extent that the actual amount of rejection damages claims changes, the value of recoveries to Holders of Claims in Class 4 could change as well, and such changes could be material.

    **P.**       **Will there be releases granted to parties in interest as part of the Plan?**

       Yes, see "Article IX -- Settlement, Release, Injunction and Related Provisions" which begins on page 37 of the Plan, and which is attached hereto as **Exhibit H**.

    **Q.**       **What is the deadline to vote on the Plan?**

       5:00 p.m. (prevailing Eastern Time) on May 3, 2010.

**R.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Claim Holders that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed, signed and received by 5:00 p.m. (prevailing Eastern Time), on May 3, 2010.

**S.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and any party in interest may object to confirmation of the Plan.

**T.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for May 12, 2010 at 10:00 a.m. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than May 3, 2010 at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The Wall Street Journal* and *The New York Times* to provide notification to those persons who may not receive notice by mail.

**U.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**V.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11. As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. The Debtors will continue to operate their businesses going forward using cash from operations, which will be utilized to implement the Reorganized Debtors' business plan.

**W.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

The Lenders will hold the vast majority of the New Common Stock of Reorganized Citadel and will appoint six independent directors to the seven-member New Board. The seventh member of the New Board will be Reorganized Citadel's Chief Executive Officer.

**X.      Does Citadel recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all creditors. Any other alternative does not in any way realize or recognize the value inherent under the Plan.

## IV.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

Citadel is the third largest radio broadcasting company in the United States when measured both according to revenue and the number of owned and operated stations. Citadel's business operations are divided into two segments: Citadel Radio, which owns and operates radio stations across the country, and Citadel Media, which produces and distributes news and talk radio programming to more than 4,000 station affiliates and 8,500 program affiliates. In 2008, Citadel Radio and Citadel Media together generated total revenues of approximately $863 million. A detailed summary of the Debtors' businesses, corporate history, organizational structure and prepetition capital structure may be found in the *Declaration of Randy L. Taylor Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Pleadings*, filed on the Petition Date [Docket No. 2] (the "**_Taylor Declaration_**") and attached hereto as **Exhibit B**.

## V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS

A number of factors contributed to the Debtors' decision to commence the Chapter 11 Cases. Although the Debtors' business is operationally sound, the Debtors' substantial funded debt burden and declining advertising revenues, combined with adverse changes in the capital markets and U.S. economy, affected the Debtors' ability to meet their debt covenants. For more information, as well as the strategic alternatives that the Debtors explored prepetition, see the Taylor Declaration, attached hereto as **Exhibit B**.

## VI.      RELIEF GRANTED DURING THE CHAPTER 11 CASES

On the Petition Date, the Debtors filed several motions seeking authorization to pay various prepetition claims, all of which is explained in **Exhibit O** attached to the Taylor Declaration. Entry of these orders eased the strain on the Debtors' relationships with employees, vendors, customers, on-air talent and network affiliates following the commencement of the Chapter 11 Cases. The Debtors also obtained various procedural orders to ease the administrative nature of these cases. All of these orders can be found at http://www.kccllc.net/Citadel.

## VII.      PROJECTED FINANCIAL INFORMATION

Attached as **Exhibit E** is a projected consolidated income statement, which includes the following: (A) the Debtors' consolidated, unaudited, preliminary, financial statement information for the year ended December 31, 2009 and (B) consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (the "**_Projections_**") for the period from 2010 through 2014 (the "**_Projection Period_**"). The Projections are based on an assumed Effective Date of April 30, 2010. To the extent that the Effective Date occurs after April 30, 2010, recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Projections are organized according to two consolidated reporting segments, Radio Markets and Radio Network. The Debtors gather and report financial information according to these two segments, even though the operations may be owned by different Debtor entities. Additionally, many of the individual Debtors are holding companies and have little or no operations. Accordingly, the Debtors believe that consolidating the Projections to reflect the segments of the Debtors' businesses is appropriate.

The Projections represent the Debtors' management's best estimate of the Debtors' future financial performance over a five year period based on currently known facts and assumptions about, among other things, the Debtors' future operations. The Projections take into account Citadel's prior year's performance, local market conditions and estimates of future results by local management, factors impacting the economy and the radio industry as a whole, and various other factors. The actual results for the first two months of 2010 and the current estimates for the first quarter of 2010 indicate the following:

- first quarter revenues for 2010 are estimated to be up approximately $6 million as compared to first quarter Projections for 2010;

- total segment operating expenses are estimated to be down approximately $4 million as compared to the first quarter Projections for 2010; and

- segment operating income is estimated to increase by approximately $10 million, as compared to the first quarter Projections for 2010.

Based on all relevant information, the Debtors do not believe that the long range five year business plan should be revised based upon the first quarter 2010 expected results.

The Debtors' Projections also include a Pro Forma Consolidated Balance Sheet as of April 30, 2010, which reflects management's best estimate of the Debtors' balance sheet upon emergence from chapter 11. The Projections estimate cash on hand of approximately $34.4 million (excluding restricted cash of approximately $5.4 million for the collateralization of outstanding letters of credit and a deposit held as security in case of default by the Debtors under their credit card processing agreement)[7] as of the Assumed Effective Date. Based on the assumptions utilized in the preparation of the pro forma balance sheet and improvements to the Debtors' actual and projected cash flows through March 31, 2010, the Debtors estimate that the cash balance upon emergence could increase by approximately $6.5 million resulting in an approximate unrestricted cash balance of $40.9 million.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Risks Relating to Bankruptcy

#### (i)    *The Debtors may not be able to obtain Confirmation of the Plan.*

With regard to any proposed plan of reorganization, the debtor seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

An objection to the adequacy of the Disclosure Statement was filed by Virtus Capital LLC and Kenneth S. Grossman Pension Plan, holders of approximately 7 million shares of Citadel common stock (the "**Two Shareholders**"), which represents approximately 2.6% of the 265.6 million shares of Citadel common stock outstanding as of December 31, 2009. The Two Shareholders asserted in their objection that the Debtors' financial projections are inaccurate and misleading. The Debtors disagree and believe that the Disclosure Statement includes adequate information for creditors to vote on the Plan as the financial projections were prepared by management in good faith and based on their best view of the Debtors' financial performance over a five-year period. In addition, to address the Debtors' recent operating performance and ensure that the Disclosure Statement includes the most up

---

[7]    *See* footnote 6.

to date financial data available, the Debtors have included disclosures regarding the actual results from the first two months of 2010 and the current estimates for the first quarter of 2010. The Two Shareholders also asserted that the Debtors' valuation does not consider data from an appropriate group of comparable companies. The Debtors support the Valuation Analysis (as defined below) and do not agree with the Two Shareholders' assertions. The Debtors believe that the Two Shareholders intend to object to confirmation of the Plan. The Debtors intend to present the Valuation Analysis at the confirmation hearing and demonstrate its appropriateness.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses; (b) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

### (ii)     The conditions precedent to the Effective Date of the Plan may not occur.

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### (iii)     The Debtors may not be able to achieve their projected financial results.

The financial projections set forth on **Exhibit E** to this Disclosure Statement represent Citadel's management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular. The Debtors' actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, the trading prices of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.[8]

### (iv)     The restructuring of the Debtors will eliminate Citadel's net operating loss carryforwards.

As of December 31, 2009, Citadel estimates that it had approximately $77 million of net operating loss carryforwards for federal income tax purposes (expiring in the years 2025 and 2029). In addition, Citadel has approximately $95 million of net operating loss carryforwards for state income tax purposes, expiring in years 2013 through 2029. Currently, such tax net operating losses can accumulate and be used to offset the Debtors' future taxable income. As a result of implementation of the Plan, Citadel expects its net operating loss carryforwards to be eliminated. For a more detailed discussion, please review "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 21.

### (v)     The Debtors' emergence from chapter 11 is not assured.

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining confirmation of the Plan.

---

[8]     The Debtors maintain an investment account (the "***Investment Account***") at Bank of America Securities, LLC. The funds in the Investment Account are invested into the Treasury Instruments Portfolio (the "***Portfolio***") managed by Goldman Sachs Asset Management, L.P. The amount of funds invested with the Portfolio ranges from $17 million to $50 million. The Treasury Investments Portfolio invests only in securities issued by the U.S. Treasury and repurchase agreements related to such securities; however, the funds in the Investment Account are not insured by the FDIC. The Debtors obtained a final order permitting them to continue to invest excess funds in the Investment Account notwithstanding the fact that the funds are not insured by the FDIC. [Docket No. 99].

**B.**      **Risks Related to the Debtors' and Reorganized Debtors' Business**

*(i)*      *Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition.*

According to the terms and conditions of the Plan, upon confirmation the Reorganized Debtors will have outstanding indebtedness of approximately $762.5 million under the New Term Loan.

The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance.  These factors depend partly on economic, financial, competitive and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

Any default under the New Term Loan could adversely affect their growth, financial condition, results of operations, the value of their equity and ability to make payments on such debt.  The Reorganized Debtors may incur significant additional debt in the future.  If current debt amounts increase, the related risks that the Reorganized Debtors now face will intensify.

*(ii)*      *The New Term Loan Agreement contains certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity.*

The New Term Loan Agreement will contain a number of significant covenants that could adversely affect the Reorganized Debtors' ability to operate their businesses, as well as significantly affect their liquidity, and therefore could adversely affect the Reorganized Debtors' results of operations.  These covenants restrict (subject to certain exceptions), the Reorganized Debtors' ability to: incur additional indebtedness; grant liens; consummate mergers, acquisitions consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with affiliates; consummate sale-leaseback transactions; change their fiscal year; enter into hedging arrangements (except as otherwise expressly permitted); allow third parties to manage their stations, and sell substantially all of the stations' programming or advertising; transfer or assign FCC Licenses to third parties; and change their lines of business.  In addition, the Reorganized Debtors will be required to maintain a minimum interest coverage ratio and a maximum leverage ratio.

The breach of any covenants or obligations in the New Term Loan, not otherwise waived or amended, could result in a default under the New Term Loan Agreement and could trigger acceleration of those obligations.  Any default under the New Term Loan could adversely affect the Reorganized Debtors' growth, financial condition, results of operations and ability to make payments on debt.

*(iii)*      *Decreased spending by advertisers and changes in the economy have had a material adverse effect on the Debtors' business, and a continuing downturn in the economy may have an even greater adverse impact on the Debtors.*

Since virtually all of Citadel Radio's net revenue is generated from the sale of local, regional and national advertising for broadcast on the Debtors' radio stations, and the net revenue of Citadel Media is also dependent on national advertising, the recent downturn in the United States economy has had a material adverse impact on the Debtors' revenue and profit margins.  A continuing recession or further downturn in the United States economy could have an even greater adverse impact on the Debtors, as advertisers generally reduce their spending during economic downturns.  In addition, because a substantial portion of the Debtors' revenue is derived from local advertisers, the Debtors' ability to generate advertising revenue in specific markets could be adversely affected by continuing local or regional economic downturns.  The current state of the economy could also adversely affect the Debtors' ability to collect accounts receivable from advertisers.

> *(iv)* ***The Debtors may lose audience share and advertising revenue to competing radio stations, radio networks or other types of media competitors.***

The Debtors operate in a highly competitive industry. Citadel Radio and Citadel Media segments compete for audiences, creative and performing talent, broadcast rights, market share and advertiser support with other radio stations and station groups, radio networks, other syndicated programming and other media such as broadcast television, newspapers, magazines, cable television, satellite television, satellite radio, the Internet and hand-held programmable devices, such as iPods and cellular phones.  Any adverse change in a particular market or in the relative market positions of the stations located in a particular market, or any adverse change in listeners' preferences could have a material adverse effect on the Reorganized Debtors' revenue or ratings.  Other radio broadcasting companies may enter the markets in which the Reorganized Debtors operate or may operate in the future or offer syndicated programming that competes with Citadel's programming, and these companies may be larger and have more financial resources than the Reorganized Debtors. In addition, from time to time, other stations may change their format or programming, a station may adopt a format to compete directly with the Reorganized Debtors for audiences and advertisers.  These tactics could result in lower ratings, lower market share and lower advertising revenue or increased promotion and other expenses and, consequently, lower earnings and cash flow for the Reorganized Debtors. Audience preferences as to format or programming may also shift due to demographic changes, personnel or other programming changes, a decline in broadcast listening trends or other reasons.

> *(v)* ***The Debtors may lose key on-air talent to competing radio stations, radio networks or other types of media competitors.***

Citadel Radio and Citadel Media compete for creative and performing on-air talent with other radio stations and station groups, radio networks, and other providers of syndicated programming and other media such as broadcast television, cable television, satellite television and satellite radio.  Employees and other on-air talent of the Debtors are subject to change and may be lost to competitors or for other reasons.  Any adverse changes in particular programs, formats or on-air talent could have a material adverse effect on the Reorganized Debtors' ability to attract local and/or national advertisers, on the Reorganized Debtors' revenue and/or ratings, or could require increased expenses.

> *(vi)* ***The Reorganized Debtors' results may be adversely affected if long-term contracts are not renewed on sufficiently favorable terms.***

Certain of the Debtors enter into long-term contracts in the ordinary course of business for both the acquisition and distribution of media programming and products, including contracts for both the acquisition and distribution of programming rights for sporting events and other programs, contracts for the distribution of programming to satellite operators, and contracts relating to programming produced by third parties on the Debtors' stations and by the Debtors' network business.  As these contracts expire, the parties must renew or renegotiate the contracts, and if they are unable to renew them on acceptable terms, the applicable Debtors may lose these rights, the related programming and applicable revenue.  Even if these contracts are renewed, the cost of obtaining programming rights may increase (or increase at faster rates than in the past) or the revenue from distribution of programs may be reduced (or increase at slower rates than in the past).  With respect to the acquisition of programming rights, the impact of these long-term contracts on the Reorganized Debtors' results over the term of the contracts will depend on a number of factors, including the strength of advertising markets, effectiveness of marketing efforts, the size of viewer audiences, and the related contract expenses and costs.  There can be no assurance that revenue from programming based on these rights will exceed the cost of the rights plus the other costs of producing and distributing the programming.

> *(vii)* ***The failure or destruction of satellites and transmitter facilities that the Debtors depend upon to distribute the Debtors' programming could materially adversely affect the Reorganized Debtors' businesses and results of operations.***

The Debtors use studios, satellite systems, transmitter facilities and the Internet to originate and/or distribute its station programs and network programs and commercials to affiliates.  The Debtors rely on third-party contracts and services to operate the Debtors' origination and distribution facilities.  These third-party contracts and services include, but are not limited to, electrical power, satellite transponders, uplinks and downlinks and telecom

circuits. Distribution may be disrupted due to one or more of the Debtors' third parties losing their ability to provide particular services to the Reorganized Debtors which could adversely affect the Reorganized Debtors' distribution capabilities. A disruption can be caused as a result of any number of events such as local disasters (accidental or environmental), various acts of terrorism, power outages, major telecom connectivity failures or satellite failures. The Reorganized Debtors' ability to distribute programming to station audience and/or network affiliates may be disrupted for an undetermined period of time until alternate facilities are engaged and put on-line. Furthermore, until third-party services resume, the inability to originate or distribute programming could have a material adverse effect on the Reorganized Debtors' businesses and results of operations.

> (viii)    *If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer.*

The Debtors' businesses depend upon the continued efforts, abilities and expertise of the Debtors' executive officers, primarily the Debtors' chairman and chief executive officer, Farid Suleman. The Debtors believe that the unique combination of skills and experience possessed by Mr. Suleman would be difficult to replace, and his loss could have a material adverse effect on the Reorganized Debtors, including impairing the Reorganized Debtors' ability to execute the Reorganized Debtors' business strategy.

> (ix)    *To remain competitive, the Reorganized Debtors must respond to changes in technology, services and standards that characterize the Reorganized Debtors' industry.*

The radio broadcasting industry is subject to technological change, evolving industry standards and the emergence of new media technologies. The Reorganized Debtors may not have the resources to acquire new technologies or to introduce new services that could compete with these new technologies.

The radio broadcasting industry historically has grown despite the introduction of new technologies for the delivery of entertainment and information, including the introduction of new technologies used in automobiles, as a result, in part, of an increasingly large human population, greater use of the automobile and increased commuter times. Some of the new technologies, particularly satellite digital audio radio service and Internet radio, will compete for the consumer's attention in the car, workplace and elsewhere. The Debtors cannot guarantee that this historical growth will continue. In addition, the Debtors cannot predict the effect, if any, that competition arising from new technologies or regulatory changes may have on the radio broadcasting industry or on the Reorganized Debtors' financial condition and results of operations, some of which could result in the imposition of significant costs and expenses not previously part of the Debtors' business operations.

> C.    **Risks Related to Regulation**

> (i)    *The Debtors' businesses depend upon licenses issued by the FCC, and if licenses were not renewed or the Reorganized Debtors were to be out of compliance with FCC regulations and policies, the Reorganized Debtors' business would be materially impaired.*

The Debtors' businesses depend upon maintaining their broadcasting and other licenses, authorizations, waivers and permits issued by the FCC (the "*FCC Licenses*"), which are issued currently for a maximum term of eight years and are renewable. Interested parties may challenge a renewal application. On rare occasions, the FCC has revoked licenses, not renewed them, or renewed them with significant qualifications, including renewals for less than a full term of eight years. In the last renewal cycle, all of the Debtors' licenses were renewed; however, the Debtors cannot be certain that the Reorganized Debtors' future renewal applications will be approved, or that the renewals will not include conditions or qualifications that could adversely affect the Reorganized Debtors' operations, could result in material impairment and could adversely affect the Reorganized Debtors' liquidity and financial condition. If any of the Reorganized Debtors' FCC Licenses are not renewed, it could prevent the Reorganized Debtors from operating the affected station and generating revenue from it. Further, the FCC has a general policy restricting the transferability of a station license while a renewal application for that station is pending. In addition, the Reorganized Debtors must comply with extensive FCC regulations and policies governing the ownership and operation of their radio stations. FCC regulations limit the number of radio stations that a licensee can own in a market, which could restrict the Reorganized Debtors' ability to consummate future transactions. The FCC's rules governing the Debtors' radio station operations impose costs on their operations, and

14

changes in those rules could have an adverse effect on the Reorganized Debtors' businesses. The FCC also requires radio stations to comply with certain technical requirements to limit interference between two or more radio stations. If the FCC relaxes these technical requirements, it could impair the signals transmitted by the Reorganized Debtors' radio stations and could have a material adverse effect on the Reorganized Debtors' businesses. Moreover, governmental regulations and policies may change over time, and the changes may have a material adverse impact upon the Reorganized Debtors' businesses, financial condition and results of operations.

### (ii)    *There will be FCC approval requirements in connection with emergence from chapter 11.*

The Debtors operate their businesses and certain of their facilities under authority granted by the FCC. Under Section 310(d) of the Communications Act, the consent of the FCC is required for the assignment of FCC licenses or for the transfer of control of an entity that holds or controls FCC licenses. Except in the case of "involuntary" assignments and transfers of control, prior consent of the FCC is required before an assignment of FCC licenses or a transfer of control of FCC licensees may be consummated.

The FCC treats emergence from bankruptcy by a licensee or its parent company as a "voluntary" transfer of control or assignment of FCC licenses when control will be transferred to a "permanent" holder, rather than to a trustee, a liquidating trust or some other court-appointed interim holder. The FCC thus expects that the outcome of the proceeding will be a restructuring (or a sale of collateral for the benefit of the debtor's creditors) and that the restructuring (or sale) will not be implemented until the FCC has granted applications seeking approval of the new control structure and demonstrating the legal qualifications of any new parties that will have attributable ownership interests or positions in the new entity.

If the proposed resolution of a bankruptcy proceeding changes ultimate control of the FCC licensees (as, for example, in a situation in which new parties will hold 50% or more of the stock of the restructured company), which would be the case under the Plan, the transfer will be a "substantial" change in control, with consent sought on an FCC "long form" application, Form 314 (assignment) or Form 315 (transfer of control). (The FCC treats a transaction as an "assignment" if the consummation of the transaction would change the identity of the holder of the FCC license; other changes in ownership or control of the entity holding or controlling the FCC license typically are treated as "transfers of control." The application procedures for transfers and assignments are essentially the same.) Even though a company may emerge from bankruptcy or receivership through a court order, the FCC will use the procedures applicable to a voluntary transfer or assignment when the consummation of the application would place the licenses in a "permanent" holder. The transaction may not be consummated until the FCC has granted its consent.

### (iii)    *Oppositions to the Debtors' application for FCC consent to transfer FCC Licenses (in connection with emerging from bankruptcy) can delay the process.*

The FCC will allow the application for transfer out of bankruptcy to a "permanent" holder to be filed once the plan of reorganization has been filed with the bankruptcy court, but the FCC will not grant the application until the application has been amended to show that the bankruptcy court has approved the plan of reorganization and authorized the transaction. Generally, three to seven days after submission of the applications for a "long form" voluntary transfer of control, the FCC issues public notice that it has accepted the applications for filing. Interested parties then have 30 days to file petitions to deny the applications. The applicant also is required to give local public notice of the filing of the applications through broadcast announcements and notices in local newspapers serving its broadcast markets. To the extent petitions to deny are filed in this situation, they typically focus on the qualifications of the restructured debtor and its reportable owners, officers and directors to hold or control FCC broadcast licenses.

If petitions to deny are filed against the transfer applications, the applicants will have an opportunity to file an opposition, with the petitioner then having an opportunity to file a reply. The pleading cycle generally will be completed within 60 days. The FCC then will consider the applications and the filings made by the parties to the proceeding.

The FCC's review of applications includes, among other factors, whether the existing media interests (broadcast and daily newspaper holdings) of the parties to the application, when combined with the broadcast interests to be acquired in the transaction, will comply with the FCC's ownership rules. The FCC also considers

compliance with limitations on foreign ownership, other legal qualifications, the parties' prior records before the FCC and certain categories of prior adverse determinations against parties to the application by courts and other administrative bodies that the FCC believes are relevant to assessing the qualifications of parties that will hold attributable interests in a broadcast licensee.

If no oppositions are filed against the applications and the FCC finds the applications to be in compliance with its rules and policies and finds the parties to the application qualified, the FCC may grant the applications shortly after the close of the public notice period. In some instances, the FCC may request that the applicants supply additional information through amendments to the applications. There is no time limit on how long the FCC may consider transfer applications before acting on them, but the FCC has a stated goal of processing all transfer applications within 180 days, and most applications are granted much more quickly. The FCC will not grant the applications, however, until the Bankruptcy Court has approved a plan of reorganization and the applications have been amended to reflect that the Bankruptcy Court has authorized the transaction.

As a variation in the structure for FCC approval described above, the FCC also may be asked, following Bankruptcy Court approval of the plan of reorganization, to grant consent for a court-approved voluntary transfer of control of the FCC licensees to a liquidating trust as a temporary step pending FCC action on the FCC long form application to transfer control of the licensees to their permanent holder (the "***Long Form Application***"). If the Plan has been confirmed by the Bankruptcy Court and a requisite number of Lenders vote to accept the Plan, pending FCC approval of the FCC Long Form Application, the Debtors can submit a short form application to the FCC to transfer the FCC Licenses to a liquidating trust (the "***Short Form Application***"). Assuming confirmation of the Plan by the Bankruptcy Court, transfer of the FCC Licenses to a liquidating trust would permit the Effective Date to occur notwithstanding the lack of approval of the Long Form Application. Delays in FCC approval of either the Long Form Application or the Short Form Application, or the lack of consent from the Lenders for the transfer to a liquidating trust, could delay the Effective Date.

Once the FCC has granted a transfer application, it will issue a public notice of the grant. Interested parties opposed to the grant may file for reconsideration for a period of 30 days following public notice of the grant. If the grant is made by the FCC's staff under delegated authority, the FCC may reconsider the action on its own motion for a period of 40 days following issuance of public notice of the grant. Parties are free to close upon the grant of FCC consent even if petitions for reconsideration are filed, but the consummation will be subject to any further order that the FCC might issue upon reconsideration. Although highly unusual, the FCC may rescind a grant of consent upon reconsideration if it finds that doing so would serve the public interest, convenience and necessity.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Classes 3 and 4. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

**B.**     **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7.

Attached as **Exhibit G** is a liquidation analysis prepared by the Debtors' management with the assistance from Alvarez & Marsal North America, LLC ("**A&M**"), the Debtors' restructuring advisor.[9]  As reflected in the liquidation analysis, the Debtors and their management believe that chapter 7 liquidations of the Debtors would result in substantial diminution in the value to be realized by Holders of Claims entitled to distribution, as compared to the distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that confirmation of the Plan will provide a substantially greater return to holders of claims than would chapter 7 liquidations.[10]

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, they may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in liquidations under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of claims under a chapter 11 liquidation plan probably would be delayed substantially.  Most importantly, the Debtors believe that any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**C.**     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Projections, as set forth on **Exhibit E**.  Based upon the Projections, the Debtors believe that the Debtors will be a viable operation following the Chapter 11 Cases, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

---

[9]   As discussed in **Exhibit G**, to estimate what members of each Impaired Class of Claims would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "**Liquidation Value**").  The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

[10]   The Liquidation Analysis was prepared on a consolidated basis.  The Liquidation Analysis assumes that the proceeds are aggregated to a common distribution source, and any guarantees of obligations of another Debtor or any joint or several liabilities of the Debtors is deemed to give rise to a single right of distribution of the aggregated proceeds.  Given that each Debtor is either the principal borrower or a guarantor under the Senior Credit Agreement, a debtor-by-debtor analysis would provide the same result.

D.        **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[11]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that _actually_ voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

E.        **Confirmation without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, _provided_ that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

(i)        *No Unfair Discrimination*

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(ii)       *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The

---

[11]     A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors.  Such analysis (the "*Valuation Analysis*") is set forth in **Exhibit F** attached hereto.

Based on the projections by the Debtors' management and solely for the purposes of the Plan, Lazard Frères & Co. LLC ("*Lazard*"), the Debtors' proposed financial advisor and investment banker, estimates that the total value available for distribution to Holders of Allowed Claims falls within a range from approximately $1.500 billion to $1.745 billion, with a midpoint estimate of $1.625 billion, which consists of the value of the Reorganized Debtors' operations on a going concern basis, which falls within a range from approximately $1.460 billion to $1.710 billion and the $39.8 million of cash on the Assumed Effective Date.  For purposes of this Valuation Analysis, Lazard assumes that no material changes that would affect value occur between the date hereof and the Assumed Effective Date.

## XI.    CERTAIN SECURITIES LAW MATTERS

### A.    Plan Securities

The Plan provides for Reorganized Citadel to distribute New Common Stock, Special Warrants and/or beneficial interests in the FCC Trust (collectively, the "*Plan Securities*") to Holders of Allowed Claims in Classes 3 and 4.

The Debtors believe that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws.  The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

### B.    Issuance and Resale of Plan Securities under the Plan

#### (i)    *Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws*

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Law) shall not apply to the offer or sale of stock, options, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law.

*(ii)*       ***Resales of Plan Securities; Definition of Underwriter***

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities and, in turn, whether any Person may freely resell Plan Securities.  The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and applicable state Blue Sky Laws.  In addition, there will be the Registration Rights Agreement providing for registration rights for the New Common Stock, which agreement shall be in form and substance reasonably acceptable to the Senior Agent, dated as of the Effective Date, and in substantially the form set forth in the Plan Supplement.

**C.       Listing of New Common Stock**

For certain purposes, including requiring Reorganized Citadel to become a public reporting company under the Securities Exchange Act, as promptly as practicable following the Effective Date, Reorganized Citadel shall file with the SEC the Form 10 or Form 8-A, and Reorganized Citadel shall use reasonable best efforts to have such registration statement declared effective by the SEC as promptly as reasonably practicable.

Reorganized Citadel shall use its reasonable best efforts to obtain a listing for the Class A Common Stock on NYSE or Nasdaq as soon as reasonably practicable following the effectiveness of the Form 10 or Form 8-A (*e.g.*, after listing requirements are satisfied).

The Plan Securities may be subject to certain transfer and other restrictions pursuant to, among other things and the terms of the Special Warrants, the New Certificate of Incorporation and, if implemented, the FCC Trust Agreement.

## XII.    NOL Motion

On the Petition Date, the Debtors filed the *Motion for Entry of an Order Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Common Stock* [Docket No. 10] (the "***NOL Motion***"), pursuant to which the Debtors sought, on an interim and final basis, to restrict the ability of shareholders that own or have owned 50% or more -- as measured under the applicable tax rules -- of Citadel's common stock to claim a federal tax deduction for worthlessness for a taxable period before emergence. The Debtors sought to avoid an ownership change under the tax laws that could adversely impact the Debtors' ability to use their NOLs, which could arise if, in connection with actions by other parties, a 50% Shareholder (as defined in the NOL Motion) took a worthless stock deduction before the year that the Debtors emerge from chapter 11. The Debtors believe that Forstmann Little & Co. ("***FLC***") is the only shareholder that may be affected by the worthless stock component of the NOL Motion. The Bankruptcy Court entered an interim order granting the NOL Motion December 22, 2009 [Docket No. 30]. The final hearing on the NOL Motion has been adjourned (on two separate occasions) and is currently scheduled to go forward on April 8, 2010 [Docket Nos. 95, 159].

As set forth in this Disclosure Statement, the Debtors state that they expect their NOLs to be eliminated to the extent the Plan is implemented. The Debtors make no statement regarding the use of their NOLs generated on or before December 31, 2009, during the portion of the 2010 taxable year preceding their emergence from chapter 11. The Debtors believe that they may need their NOLs during this period to avoid paying cash taxes that would otherwise be payable. FLC believes that certain statements regarding the elimination of the Debtors' NOLs in this Disclosure Statement contradict the relief that the Debtors seek in their NOL Motion. [*See* Article XIII.A.] FLC further believes that a final order granting the Debtors' NOL Motion can not be entered under the circumstances in this case. Citadel disagrees with FLC's contentions. Nonetheless, Citadel is in the process of reviewing and analyzing the relief sought in the NOL Motion to determine if it is necessary to go forward on a final basis.

FLC has advised the Debtors that if they determine to go forward with the NOL Motion and seek entry of the final order approving same, FLC will oppose the NOL Motion. FLC has also advised the Debtors that, if FLC is prevented from filing a worthless stock deduction for the 2009 tax year in 2010 as a consequence of the Debtors' actions, FLC believes it will suffer damages in excess of $30 million on behalf of its investors. The Debtors have not independently verified this amount at this time and neither agree nor disagree with the amount. FLC has further advised the Debtors that if the NOL Motion is granted on a final basis it intends to file an administrative claim in excess of $30 million against Citadel as a result of its inability to file a worthless stock deduction. Again, the Debtors have not independently verified this amount at this time and neither agree nor disagree with the amount. Administrative claims, if allowed by the Bankruptcy Court, need to be satisfied in full in cash upon consummation of a chapter 11 plan. The Debtors dispute FLC's contentions and its ability to assert an administrative claim to the extent the NOL Motion is approved on a final basis. To the extent the NOL Motion is approved on a final basis, the Debtors will agree to set a hearing before Confirmation to determine whether FLC is entitled to any Administrative Claim as a result of the entry of such order (subject to all of the Debtors' rights and defenses). To the extent FLC has an Allowed Administrative Claim, FLC has advised the Debtors that it may raise a feasibility concern at the hearing to consider Confirmation, and the Debtors acknowledge that FLC has not waived its right to do so. Further, the Debtors' reserve all of their rights to dispute and otherwise object to any claim, administrative or otherwise, filed by FLC in these chapter 11 cases.

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States federal income tax consequences in connection with the implementation of the Plan for Citadel, the Reorganized Debtors and certain Holders of Allowed Claims or Interests. This summary is based on the United States Internal Revenue Code of 1986, as amended (the "***Tax***

*Code*"), the Treasury regulations promulgated thereunder (the "***Regulations***"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "***IRS***"), each as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

Citadel has requested a private letter ruling (the "***Ruling***") from the IRS with respect to certain tax consequences discussed herein.  The following discussion assumes that the IRS will grant Citadel a Ruling that (i) the Special Warrants should be treated as stock for U.S. federal income tax purposes, (ii) both the Senior Claims (to the extent of the Tranche A Term Loan and the Tranche B Term Loan) and the New Term Loan constitute a "security" for purposes of the "reorganization" provisions of the Tax Code and (iii) otherwise confirms the tax treatment discussed herein.

This discussion does not apply to a Holder of Claims or Interests that is not a "United States person" (as defined in the Tax Code).  This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to Holders in light of their individual circumstances or to Holders that may be subject to special tax rules (such as Persons who are related to Citadel within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees, Persons who received their Claims as compensation, Persons who hold Claims or Interests or who will hold the New Term Loan, New Common Stock or Special Warrants as part of a straddle, hedge, conversion transaction or other integrated investment, Persons using a mark to market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy).  Furthermore, this summary assumes that each Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning of Section 1221 of the Tax Code).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

Citadel expects to report consolidated net operating loss ("***NOL***") carryforwards for U.S. federal income tax purposes of approximately $77 million as of December 31, 2009.  As discussed below, Citadel expects its NOL carryforward to be eliminated as a result of implementation of the Plan.  In addition, should any NOL carryforward survive the reorganization, the Reorganized Debtors' subsequent utilization of such remaining losses and NOL carryforwards and possibly certain other tax attributes may be restricted as a result of and upon the implementation of the Plan.

(i)      ***Reorganization Transfer***

As mentioned above, Citadel has requested a Ruling from the IRS that the Reorganization Transfer constitutes a "reorganization" within the meaning of the Tax Code.  Citadel expects that the IRS will grant Citadel the Ruling, confirming the tax-free nature of the Reorganization Transfer.  This discussion assumes that the IRS

22

grants such a Ruling. If the IRS declines to issue the Ruling, Citadel reserves the right, subject to the agreement of the Senior Agent and the Requisite Participating Lenders, to alter the Restructuring Transactions, including the Reorganization Transfer. As so altered, the Restructuring Transactions could have tax consequences that differ from those described herein.

Pursuant to the Reorganization Transfer, on the Effective Date, Citadel will merge with and into CB Company, with CB Company as the surviving entity. Citadel will be treated as transferring all of its assets (principally, its Interests in ABC Radio and CB Company) to CB Company in exchange for the New Term Loan, New Common Stock and Special Warrants issued by CB Company. Neither Citadel nor CB Company should recognize gain or loss with respect to this exchange. Reorganized Citadel, the resulting company, should succeed to any of Citadel's tax attributes that remain immediately after the close of the Effective Date and, therefore, such attributes should be available (subject to the reductions and limitations discussed below) to offset future taxable income of the Reorganized Debtors.

### (ii)    Cancellation of Indebtedness and Reduction of Tax Attributes

As a result of the Plan, Citadel's aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor recognizes cancellation of debt income ("**CODI**") upon discharge of its outstanding indebtedness for an amount of consideration less than its adjusted issue price. The Tax Code provides that a debtor in a bankruptcy case may exclude CODI from income but generally must reduce certain of its tax attributes by the amount of any CODI realized as a result of consummation of a plan of reorganization.

The exact amount of CODI that Citadel will realize is unclear. The amount of CODI realized by a taxpayer is generally the excess of (i) the adjusted issue price of any indebtedness discharged, over (ii) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration (including any stock and warrants) given in exchange therefor, subject to certain statutory and judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled indebtedness would have given rise to a tax deduction). The extent of such CODI realized by Citadel (and the resulting tax attribute reduction) will therefore depend significantly on the value of the New Term Loan, New Common Stock and Special Warrants distributed pursuant to the Plan. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that there will be a material reduction of Citadel's tax attributes as a result of Citadel's CODI, the exact amount of such reduction cannot be predicted with certainty.

As a general rule, tax attributes must be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (e) foreign tax credits. A debtor with CODI may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Tax Code, with any remaining balance applied to the other tax attributes in the order stated above. Citadel does not expect to make the election under section 108(b)(5). In the context of a consolidated group of corporations, the Tax Code provides for a complex ordering mechanism to determine how the tax attributes of one member (*e.g.*, ABC Radio) can be reduced in respect of the CODI of another member (*e.g.*, Citadel). The reduction in tax attributes occurs only after the determination of the debtor's tax for the year in which the discharge of indebtedness occurs. To the extent that the amount of excluded CODI exceeds a Debtor's tax attributes available for reduction, the remaining CODI is nevertheless excluded from the Debtor's gross income.

Citadel currently expects that all of its NOL carryforwards will be eliminated and potentially other tax attributes will be reduced under the application of these rules and thus will not be available to offset any future taxable income of the Reorganized Debtors after 2010.

### (iii)    Limitation of NOL Carryforwards and Certain Other Tax Attributes

Section 382 of the Tax Code generally imposes an annual limitation (the "**Section 382 Limitation**") on a corporation's use of its NOL carryforwards and certain built-in losses (collectively, "**Pre-Change Losses**") if the corporation undergoes an "ownership change." Similar rules apply to a corporation's capital loss carryforwards and tax credits. These limitations are independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from CODI realized by a corporation.

The issuance under the Plan of the New Common Stock and the Special Warrants, along with the cancellation of existing Interests, is expected to cause an ownership change with respect to Citadel. As discussed above, Citadel does not believe that any of its Pre-Change Losses will survive the restructuring, and the Section 382 Limitation should thus not apply to the Reorganized Debtors. However, if contrary to Citadel's expectations any of its Pre-Change Losses survive the restructuring, the Reorganized Debtors' use of such Pre-Change Losses after the Effective Date would be subject to the Section 382 Limitation and would also be limited for purposes of the alternative minimum tax under the Tax Code.

**B.**    **Certain U.S. Federal Income Tax Consequences to Holders of Claims and Interests**

***(i)***    ***Consequences to Holders of Senior Claims***

Pursuant to the Plan, each holder of an Allowed Senior Claim will receive, in full and final satisfaction of the secured portion of such Claim, its Pro Rata share of (i) the New Term Loan; (ii) a combination of New Common Stock, Special Warrants or beneficial interests in the FCC Trust; and (iii) the Excess Cash. Whether a Holder recognizes gain or loss, in whole or in part, as a result of the exchange depends, in part, on whether (a) the debt instrument constituting a surrendered Claim and the New Term Loan each constitutes a "security" for U.S. federal income tax purposes; (b) the FCC Trust qualifies as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Regulations; (c) the Holder purchased the surrendered Claim at a discount; (d) the Holder has previously included in income any accrued but unpaid interest with respect to the surrendered Claim; and (e) the Holder has claimed a bad debt deduction or worthless security deduction with respect to the surrendered Claim. The United States federal income tax consequences of a Holder's receipt of beneficial interests in the FCC Trust are discussed separately in "FCC Trust" below.

Assuming the IRS grants Citadel the Ruling, a Holder of an Allowed Senior Claim that receives the New Term Loan, New Common Stock or Special Warrants, and Excess Cash generally will not recognize loss with respect to the exchange and will not recognize any gain except (i) to the extent any of the New Term Loan, New Common Stock, Special Warrants or Excess Cash is treated as received in satisfaction of accrued but unpaid interest on the debt instruments underlying the surrendered Claim (*see* "Accrued Interest" below) and (ii) to the extent not treated as received in satisfaction of accrued but unpaid interest in the preceding clause, in an amount equal to the Excess Cash received (but not in excess of the amount of realized gain). A Holder should obtain a tax basis in its New Term Loan and New Common Stock or Special Warrants equal to its tax basis in the debt instruments constituting the Claim surrendered therefor, and a Holder should have a holding period for its New Term Loans and New Common Stock or Special Warrants that includes the holding period of the debt instruments constituting the Claim surrendered therefor; provided that a Holder's tax basis in any New Term Loan, New Common Stock or Special Warrants treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for any such New Term Loan, New Common Stock or Special Warrants should not include the holding period of the debt instruments constituting the surrendered Claim.

(a)    Accrued Interest

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the Holder as ordinary interest income to the extent not already taken into income by the Holder. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by Citadel. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which an amount received by a Holder of a Claim will be attributable to accrued interest on the debt instrument constituting the Claim is unclear. Certain Regulations treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such claim, to the extent otherwise permitted and as determined for U.S. federal income tax purposes, and thereafter to the remaining portion of such Claim, if any. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

24

(b)       Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" that accrued on the debt instruments constituting the Claim while held by the Holder.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in the case of (i) and (ii), by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

To the extent the debt instruments constituting a surrendered Claim had been acquired with market discount and are exchanged for any New Term Loan, New Common Stock or Special Warrants in a reorganization, any market discount that accrued on such debt instruments but was not recognized by the Holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of such New Term Loan, New Common Stock or Special Warrants to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

*(ii)       Consequences to Holders of General Unsecured Claims*

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Claim (i) a combination of New Common Stock, Special Warrants or beneficial interests in the FCC Trust and (ii) Cash.  Whether a Holder recognizes gain or loss, in whole or in part, as a result of the exchange depends, in part, on whether (a) the debt instrument constituting a surrendered Claim constitutes a "security" for U.S. federal income tax purposes; (b) the FCC Trust qualifies as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Regulations; (c) the Holder purchased the surrendered Claim at a discount; (d) the Holder has previously included in income any accrued but unpaid interest with respect to the surrendered Claim; and (e) the Holder has claimed a bad debt deduction or worthless security deduction with respect to the surrendered Claim.  The United States federal income tax consequences of a Holder's receipt of beneficial interests in the FCC Trust are discussed separately in "FCC Trust" below.

A Holder of a General Unsecured Claim that receives Cash, New Common Stock or Special Warrants, if the debt instrument constituting the surrendered Claim is treated as a "security" for purposes of the reorganization provisions of the Tax Code (*see* "Treatment of a Debt Instrument as a 'Security'" below), generally will not recognize loss with respect to the exchange and will not recognize any gain except (i) to the extent any of the Cash, New Common Stock or Special Warrants is treated as received in satisfaction of accrued but unpaid interest on the debt instruments underlying the surrendered Claim (*see* "Accrued Interest" above) and (ii) to the extent not treated as received in satisfaction of accrued but unpaid interest pursuant to the preceding clause, in an amount equal to the amount of Cash received (but not in excess of the amount of realized gain).  Such Holder should obtain a tax basis in its New Common Stock or Special Warrants equal to its tax basis in the debt instruments constituting the Claim surrendered therefor, increased by the amount of gain recognized pursuant to clause (ii) of the preceding sentence, and such Holder should have a holding period for its New Common Stock or Special Warrants that includes the holding period of the debt instruments constituting the Claim surrendered therefor; provided that a Holder's tax basis in any New Common Stock or Special Warrants treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for any such New Common Stock or Special Warrants should not include the holding period of the debt instruments constituting the surrendered Claim.

A Holder of a General Unsecured Claim (who holds only a General Unsecured Claim) whose debt instrument constituting such Holder's Claim is not treated as a security for purposes of the reorganization provisions of the Tax Code will be treated as exchanging its Claim in a fully taxable exchange.  In that case, a Holder should recognize (a) gain or loss equal to the difference between (i) the fair market value as of Effective Date of any consideration received for such Claim that is not allocable to accrued interest and (ii) the Holder's tax basis in the debt instruments constituting the Claim surrendered therefor.  Such gain or loss should be capital in nature (subject to the rules described in "Market Discount" above) and should be long term capital gain or loss if the surrendered

Claim was held for more than one year by the Holder. To the extent that any amount of New Common Stock, Special Warrants or Cash received in the exchange is allocable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the Holder may recognize ordinary interest income (*see* "Accrued Interest" above). A Holder's tax basis in any New Common Stock or Special Warrants received on the Effective Date should equal the fair market value of such New Common Stock or Special Warrants as of the Effective Date, and a Holder's holding period for any New Common Stock or Special Warrants received on the Effective Date should begin on the day following the Effective Date.

(a)       Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. This discussion assumes that the Ruling granted by the IRS will treat the New Term Loan as a "security" for U.S. federal tax purposes. However, each Holder of a Claim should consult with its own tax advisor to determine whether or not the debt instrument underlying its Claim is a "security" for U.S. federal income tax purposes.

(iii)       *Consequences to Holders of Section 501(b) Claims and Holders of Interests*

Pursuant to the Plan, a Holder of a Section 501(b) Claim or an Interest will receive no distribution and its Claim or Interest (as applicable) will be cancelled and extinguished, whether surrendered for cancellation or otherwise. Section 165(g) of the Tax Code permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year. Thus, a Holder of a Section 501(b) Claim or an Interest may be entitled a worthless security deduction, which for most Holders likely will be a capital loss. The rules governing the timing and amount of worthless security deductions place considerable emphasis on the facts and circumstances of the holder, the issuer, and the instrument with respect to which the deduction is claimed. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

(iv)       *Limitation on Use of Capital Losses*

A Holder of a Claim or Interest who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate Holder may carry over unused capital losses and apply them to future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year, and may carry over unused capital losses for the five years following the capital loss year.

(v)       *Information Reporting and Back-up Withholding*

Payments under the Plan in respect of Allowed Claims may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding of taxes will generally apply to payments in respect of an Allowed Claims under the Plan if the Holder of such Claim fails to timely provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess

amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

### C.    FCC Trust

Pursuant to the Plan, in lieu of distributing New Common Stock or Special Warrants to certain Holders of Claims, Reorganized Citadel may (i) contribute the New Common Stock or Special Warrants to the FCC Trust and (ii) subsequently issue beneficial interests in the FCC Trust to such Holders.  The Debtors intend that the FCC Trust will qualify as a "liquidating trust" and as a "grantor trust" for U.S. federal income tax purposes.  If the FCC Trust so qualifies, then for all U.S. federal income tax purposes, Citadel will be deemed to have distributed to the Holders an undivided interest in their Pro Rata shares of the assets of the FCC Trust (*i.e.*, the New Common Stock or Special Warrants) and such Holders will be deemed to have contributed such interests to the FCC Trust in exchange for beneficial interests in the FCC Trust.

The U.S. federal income tax consequences to Reorganized Citadel of distributing beneficial interests in the FCC Trust to certain Holders should be identical to the consequences to Reorganized Citadel of distributing the New Common Stock and Special Warrants discussed above.

The U.S. federal income tax consequences to a Holder resulting from the exchange of such Holder's Claim for a beneficial interest in the FCC Trust should mirror the consequences, described above, had such Holder received its Pro Rata shares of the assets of the FCC Trust (*i.e.*, New Common Stock or Special Warrants) in exchange for such Holder's Claim.  A Holder should not recognize gain or loss on the deemed contribution of the assets of the FCC Trust (*i.e.*, the New Common Stock or Special Warrants) to the FCC Trust.  Upon a Holder's actual receipt of assets from the FCC Trust, the Holder should not recognize any gain or loss.

The Disbursing Agent will file tax returns with the IRS for the FCC Trust as a grantor trust.  The Disbursing Agent will also send to each beneficiary of the FCC Trust a separate statement setting forth the beneficiary's allocable share of items of income, gain, loss, deduction or credit (if any) and will instruct the beneficiary to report such items on such beneficiary's federal income tax return.  This requirement may result in any such Holder being subject to tax on its allocable share of the FCC Trust's taxable income (if any) prior to receiving any distributions from the FCC Trust.

Although the FCC Trust has been structured with the intention of complying with guidelines established by the IRS in Revenue Procedure 94-45, 1994-2 C.B. 684, for the formation of a liquidating trust, the Ruling will not address the tax status of the FCC Trust.  Thus, it is possible that the IRS could require an alternative characterization of the FCC Trust, which could result in different, and possibly greater, tax liability to the FCC Trust and/or Holders that receive a beneficial interest in the FCC Trust.  A Holder that receives a beneficial interest in the FCC Trust is urged to consult its own tax advisors regarding the tax consequences of the right to receive and of the receipt of property from the FCC Trust.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIV.    FCC TRUST INFORMATION

### A.    Generally

In the event that the Debtors and the Senior Agent determine that consideration of the FCC Long Form Application is causing unwanted delay in consummation of the Plan, they shall, subject to the consent of the Requisite Participating Lenders, promptly establish the FCC Trust for the benefit of the Holders of Allowed Claims that may be entitled to distributions under the Plan.  The powers, authority, responsibilities and duties of the FCC Trust and the FCC Trustees are set forth in and shall be governed by the FCC Trust Agreement.  The FCC Trust

Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, all provisions necessary to ensure the continued treatment of the FCC Trust as a "grantor trust" and a "liquidation trust", and the beneficiaries of the FCC Trust as the grantors and owners thereof, for United States federal income tax purposes. The FCC Trust and the FCC Trustees, including any successors, shall be bound by the Plan and shall not challenge any provision of the Plan.

The provisions of the Plan concerning the relative roles of the Long Form Application and Short Form Application in consummating the Plan reflect the consensual agreement of parties reached through the negotiation of the Plan and its terms.

### B.        Creation and Funding of the FCC Trust

On the Effective Date, if the FCC Trust is implemented, the Reorganized Debtors shall (i) execute the FCC Trust Agreement in a manner consistent with the Plan, (ii) establish the FCC Trust in accordance with the FCC Trust Agreement for the benefit of the Holders of Allowed Claims that may be entitled to distributions from the FCC Trust under the Plan, and (iii) deposit with the FCC Trust the minimum amount necessary for the recognition of the FCC Trust for United States federal income tax purposes, with such amount to be subject to Reasonable Lender Consent.

### C.        Appointment of the FCC Trustees

On the Effective Date, and in compliance with the provisions of the Plan and the FCC Trust Agreement, the Debtors will appoint the FCC Trustees in accordance with the FCC Trust Agreement and, thereafter, any successor FCC Trustees shall be appointed and serve in accordance with the FCC Trust Agreement. The FCC Trustees or any successor thereto will administer the FCC Trust in accordance with the Plan and the FCC Trust Agreement.

### D.        Contributions to the FCC Trust

If the Effective Date occurs upon an FCC Approval pursuant to clause (2) of the definition of FCC Approval, Reorganized Citadel shall contribute the New Common Stock and/or Special Warrants to the FCC Trust for the benefit of the Holders of Senior Claims and General Unsecured Claims that otherwise would have been entitled to receive a distribution of such New Common Stock and/or Special Warrants pursuant to Article III.C of the Plan.

### E.        Transferability of Beneficial Interests

Ownership of a beneficial interest shall be uncertificated and shall be in book entry form. The beneficial interests in the FCC Trust will not be registered pursuant to the Securities Act, as amended, or any state securities law. If the beneficial interests constitute "securities," the parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to the beneficial interests. The beneficial interests will be transferable, subject to the terms of the FCC Trust Agreement.

### F.        Distributions; Withholding

The FCC Trustees shall make distributions to the beneficiaries of the FCC Trust when and as authorized pursuant to the FCC Trust Agreement in compliance with the Plan, provided that distributions in respect of the Senior Claims and the Subordinated Notes Claims will be made to the Senior Agent and the Subordinated Notes Indenture Trustees, respectively, as Disbursing Agents, subject to implementing a mechanism with respect to the beneficial interests in the FCC Trust to be held by Holders of Senior Claims and Subordinated Notes Claims. The FCC Trustees may withhold from amounts otherwise distributable from the FCC Trust to any Entity any and all amounts required to be withheld by the FCC Trust Agreement or any law, regulation, rule, ruling, directive, treaty, or other governmental requirement. The Disbursing Agent will provide such Holders with a valuation of the assets transferred to the FCC Trust, and such valuation shall be used consistently by the FCC Trust and such Holders for all U.S. Federal Income Tax Purposes.

**G.        Termination of the FCC Trust**

If created, the FCC Trust shall terminate as soon as practicable, but in no event later than the third anniversary of the Effective Date; *provided that*, on or after the date that is less than 30 days before such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the FCC Trust for a finite period if such an extension is necessary to complete any pending matters required under the FCC Trust Agreement provided that the aggregate of all extensions shall not exceed two years unless the FCC Trustees receive an opinion of counsel or a favorable ruling from the Internal Revenue Service to the effect that any such extension would not adversely affect the status of the FCC Trust as a liquidating trust within the meaning of Section 301.7701-4(d) of the Regulations.  Notwithstanding the foregoing, multiple extensions may be obtained so long as the conditions in the preceding sentence are met no more than six months prior to the expiration of the then-current termination date of the FCC Trust.

**[Remainder of page intentionally left blank]**

## Exhibit A

**Plan of Reorganization**
[Filed as Docket No. 198]

**Exhibit B**

**Declaration of Randy L. Taylor**
**Pursuant to Rule 1007-2 of the Local Bankruptcy Rules**
**for the Southern District of New York in Support of First-Day Pleadings**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| CITADEL BROADCASTING CORPORATION, *et al.*, | ) |
|  | ) Case No. |
| Debtors. | ) |
|  | ) Joint Administration Requested |
|  | ) |

**DECLARATION OF RANDY L. TAYLOR**
**PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE**
**SOUTHERN DISTRICT OF NEW YORK IN SUPPORT OF FIRST-DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Randy L. Taylor, hereby declare as follows under penalty of perjury:

1.       I am the Senior Vice President and Chief Financial Officer of Citadel Broadcasting Corporation ("*Citadel*"), a publicly held company organized under the laws of the State of Delaware and the direct or indirect parent corporation of each of the other debtors and debtors in possession in the above-captioned chapter 11 cases (together with Citadel, collectively, the "*Debtors*").[1]  In this role, I have become familiar with the Debtors' day-to-day operations, businesses, financial affairs and books and records.

---

[1]     The Debtors in these chapter 11 cases are:  Alphabet Acquisition Corp.; Atlanta Radio, LLC; Aviation I, LLC; Chicago FM Radio Assets, LLC; Chicago License, LLC; Chicago Radio Assets, LLC; Chicago Radio Holding, LLC; Chicago Radio, LLC; Citadel Broadcasting Company; Citadel Broadcasting Corporation; DC Radio Assets, LLC; DC Radio, LLC; Detroit Radio, LLC; International Radio, Inc.; KLOS Radio, LLC; KLOS Syndications Assets, LLC; KLOS-FM Radio Assets, LLC; LA License, LLC; LA Radio, LLC; Minneapolis Radio Assets, LLC; Minneapolis Radio, LLC; Network License, LLC; NY License, LLC; NY Radio Assets, LLC; NY Radio, LLC; Oklahoma Radio Partners, LLC; Radio Assets, LLC; Radio License Holding I, LLC; Radio License Holding II, LLC; Radio License Holding III, LLC; Radio License Holding IV, LLC; Radio License Holding V, LLC; Radio License Holding VI, LLC; Radio License Holding VII, LLC; Radio License Holding VIII, LLC; Radio License Holding IX, LLC; Radio License Holding X, LLC; Radio License Holding XI, LLC; Radio License Holding XII, LLC; Radio Networks, LLC; Radio Today Entertainment, Inc.; Radio Watermark, Inc.; San Francisco Radio Assets, LLC; San Francisco Radio, LLC; SF License, LLC; WBAP-KSCS Acquisition Partner, LLC; WBAP-KSCS Assets, LLC; WBAP-KSCS Radio Acquisition, LLC; WBAP-KSCS Radio Group, Ltd.; and WPLJ Radio, LLC.  The principal corporate locations of the Debtors are:  142 West 57th Street, 11th Floor, New York, New York 10019; and 7201 W. Lake Mead Blvd., Suite 400,

(Continued…)

2. On the date hereof (the "***Petition Date***"), each of the Debtors filed a petition with this Court under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Declaration, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

3. This Declaration is submitted pursuant to rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***"), and I am authorized to submit it on behalf of the Debtors.

4. No one individual, including myself, has personal knowledge of all of the facts set forth in this Declaration. Except as otherwise set forth herein, all facts included herein are based upon (i) my personal knowledge of the Debtors' operations and finances; (ii) information learned from review of relevant documents; and/or (iii) information supplied to me by members of the Debtors' management team and our advisors. If called upon to testify, I would testify to the facts set forth herein on that basis.

## **INTRODUCTION**

5. Citadel is the third largest radio broadcasting company in the United States according to both revenue and the number of owned and operated radio stations. Citadel is a major presence in the radio broadcast industry through two business segments: Citadel's radio station segment ("***Citadel Radio***") owns and operates 224 radio stations across the country, and Citadel's radio network segment ("***Citadel Media***") produces and distributes news and talk radio

---

Las Vegas, Nevada 89128. The service address for all of the Debtors is 7201 W. Lake Mead Blvd., Suite 400, Las Vegas, Nevada 89128.

programming to more than 4,000 station affiliates and 8,500 program affiliates. Citadel Radio reaches more than 50 markets in 27 states and the District of Columbia, and Citadel Media owns and broadcasts several of the top programs across the U.S. radio network.

6.    The recent and dramatic economic downturn has left very few businesses and industries unscathed. The media sector — and the radio broadcast business more particularly — is one of the many industries that has been hit the hardest, experiencing a dramatic and significant deterioration in revenues due to the financial crisis. After all, media companies are fueled by advertising dollars, but the economic slowdown has put a chokehold on advertising spending and, as a result, the financial results of such companies have been negatively affected.

7.    Citadel, like many radio, television and newspaper companies, has seen its revenue and profitability decline due to the downturn in advertising spending by companies particularly in the auto, banking and restaurant sectors. Citadel is also highly overleveraged — indebted to its lenders for approximately $2.076 billion in secured loans. Indeed, based on Citadel's current financial position and recent industry performance, Citadel anticipates that it will not be able to comply with the financial covenants imposed by an amendment to its credit agreement as of January 15, 2010.

8.    All of these factors, which have been highly publicized in the marketplace, have contributed to increasing pressure from competitors in light of the instability surrounding Citadel's existing capital structure. Recognizing all of this, Citadel determined that an expeditious balance sheet restructuring was key to its future success.

9.    To that end, and beginning as early as April 2009, the Debtors explored, with the assistance of their advisors from Kirkland & Ellis LLP and Lazard Fréres & Co. LLC ("**Lazard**"), several strategic alternatives to restructure their balance sheet, including the

3

possibility of both a sale transaction and a standalone recapitalization.  When it was ultimately determined that a standalone restructuring would result in the maximization of value for these estates, Citadel immediately turned its attention to negotiating a balance sheet restructuring to ensure that Citadel maintained the operational flexibility necessary to compete in a competitive marketplace.  Citadel was successful.

10.    After more than six months of intense and protracted negotiations among Citadel, JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement (as defined below), and a steering committee of Citadel's prepetition secured lenders, detailed terms regarding the parameters of a global financial restructuring — which restructuring will serve as the foundation for maximizing the value of these estates for the benefit of all parties in interest — have been agreed upon.  Indeed, over 60% of all senior lenders have confirmed their support for a detailed framework of Citadel's restructuring, the terms of which are reflected in the term sheet annexed as **Exhibit 1** to the Plan Support Agreement attached hereto as **Exhibit A** (the "***Plan Support Agreement***").  And this is notable considering that only private-side lenders were solicited for support before the Petition Date.

11.    Specifically, the key terms of the Debtors' pre-negotiated restructuring are as follows:

- The Debtors' secured lenders (the "***Prepetition Lenders***") – on account of claims of approximately $2.076 billion – will receive a pro rata share of (i) a new term loan in the principal amount of $762.5 million, with a 5-year term and an interest rate of LIBOR + 800 (and a LIBOR floor of 3%) and (ii) 90% of the new common stock (the "***New Common Stock***") of reorganized Citadel ("***Reorganized Citadel***"), subject to dilution for distributions of New Common Stock under Reorganized Citadel's management equity incentive program and/or director equity incentive program.

- Holders of unsecured claims, including any deficiency claims of the Prepetition Lenders', will have the option to receive either (i) a pro rata share of 10% of the

4

New Common Stock or (ii) cash in an amount equal to 5% of the unsecured claim (capped at $2 million).

- Shares of New Common Stock will be distributed pursuant to an allocation mechanism designed to ensure compliance with the attribution and foreign ownership rules and regulations of the Federal Communications Commission (as set forth in **Annex 1** to **Exhibit 1** attached to **Exhibit A** annexed hereto).

- All equity interests in the Debtors, including common stock, preferred stock and any options, warrants or rights to acquire any equity interests, will be cancelled or extinguished and the holders thereof shall not receive a distribution on account of such equity interests.

12.     With the support of over 60% of its secured lenders (who have executed the Plan Support Agreement) for a restructuring that will result in a net reduction of approximately $1.4 billion in long-term indebtedness, and having analyzed and diligenced (over the course of several months) various legal impediments and issues that were critical to resolve in connection with any recapitalization transaction, Citadel intends to move forward with its pre-negotiated restructuring as quickly as possible.  Indeed, the Plan Support Agreement requires the Debtors to file a plan and disclosure statement within 45 days after the Petition Date and obtain an order confirming their plan within 180 days.  Citadel is hopeful that the milestone dates in the Plan Support Agreement are truly "outside dates," as Citadel intends to effectuate the restructuring process swiftly to ensure the least amount of business disruption and accomplish an immediate repositioning of Citadel for future growth and success.

13.     To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and ensure that their restructuring goals can be implemented with limited disruption to operations, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "***First Day Pleading***" and, collectively, the "***First Day Pleadings***"), filed concurrently herewith.  I am familiar with the contents of each of the First Day Pleadings, and I

believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

14.    In fact, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to use cash on hand and make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

15.    To assist the Court in becoming familiar with the Debtors and the initial relief sought by the Debtors to stabilize operations and facilitate their balance sheet restructuring, I have organized this Declaration into four parts.  Part I provides background information with respect to the Debtors' business operations and corporate history, as well as a summary of the Debtors' prepetition capital structure.  Part II describes the circumstances leading to the commencement of these chapter 11 cases.  Part III and **Exhibit O** hereto describe the relief sought by the Debtors in each of the First Day Pleadings.  Part IV provides an overview of **Exhibits C**, **D**, **E**, **F**, **G**, **H**, **I**, **J**, **K**, **L**, **M** and **N** attached hereto, which in turn set forth certain additional information about the Debtors, as required by Local Rules 1007-2(a) and (b).

## PART I

## GENERAL BACKGROUND

**A.    The Debtors' Businesses**

16.    Citadel is the third largest radio broadcasting company in the United States when measured both according to revenue and the number of owned and operated stations.  Citadel's business operations are divided into two segments: Citadel Radio, which owns and operates radio stations across the country, and Citadel Media, which produces and distributes news and

talk radio programming to more than 4,000 station affiliates and 8,500 program affiliates.[2]  In 2008, Citadel Radio and Citadel Media together generated total revenues of approximately $863 million.

17.     The operation of Citadel Radio's 224 radio stations represents approximately 79 percent of the company's total revenues.   These stations serve more than 50 different geographical areas (typically, a city or combination of cities), which the Debtors refer to as markets.   These markets are located across 27 states and the District of Columbia.   Citadel Radio ranks first or second in audience share in 29 of its markets, as reported by Arbitron, Inc. ("**Arbitron**"), a media and market research firm.

18.     Citadel's other reportable segment, Citadel Media, represents approximately 21 percent of Citadel's total revenues.  Citadel Media produces and distributes news and talk radio programming featuring well-known personalities including Mike Huckabee, Joe Scarborough, Mark Levin and Michael Baisden and content such as *ABC News* to more than 4,000 station affiliates and 8,500 program affiliates.  Citadel Media is one of the three largest radio networks in the country.

19.     As of the date hereof, Citadel employs approximately 4,200 people.

20.     Until March 6, 2009, Citadel was publicly traded on the New York Stock Exchange under the symbol CDL.  Since then, Citadel has traded on the Over the Counter Bulletin Board under the symbol CTDB.  As of October 30, 2009, Citadel had 265,759,192 outstanding shares of common stock.  The last reported sales price of stock was $0.01 per share (as of December 15, 2009).

---

[2]    Citadel's corporate organizational chart is attached hereto as **Exhibit B**.

### i.    Radio Industry

21.    The radio industry is a proven advertising medium with strong historical growth. From 1971 to 2008, the industry enjoyed a 7.1 percent compound annual growth rate. Substantially all of the radio industry's revenues arise from advertising. In 2008, revenue from radio advertising measured approximately $17.4 billion.



22.    As an advertising medium, radio has remained stable with a relatively consistent share of national and local advertising expenditures. Despite the emergence of the internet, which has had a significant impact on advertising in print and other traditional media, the radio sector's share of the total media advertising revenue has remained at 7 - 8 percent over the last 20 years.

23.    Approximately 75 percent of adults in the United States listen to the radio every day. Thus, radio's daily reach is surpassed only by television as a leading media. Moreover, when measured on a weekly basis, more than 90 percent of Americans listen to the radio each week in almost every age group.



Source: Arbitron RADAR 101 - June 2009, Mon-Sun 6a-12mid, Weekly cumes

24.    According to industry observers, radio faces limited competition from alternate media sources, particularly during listeners' commutes.  While radio garners a 24 percent share of overall adult media consumption, radio enjoys approximately 75 percent share of media consumption during transit.  Approximately 77 percent of Americans drive to work alone, with another 11 percent carpooling.  For commuters, the primary media sources are radio and outdoor advertising.  Since transit accounts for 11 percent of a consumer's overall media consumption, this limited competing and captive audience make radio a valuable medium for advertisers.  Radio also benefits from a sustained trend of longer commutes.  Since 1982, average commuting times have more than doubled across metropolitan areas of all sizes.

25.    Radio is a relatively low cost medium for advertisers, as it offers both cost effective production and rapid turnaround for new advertising spots, in favorable comparison to other major media categories such as television, internet, newspapers and magazines.

### ii.    Citadel Radio

26.    Citadel Radio owns and operates 224 radio stations (166 FM and 58 AM radio stations) and holds Federal Communications Commission ("***FCC***") licenses in more than 50 markets located in 27 states and the District of Columbia.    Thus, Citadel's radio broadcast operations are subject to significant regulation by the FCC under the Communications Act of 1934 (the "***Communications Act***").    A radio station may not operate without authorization of the FCC.    Approval of the FCC is required for the issuance, renewal and transfer of station operating licenses.    The Communications Act also empowers the FCC to regulate other aspects of Citadel's business in addition to imposing licensing requirements.

27.    Citadel Radio is the third largest radio operator in the country based on net broadcasting revenue and the number of stations owned and operated.    Citadel Radio also enjoys a strong market position within each of its markets based on audience share, as it ranks first or second in audience share in 29 of its markets.

28.    Citadel Radio's portfolio is highly diversified: stations are located in markets throughout the country and serve diverse target demographics through a range of programming formats such as rock, country, oldies, urban and sports/news/talk.    Similarly, Citadel Radio's advertising is comprised of a broad range of industries, including many of the top advertising industries.  Citadel Radio's management believes that maintaining this diversity enables Citadel Radio to avoid dependence on any particular local economy, market, format, on-air personality, advertiser or advertising industry.

29.    During the year ended December 31, 2008, Citadel Radio represented approximately 79 percent of Citadel's consolidated net revenue, and 91 percent of Citadel's total assets.

10

30. Citadel Radio's 224 radio stations are comprised of 24 large market stations (the "***Former ABC Stations***") and 200 middle and smaller market stations (the "***Legacy Stations***"). As described in detail below, the Former ABC Stations operate in large radio markets and were acquired by Citadel in a 2007 merger transaction with subsidiaries of The Walt Disney Company (this merger is described in detail below). The Legacy Stations operate in small and mid-sized radio markets, and were owned and operated by the company before the 2007 merger. The map below indicates the location and station name for each of Citadel Radio's 224 radio stations.

**STATION PORTFOLIO OF THE COMPANY**

*Source: Company filings and BIA as of December 2009.*

Note: In addition to the stations on this map, Citadel owns WHLD (AM) and WBBF (AM) in Buffalo, and KJQS (AM) and KFNZ (AM) in Salt Lake City. These stations are operated by third parties through local market agreements and are excluded from station count figures.



### a.    The Former ABC Stations

31.    The Former ABC Stations (16 FM and 8 AM stations) are located in nine of the top 16 Designated Market Areas (as defined by Arbitron).  As shown on the map immediately below, Citadel Radio operates radio stations in each of Los Angeles, New York, Chicago, Dallas/Ft. Worth and San Francisco, which represent, respectively, the top five largest radio markets in the country.



**PORTFOLIO OF ABC STATIONS**

Minneapolis-St. Paul, MN
KQRS (FM)
KXXR (FM)
WGVX/Y/Z (FM)

Chicago, IL
WLS (AM)
WLS (FM)

Detroit, MI
WDRQ (FM)
WDVD (FM)
WJR (AM)

New York, NY
WABC (AM)
WPLJ (FM)

Washington, DC
WVRX (FM)
WMAL (AM)
WRQX (FM)

San Francisco, CA
KGO (AM)
KSFO (AM)

Los Angeles, CA
KABC (AM)
KLOS (FM)

Dallas-Ft. Worth, TX
KPMZ (FM)
KSCS (FM)
WBAP (AM)

Atlanta, GA
WKHX (FM)
WYAY (FM)

*Source:  Company filings and BIA as of December 2009.*

12

32.    Many of these Former ABC Stations have well-established, highly-recognizable brands in the markets in which they operate.  Further, these stations maintain strong ratings in their targeted demographics and have loyal listener bases.[3]

| Market City | National Radio Market Ranking | Audience Share in Market |
|---|---|---|
| New York | 1st | 6.0% |
| Los Angeles | 2nd | 4.0% |
| Chicago | 3rd | 5.8% |
| San Francisco | 4th | 8.5% |
| Dallas/Ft. Worth | 5th | 7.2% |
| Atlanta | 7th | 6.6% |
| Washington D.C. | 9th | 7.9% |
| Detroit | 11th | 12.2% |
| Minneapolis-St. Paul | 16th | 15.8% |

###    b.    The Legacy Stations

33.    The Legacy Stations (150 FM and 50 AM stations) are located in middle and smaller markets across the country.  Citadel Radio has dominant station clusters in the majority of these markets.  This means that, by operating multiple radio stations that cover a particular market, Citadel Radio enjoys significant audience share in that market.  Specifically, as of February 2009, Citadel Radio ranked first or second in market share revenue in 34 of its 45

---

[3]    *Source: Company filings and BIA as of April 2009.*

ranked markets, as determined by Arbitron. Citadel Radio presently ranks first or second in audience share in 29 of these ranked markets.

34. These clusters are geographically dispersed. The map below indicates the location and station names of each of the Legacy Stations.

**PORTFOLIO OF CITADEL LEGACY STATIONS**

*Source: Company filings and BIA as of December 2009.*

Note: In addition to the stations on this map, Citadel owns WHLD (AM) and WBBF (AM) in Buffalo, and KJQS (AM) and KFNZ (AM) in Salt Lake City. These stations are operated by third parties through local market agreements and are excluded from station count figures.

35.    The Legacy Stations are generally grouped in six geographical regions: Northeast, Southeast, Midwest, West, New York and South.

| **Region** | **Number of Stations (FM/AM)** | **Number of Markets** |
|---|---|---|
| **Northeast** | 45 (36/9) | 13 |
| **Southeast** | 29 (22/7) | 7 |
| **Midwest** | 36 (27/9) | 9 |
| **West** | 36 (26/10) | 7 |
| **New York** | 16 (12/4) | 4 |
| **South** | 38 (27/11) | 7 |

### iii.    Citadel Media

36.    Citadel Media produces and distributes syndicated talk shows, music and news programs, and other radio programming and formats to more than 4,000 station affiliates and 8,500 program affiliates.  Citadel Media is among the top three largest radio networks in the country; collectively, these three networks (Citadel Media, Premiere Radio Networks and Westwood One) command a significant majority of total market share.

37.    Generally speaking, Citadel Media distributes its programming to the entire radio market, including competitors of the Debtors' owned and operated radio stations.  Syndicated and 24-hour content is typically offered on an exclusive basis to one station in a particular market.  In exchange for the right to broadcast the Citadel Media programming, stations will remit a portion of their advertising time, which Citadel Media can sell to network advertisers, and in some cases an additional cash fee.  Citadel Media also pays a cash fee to stations to air its network commercials.  These commercials are aggregated and sold to advertisers as part of a

15

radio network.  In some instances, Citadel Media may also pay certain stations to air its programming depending on the station size and the size of the market.  In contrast to Citadel Radio, which typically sells to local advertisers on a station-by-station basis, the majority of the advertisements sold by Citadel Media are sold to national advertisers.

38.    Citadel Media produces and distributes news and talk radio programming featuring well-known personalities including Mike Huckabee, Joe Scarborough, Mark Levin and Michael Baisden.  Citadel Media also provides affiliates with various content such as *ABC News* and eight different 24-hour music formats.

39.    Citadel Media is also the exclusive sales representative for ESPN Radio Network, which produces programming such as ESPN SportsCenter, Mike & Mike In The Morning, hosted by Mike Greenberg and former NFL player Mike Golic, and national broadcasts of Major League Baseball, the National Basketball Association and the Bowl Championship Series.  Pursuant to the sales representation agreement between the parties, entered into on June 12, 2007, Citadel Media solicits and negotiates the sale of advertising on behalf of ESPN Radio Network and manages advertising trafficking, billing and collection in exchange for a portion of the net sales generated on behalf of ESPN Radio Network.  Pursuant to the terms of this agreement, Citadel collects and retains cash on ESPN's behalf, ultimately remitting such cash to ESPN.

40.    During the year ended December 31, 2008, Citadel Media represented approximately 21 percent of Citadel's consolidated net revenue, 10 percent of segment operating income and 8 percent of Citadel's total assets.

### iv.    Advertising Revenue

41.    Citadel, like its competitors in the radio industry, generates substantially all of its revenue from the sale of advertising.  Citadel's advertising segments are diversified, with no one

industry or customer group accounting for more than approximately 15 percent of its advertising.  Moreover, no single advertising customer accounts for more than 5 percent of the Debtor's net broadcasting revenues.  In 2008, for example, advertising revenues among the top 6 industry categories was diversified among the following: automotive; retail; medical; financial; entertainment; and food stores/supermarkets.

42.    Approximately two-thirds of Citadel's consolidated gross revenue is generated by local advertisers.  Citadel Media's revenue is generated from national accounts or advertisers.

**B.    Citadel's Corporate History**

43.    Citadel was formed on June 26, 2001, through a leveraged buyout transaction in which affiliates of Forstmann Little & Co. (collectively, "***Forstmann***") acquired Citadel's corporate predecessor, Citadel Communications Corporation, for an aggregate purchase price -- including the redemption of debt and exchangeable preferred stock -- of approximately $2.0 billion.  Citadel Communications Corporation thereafter became a wholly-owned subsidiary of Citadel.

44.    At the time of its initial formation, Citadel had approximately 200 stations and $323.5 million in revenue for the full year ended December 31, 2001.

45.    Since 2001, Citadel grew its operations both internally and through the acquisition of stations that serve mid-sized markets.  By June 2003, Citadel had become the sixth largest radio broadcasting company in the United States based on net broadcasting revenue, owning and operating 144 FM and 63 AM radio stations in 42 mid-sized and small markets located in 24 states across the country.  Notably, and reflective of Citadel's substantial growth, approximately 69% of the 207 owned and operated stations at that time had been acquired by the company after January 1, 1999, of which 80 percent were in new markets and 20 percent were designed to supplement the company's existing portfolios.

17

### i.    2003 Initial Public Offering

46.    On August 6, 2003, Citadel completed an initial public offering (an "*IPO*") of 25.3 million shares of common stock at $19.00 per share, resulting in net proceeds of approximately $448.0 million.    Immediately following the IPO, Forstmann owned approximately 80 percent of Citadel's outstanding common stock.[4]    On February 18, 2004, Citadel Broadcasting sold an additional 9.63 million shares.

### ii.    2007 ABC Merger

47.    On February 6, 2006, Citadel, along with one of its wholly-owned subsidiaries, Alphabet Acquisition Corp., entered into an Agreement and Plan of Merger with The Walt Disney Company ("*Disney*") and one of its wholly-owned subsidiaries, ABC Radio Holdings, Inc., formerly known as ABC Chicago FM Radio, Inc. ("*ABC Radio*") (the "*ABC Merger Agreement*").    Under the terms of the ABC Merger Agreement, through a series of restructuring transactions and a merger (the "*Merger*"), Citadel acquired Disney's ABC Radio Network business (now known as "*Citadel Media*"), which produces and distributes radio programs and formats, as well as Disney's 24 major market radio stations (collectively, the "*ABC Radio Business*").    Following the Merger, Citadel's pre-merger stockholders owned approximately 42.5 percent of Citadel's outstanding common stock, and Disney's stockholders owned the remaining approximately 57.5 percent of Citadel's outstanding common stock.

48.    The Merger involved three distinct steps, the details of which are set forth immediately below.

---

[4]    Forstmann continues to be a major stakeholder of Citadel.  As of July 30, 2009, Forstmann owns approximately 29% of the company's outstanding common stock.

49.    *First*, on February 6, 2006, Disney and ABC Radio entered into a Separation Agreement (the "***Separation Agreement***") to separate the ABC Radio Business assets from the rest of Disney's businesses.    Pursuant to the Separation Agreement, and before the consummation of the Merger, the ABC Radio Business assets were transferred from Disney to ABC Radio and its subsidiaries.

50.    *Second*, on June 5, 2007, ABC Radio incurred $1.35 billion of debt (the "***ABC Radio Debt***"), which cash Disney retained.    Thereafter, on June 12, 2007, Disney distributed all of the outstanding common stock of ABC Radio pro rata to Disney's stockholders through a spin-off (the "***Spin-Off***").    In the Spin-Off, each Disney stockholder received approximately 0.0768 shares of ABC Radio common stock for each share of Disney common stock.

51.    *Third*, on June 12, 2007, Citadel's subsidiary, Alphabet Acquisition Corp., was merged with and into ABC Radio, with ABC Radio continuing as the surviving corporation and becoming a wholly-owned subsidiary of Citadel.    ABC Radio's name was then changed to Alphabet Acquisition Corp.    The Merger became effective on June 12, 2007, at which time each share of ABC Radio common stock was converted into the right to receive one share of Citadel's common stock.    Citadel issued 151,707,512 shares of its common stock to Disney's stockholders.[5]

---

[5]    In connection with the consummation of the transactions contemplated by the Separation Agreement and the ABC Merger Agreement, on June 12, 2007, Citadel, Disney and ABC Radio entered into a Tax Sharing and Indemnification Agreement (the "***Tax Sharing and Indemnification Agreement***") that allocates (i) the responsibility for filing tax returns and preparing other tax-related information and (ii) the liability for payment and the benefit of refund or other recovery of taxes. The Tax Sharing and Indemnification Agreement also provides for certain additional representations, warranties, covenants and indemnification provisions relating to the preservation of the tax-free status of Disney's internal restructuring and the distribution of ABC Radio common stock to the stockholders of Disney in the Spin-Off.

52.     To effectuate the Merger, on June 12, 2007, Citadel entered into a new credit agreement to, among other things, (a) finance the payment of a special distribution to Citadel's pre-merger stockholders of record of company common stock in connection with the Merger (the "***Special Distribution***"); (b) refinance Citadel's existing senior credit facility; (c) refinance the ABC Radio Debt; and (d) complete the Merger.  The terms of this financing are set forth immediately below in Section C.

## C.     Summary of Prepetition Indebtedness

53.     As of the date hereof, Citadel has prepetition indebtedness of approximately $2.126 billion, including $2.076 billion of secured debt (collectively, the "***Secured Debt***") and $49.6 million of unsecured, convertible notes.  Citadel also is party to a secured interest rate swap agreement.  The following chart summarizes Citadel's prepetition indebtedness:

| Financing | Original Amount | Outstanding Amount (estimated as of 12/20/09) [6] | Maturity Date | Security |
|---|---|---|---|---|
| Revolving Credit Facility | $200M[7] | $140.6M | June 2013 | Secured |
| Tranche A Term Loan | $600M | $544.8M | June 2013 | Secured |
| Tranche B Term Loan | $1,535M | $1,390.2M | June 2014 | Secured |
| Interest Swap Agreement | $1,067.5M | $970M[8] | September 2012 | Secured |
| 8.0% Convertible Subordinated Notes[9] | $330M | $49.6M[10] | February 2011 | Unsecured |

### i.    The Secured Debt

54.    Citadel's Secured Debt consists of: (a) a $200 million six-year revolver (the "***Revolver***")[11] due June 2013; (b) a $600 million six-year Tranche A term loan (the "***Tranche A Term Loan***") due June 2013; and (c) a $1.535 billion seven-year Tranche B term loan (the

---

[6]    The outstanding balances as of December 20, 2009 for the Revolving Credit Facility, Tranche A Term Loan and Tranche B Term Loan include accrued paid-in-kind interest through December 20, 2009.

[7]    The amount reflects that which was originally available under the Revolving Credit Facility.

[8]    The amount indicated as of December 20, 2009 represents the current notional amount of the interest rate swap. The termination value of the interest rate swap is calculated based on the present value of the estimated remaining payments under the swap agreement and will be determined as of the termination date, which is expected to be significantly less than the notional amount of the swap agreement.

[9]    As noted below, approximately $500,000 of outstanding convertible, subordinated notes are comprised of notes that were issued by Citadel on February 18, 2004, and were not tendered by their holders in connection with a tender and exchange offer made by Citadel in 2008.

[10]    The outstanding balance as of December 20, 2009 for the 8.0% Convertible Subordinated Notes includes accrued interest through December 20, 2009.

[11]    The availability under the Revolver was reduced to $150 million and later to $140 million pursuant to certain amendments to the Credit Agreement (as defined below).

"***Tranche B Term Loan***") due June 2014.  As of the date hereof, $2.076 billion in Secured Debt

is outstanding.    This balance includes $140.6 million outstanding on the Revolver,

$544.8 million outstanding on the Tranche A Term Loan, and $1,390.2 million outstanding on

the Tranche B Term Loan.

55.    The Secured Debt is memorialized by that certain Credit Agreement, dated as of

June 12, 2007, by and among Citadel Broadcasting Corporation, certain lenders, JPMorgan

Chase Bank, N.A., as administrative agent (the "***Prepetition Agent***"), Bank of America, N.A.

and Deutsche Bank Trust Company Americas, as syndication agents, Credit Suisse, Cayman

Islands Branch and Wachovia Bank, National Association, as documentation agents, J.P.

Morgan Securities Inc., as sole lead arranger and sole bookrunner, and Banc Of America

Securities LLC, Deutsche Bank Securities Inc., Credit Suisse Securities (USA) LLC, Wachovia

Capital Markets, LLC, Bear, Stearns & Co. Inc. and Goldman Sachs Credit Partners L.P., as

joint arrangers (the "***Credit Agreement***").

56.    The obligations under the Credit Agreement are unconditionally guaranteed by

Citadel's operating subsidiaries, including each of the Debtors (collectively, the "***Subsidiary

Guarantors***").    The debt issued under the Credit Agreement is secured by a first priority

security interest in certain assets and real property of the Debtors.

57.    The Credit Agreement has been amended and modified from time to time.  Most

recently, on March 26, 2009, the parties entered into the Fourth Amendment to the Credit

Agreement to, among other things, waive certain financial covenants through 2009 while

imposing new monthly and other covenants for 2009 and 2010.  Based on Citadel's current

financial position and recent industry performance, Citadel anticipates that it will not be able to

comply with the financial covenants imposed by the Fourth Amendment, which covenants go

into effect on January 15, 2010.  Nonetheless, as of the date hereof, Citadel is in compliance with the terms of the Credit Agreement, as amended.

### ii.    Swap Agreements

58.    Citadel is party to an amortizing interest swap agreement, which it uses to manage its exposure to the variability of future cash flows related to its floating interest rate obligations under its Credit Agreement.  The swap agreement is memorialized by: (a) the ISDA 2002 Swap Master Agreement between JPMorgan Chase Bank, N.A. ("***Chase***") and Citadel Broadcasting, dated June 26, 2007, which sets forth the terms and conditions by which the swap transaction will be governed; and (b) the Interest Rate Swap Transaction between Chase and Citadel, dated June 27, 2007, whereby Citadel Broadcasting pays a quarterly fixed amount to Chase and Chase pays a quarterly floating amount (derived from LIBOR) to Citadel as per the terms of the agreement and the Master Agreement from the period commencing July 12, 2007 through September 30, 2012 (collectively, the "***Swap Agreements***").

59.    As of the date hereof, the notional amount of the Swap Agreement is $970 million.

### iii.    Convertible Subordinated Notes

60.    As of the date hereof, Citadel presently has approximately $49.6 million of outstanding convertible, subordinated notes (the "***Notes***").   The outstanding Notes are comprised primarily of amended Notes that were issued by Citadel as part of a negotiated tender and exchange offer in 2008.  Approximately $0.5 million of Notes were issued by Citadel on February 18, 2004 and were not tendered by their holders as part of the 2008 exchange offering. The Notes have a stated maturity date of February 2011 and may be converted to Citadel common stock under certain conditions.  While the Notes had an annual interest rate of 1.875 percent per year when issued, pursuant to the terms of the indenture agreement dated June 11,

23

2008 between Citadel and Wilmington Trust Company, as trustee (the "***Notes Indenture***"), the annual interest rate of the outstanding exchanged Notes (excluding those Notes that were not tendered as part of the exchange) was 4% in 2008 and increased to 8.0 percent per year as of January 1, 2009.

61.    Pursuant to the terms of the Fourth Amendment to the Credit Agreement, Citadel presently may not repurchase the Notes, except under limited circumstances.  Moreover, the Fourth Amendment requires Citadel, before January 15, 2010, to negotiate with the holders of the Notes to, among other things, amend the maturity date of the Notes to no earlier than September 30, 2014 and eliminate any principal payments until that time.  A default under the Credit Agreement would also constitute a default under the Notes Indenture.

## PART II

### EVENTS LEADING TO THE
### COMMENCEMENT OF THESE CHAPTER 11 CASES

62.    Over the past year, Citadel has experienced declining profitability as a result of the economic downturn.  Citadel, like its competitors, derives substantially all of its revenue from advertising.  For this reason, the financial crisis, with its particular impact on consumer-driven segments, has had a significant negative impact on advertising.  Significant sources of Citadel's advertising revenues relate to several beleaguered consumer-driven sectors (*e.g.*, auto, retail, financial services and entertainment).

63.    Coupled with Citadel's highly leveraged capital structure, the effects of the economic downturn beginning in 2008 (which has continued through 2009) forced Citadel to consider a variety of options to delever its balance sheet and address the continuing impact of a slow economy.  These factors, combined with a decline in operating performance, created uncertainty regarding Citadel's ability to continue to comply with the debt and financial

24

covenants in its Credit Agreement in 2009. As a result, on March 26, 2009, Citadel entered into the Fourth Amendment to the Credit Agreement. The Fourth Amendment, among other things, suspended certain financial covenants through 2009 while imposing new monthly and other covenants for 2009 and 2010.

64.      In search of a more permanent solution to its balance sheet concerns, Citadel together with its advisors from Lazard, Freres & Co. Inc. ("*Lazard*") and Credit Suisse Securities (USA) LLC ("*Credit Suisse*"), explored several strategic alternatives, including a potential recapitalization and/or sale through an outside sponsor(s). A formal marketing process was launched in June 2009. After discussions with Citadel, the Prepetition Agent and the Prepetition Lenders, Lazard and Credit Suisse formally contacted 14 potential investors/sponsors with significant knowledge and experience in the radio industry. Of these potential sponsors, four executed confidentiality agreements and were provided with a confidential information memorandum that included Citadel's financial information for the years 2007 through 2009, as well as various other financial details regarding Citadel's businesses.

65.      Citadel received four preliminary written indications of interest from potential purchasers. Lazard presented the four indications of interest, together with a verbal indication from a fifth party, to the Prepetition Agent. After considering the various offers and discussing them with Citadel's board of directors, its advisors and the Prepetition Agent, Citadel determined that a sale of its businesses or third-party sponsor investment at the levels of interest indicated would not result in the maximization of value of these estates. Instead, Citadel and its advisors believed that a standalone restructuring was more attractive from a value proposition. Thus, beginning in late July, Citadel focused its efforts on pursuing a standalone reorganization.

Over the course of the last six months, Citadel and its advisors, the Prepetition Agent and a steering committee of Citadel's prepetition secured lenders engaged in on going negotiations and analyses concerning a restructuring of the Debtors' businesses. After much back and forth, including the resolution of several complicated legal issues, one of which relates to restrictions that arise in connection with the prepetition lenders owning interests in an FCC-regulated entity, Citadel and over 60% of its secured lenders have agreed on the framework of a chapter 11 plan of reorganization, which will result in the elimination of approximately $1.4 billion in indebtedness.

66.    As a result, for the foregoing reasons, Citadel has concluded that it is in the best interests of its business, creditors and stakeholders to commence these chapter 11 cases to, among other things, implement the pre-negotiated restructuring agreement entered into with Citadel's Prepetition Lenders and effectuate a significant restructuring of Citadel's outstanding indebtedness.

## PART III

## RELIEF SOUGHT IN THE DEBTORS' FIRST DAY PLEADINGS

67.    It is critically important for Citadel to maintain the services, loyalty and goodwill of, among other constituencies, its employees, on-air talent, affiliates, vendors and customers. Achieving this goal is likely to be particularly challenging while operating in chapter 11. The Debtors have filed First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant consequences because parties may refuse to continue to provide services to, or do business with, the Debtors.

68.     Several of the First Day Pleadings request authority to pay certain prepetition claims.  I am told by my advisors that rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims into those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

69.     I have reviewed each of the First Day Pleadings.  The facts stated therein and attached hereto as **Exhibit O** are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

## PART IV

## INFORMATION REQUIRED BY LOCAL RULE 1007-2

70.     I am told by my advisors that Local Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibits C**, **D**, **E**, **F**, **G**, **H**, **I**, **J**, **K**, **L**, **M** and **N**.  Specifically, these exhibits contain the following information with respect to the Debtors:[12]

---

[12]   The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective

(Continued…)

- Pursuant to Local Rule 1007-2(a)(3), **Exhibit C** hereto provides the following information: the name and address of the attorneys to the steering committee of the Debtors' secured lenders and a brief description of the circumstances surrounding the formation of this committee and the approximate date of its formation.

- Pursuant to Local Rule 1007-2(a)(4), **Exhibit D** hereto provides the following information with respect to each of the holders of the Debtors' 50 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); telephone number; the name(s) of person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Rule 1007-2(a)(5), **Exhibit E** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim and whether the claim or lien is disputed.

- Pursuant to Local Rule 1007-2(a)(6), **Exhibit F** hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Rule 1007-2(a)(8), **Exhibit G** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name, address, and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Rule 1007-2(a)(9), **Exhibit H** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business. The Debtors' corporate headquarters are located at 142 West 57th Street, New York, New York 10019; and 7201 W. Lake Mead Blvd., Suite 400, Las Vegas, Nevada 89128.

- Pursuant to Local Rule 1007-2 (a)(10), **Exhibit I** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

---

corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

- Pursuant to Local Rule 1007-2(a)(7), **Exhibit J** attached hereto provides information on the Debtors' outstanding publicly held securities.

- Pursuant to Local Rule 1007-2 (a)(11), **Exhibit K** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Rule 1007-2 (a)(12), **Exhibit L** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Rule 1007-2 (b)(1)-(2)(A), **Exhibit M** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amounts to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30 day period following the filing of the Debtors' chapter 11 petitions.

- Pursuant to Local Rule 1007-2 (b)(3), **Exhibit N** hereto provides a schedule for the 30-day period following the filing of these chapter 11 cases, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __20th__ day of December 2009.

By: _____

Name:    Randy L. Taylor

Title:    Chief Financial Officer

         Citadel Broadcasting Corporation

**<u>Exhibit A</u>**


**Plan Support Agreement**

EXECUTION COPY

December 16, 2009

To the Holders of Lender Claims
Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Citadel Broadcasting Corporation ("Citadel") and certain of its domestic subsidiaries (together with Citadel, collectively the "Debtors") will propose a joint chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of the undersigned, which are lenders (the "Lenders") party to that certain Credit Agreement dated as of June 12, 2007 (as amended, modified or otherwise supplemented from time to time, the "Credit Agreement"), among Citadel, the Lenders, JPMorgan Chase Bank, N.A., as administrative agent thereunder (in such capacity, the "Agent"), and the other parties signatory thereto.

Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, "pre-arranged" cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which Chapter 11 Cases the Debtors will seek to have jointly administered. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will provide for, among other things, certain distributions on account of the claims of the Lenders under the Pre-Petition Senior Obligations (the "Lender Claims").

2.    Representations and Warranties of the Participating Lenders

Each Lender identified as a holder of Lender Claims on the signature pages hereto (such Lenders, the "Participating Lenders") represents and warrants to the Debtors that, as of the date hereof:

2

(a)      Such Participating Lender (i) either (A) is the sole beneficial owner of the principal amount of Lender Claims set forth below under its signature hereto, or (B) has sole investment or voting discretion with respect to the principal amount of Lender Claims set forth below under its signature and has the power and authority to bind the beneficial owner(s) of such Lender Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Lender Claims and to dispose of, exchange, assign and transfer such Lender Claims. For the purposes of this Agreement, "Participating Lenders" shall not include (A) a holder of Lender Claims signatory hereto in its capacity or to the extent of its holdings as a broker, dealer or market maker of Lender Claims or any other claim against or security in the Debtors or (B) any subsidiary or affiliate of a holder of Lender Claims signatory hereto (x) over which the holder of Lender Claims does not have corporate authority or control or (y) whose credit decisions, including credit decisions to be bound by agreements such as this Agreement, under the internal policies or rules of such subsidiary or holder, are not subject to control by such holder.

(b)      Such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Lender Claims that are subject to this Agreement that are inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)      Such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

3.      Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long as no Support Termination Event (as hereinafter defined) shall have occurred, and except as Citadel may expressly release the Participating Lenders in writing from any of the following obligations, each Participating Lender shall and shall cause each of its affiliates, subsidiaries, managed funds, representatives, agents and employees set forth on the signature page attached hereto for such Participating Lender (in each case, except to the extent such affiliates, subsidiaries, managed funds, representatives, agents and employees would be excluded from the definition of "Participating Lender" under the last sentence of clause (a) of Section 2 above) to: (a) (i) (A) vote its Lender Claims to accept any Plan proposed by the Debtors incorporating the terms and conditions set forth on the term sheet annexed hereto as Exhibit 1 (which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 9 hereof, the "Restructuring Term Sheet")), which Plan shall be consistent in all material respects with this Agreement and the Restructuring Term Sheet and contain no other provisions materially adverse to the Lenders

509265-0806-00421-Active.11758144.25

except as the Agent and the Requisite Participating Lenders may expressly consent in writing (a "Qualified Plan") and (B) deliver its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn) provided that such vote may be revoked or withdrawn immediately upon occurrence of a Support Termination Event, (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, provided that no Participating Lender shall be obligated to incur material out of pocket expenses pursuant to this paragraph 3, (c) not object to, or vote any of its Lender Claims to reject, a Qualified Plan, support directly or indirectly any such objection or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Plan, the related disclosure statement (which disclosure statement shall be in form and substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement and the Restructuring Term Sheet (the "Disclosure Statement")) or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Lender Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support the release provisions in favor of the Debtors and its agents, including their respective officers, directors and employees, as reflected in the Restructuring Term Sheet.

Each Participating Lender agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors with the Securities and Exchange Commission and any other regulatory agency to which the Debtors may be subject of the contents of this Agreement, including, but not limited to, the aggregate Lender Claims held by all Participating Lenders; provided that (i) the Debtors shall provide a draft of such disclosure to the Agent (on behalf of the Participating Lenders) and a reasonable amount of time to review such draft prior to such disclosure being made and (ii) the Debtors shall not disclose the amount of any individual Lender Claim, except as otherwise required by applicable law.

4.    Transfer of Lender Claims

Each Participating Lender agrees that so long as this Agreement has not been terminated in accordance with its terms it shall not directly or indirectly (a) grant any proxies to any person in connection with its Lender Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in ("Transfer") any Lender Claims, except, in each case, (i) in accordance with the terms of the Credit Agreement and the Restructuring Term Sheet and (ii) to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Participating Lender", which writing shall be in form and substance reasonably satisfactory to

509265-0806-00421-Active.11758144.25

the Agent and the Debtors.[1]  Each Participating Lender agrees to notify the Debtors and the Agent of any Transfer of its Lender Claims and to provide the Debtors and the Agent with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before such Transfer becomes effective.  Any Transfer of any Lender Claim that does not comply with the foregoing shall be deemed void *ab initio*.  This Agreement shall in no way be construed to preclude any Lender from acquiring additional Lender Claims or any other interests in any Debtors; provided, however, that any such additional Lender Claims or other interests in such Debtor shall, upon acquisition, automatically be deemed to be subject to all the terms of this Agreement.

5.    The Debtors' Covenants

As long as a Support Termination Event has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the extent not inconsistent with the fiduciary obligations of any of the Debtors or any of their respective subsidiaries, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Agent and the Debtors and consistent in all material respects with this Agreement and the Restructuring Term Sheet; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    Termination of Obligations

(a)    This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows (each, a "Support Termination Event"),

---

[1]    See attached joinder.

509265-0806-00421-Active.11758144.25

5

(i)    upon termination of this Agreement by the mutual written consent of Citadel and Participating Lenders holding more than 75% in amount of the Lender Claims bound under this Agreement (the "Requisite Participating Lenders");

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below, unless any such Support Termination Event is waived by the Requisite Participating Lenders within such five (5) business day period:

(A)    the Chapter 11 Cases shall not have been filed by December 21, 2009 (or such later date as may be agreed by Citadel and the Requisite Participating Lenders);

(B)    a Qualified Plan and the Disclosure Statement shall not have been filed within 45 days after the filing date of the Chapter 11 Cases (the "Petition Date") (or such later date as may be agreed by Citadel and the Requisite Participating Lenders);

(C)    an order, in form and substance reasonably satisfactory to the Agent, shall not have been entered approving the adequacy of the Disclosure Statement within 90 days after the Petition Date (or such later date as may be agreed by Citadel and the Requisite Participating Lenders);

(D)    the Confirmation Order shall not have been entered within 180 days after the Petition Date (or such later date as may be agreed by Citadel and the Requisite Participating Lenders);

(E)    a Qualified Plan shall not have been consummated within 300 days after the Petition Date (or such later date as may be agreed by Citadel and the Requisite Participating Lenders);

(F)    the Debtors shall have (1) materially breached the Debtors' covenants set forth in Section 5 above, (2) publicly announced their intention not to pursue a Qualified Plan, or (3) proposed, accepted or filed a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(G)    (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(H)    the Chapter 11 Case of any Debtor that is an obligor or guarantor under the Credit Agreement shall have been dismissed;

(I)    the Bankruptcy Court shall not have entered the Interim Cash Collateral Order within 7 days after the Petition Date, or the Final Cash Collateral Order within 75 days after the date of entry of the Interim Cash Collateral Order;

6

(J)     there shall have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not changes in the financial, banking or capital markets generally);

(K)     any court (including the Bankruptcy Court) shall declare, in a final, non-appealable order, this Agreement or a material part thereof to be unenforceable; or

(L)     the entry of an order by the Bankruptcy Court invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Lender Claims or liens securing them.

(iii)     upon delivery of written notice of termination to the Agent by Citadel following any material breach, in the aggregate, of the Participating Lenders' representations, warranties, covenants or agreements set forth in this Agreement if such breach would have a material adverse effect on Citadel's ability to obtain confirmation of, and achieve consummation of, a Qualified Plan.

(b)     Upon occurrence of a Support Termination Event, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) obligations under this Agreement which by their terms expressly survive any such termination; and provided, further that, notwithstanding anything to the contrary herein, any Support Termination Event may be waived in accordance with the procedures established by Section 9 hereof, in which case the Support Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the parties hereto shall be restored, subject to any modification set forth in such waiver. Upon termination of this Agreement, any and all votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors.

7.     Specific Performance

It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

8.     Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Lenders (and their respective advisors), with respect to the subject matter hereof.

9.    <u>Amendments</u>

No amendment, modification, waiver or other supplement of the terms of this Agreement or the Restructuring Term Sheet shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors, the Agent and the Requisite Participating Lenders; <u>provided</u>, <u>however</u>, that the written consent of the Agent and each Participating Lender shall be required for any amendment, modification, waiver or other supplement of this Agreement that amends or modifies in any way this Section 9 or the definition of Requisite Participating Lenders as used in this Agreement; <u>provided</u>, <u>further</u> that no amendment, waiver, modification or other supplement of this Agreement or the Restructuring Term Sheet may impose less favorable treatment of any Participating Lender's Lender Claims or its rights and obligations hereunder and under the Restructuring Term Sheet compared to those of the Participating Lenders generally, without such Participating Lender's express written consent.

For the purposes hereof, immaterial changes to the Restructuring Term Sheet shall not constitute a modification or amendment thereof or of this Agreement and may be made upon agreement by the Debtors and the Agent.

10.    <u>Independent Analysis</u>

Each Participating Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

11.    <u>Governing Law</u>

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. EACH PARTY HERETO

UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR
PROCEEDING REFERRED TO ABOVE.

      12.    Effective Date

      Upon delivery of its duly executed counterpart signature page, each Participating
Lender shall be bound to the terms of this Agreement, and this Agreement shall become effective
upon the Debtors giving notice to the Agent and such Participating Lender of effectiveness (the
date on which such notice is provided, the "Effective Date"); provided, that if, as of the
commencement of the Chapter 11 Cases, the Debtors have not received signature pages to this
Agreement from Lenders holding more than 50% of the aggregate principal amount of the Pre-
Petition Senior Obligations, this Agreement shall become null and void.

      Upon the Effective Date, the Restructuring Term Sheet shall be deemed effective
for the purposes of this Agreement and thereafter the terms and conditions therein may only be
amended, modified, waived or otherwise supplemented as set forth in Section 10 above.

      13.    Third-Party Beneficiary

      This Agreement is intended for the benefit of the parties hereto and no other
person shall have any rights hereunder.

      14.    Counterparts

      This Agreement may be executed in several counterparts, each of which shall be
deemed to be an original, and all of which together shall be deemed to be one and the same
agreement.  Execution copies of this agreement may be delivered by facsimile, electronic mail or
otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

      15.    Headings

      The section headings of this Agreement are for convenience of reference only and
shall not, for any purpose, be deemed a part of this Agreement.

      16.    Acknowledgment

      This Agreement is not and shall not be deemed to be a solicitation of consents to
the Plan. The acceptance of the Lenders will not be solicited until the Lenders have received the
Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

      17.    Settlement Discussions

      This Agreement and the Restructuring Term Sheet are part of a proposed
settlement of matters that could otherwise be the subject of litigation among the parties hereto.
Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence
408 and any applicable state rules of evidence, this Agreement and all negotiations relating
thereto shall not be admissible into evidence in any proceeding other than to prove the existence

9

of this Agreement or in a proceeding to enforce the terms of this Agreement or to enforce a Cash Collateral Order.

        18.    <u>No Waiver of Participation and Preservation of Rights</u>

        Except as expressly provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Lenders to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors or other parties, any liens or security interests it may have in any assets of any of the Debtors or other parties, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, after a Support Termination Event, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of this Agreement, arising prior to termination.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**CITADEL BROADCASTING CORPORATION**

By: _____
  Name: RANDY L. TAYLOR
  Title: CFO

**[OTHER DEBTORS]**

By: _____
  Name:
  Title:

AGREED BY EACH OF THE FOLLOWING
LENDERS

[Signature Page Plan Support Agreement]

**JPMORGAN CHASE BANK, N.A.,**
on behalf of its Special Credits group and its position in the Lender Claims

Claims under the Credit Agreement:      $_____

Authorized Signatory:

By:_____
Name: Stephanie Parker
Title: Executive Director

[Signature Page Plan Support Agreement]

## JOINDER

This Joinder to the Plan Support Agreement, dated as of November [  ], 2009, by and among Citadel Broadcasting Corporation and certain of its domestic subsidiaries and the Participating Lenders signatory thereto (the "Agreement), is executed and delivered by [_____] (the "Joining Party") as of [_____], 20[__].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, attached to this Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Participating Lender" and a party for all purposes under the Agreement.

2.    Representations and Warranties.  With respect to the aggregate principal amount of Lender Claims held by the Joining Party upon consummation of the Transfer, the Joining Party hereby makes the representations and warranties of the Participating Lenders set forth in the Agreement to each other party to the Agreement.

3.    Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts off law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS

INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

_____

Entity Name of Joining Party

Authorized Signatory:

By:_____
Name:
Title:

[JOINDER]

<u>**ANNEX I**</u>

<u>Plan Support Agreement</u>

[Annex I to Joinder]

EXHIBIT 1

## CITADEL BROADCASTING CORPORATION

## PLAN TERM SHEET

## DECEMBER 16, 2009

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND ANY DEFINITIVE AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE COMPANY, THE AGENT AND THE PARTICIPATING LENDERS (EACH AS DEFINED BELOW). THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY.

This term sheet (the "Term Sheet") sets forth the principal terms of a proposed financial restructuring (the "Restructuring") for the existing debt and other obligations of Citadel Broadcasting Corporation ("Citadel" or the "Company") and each subsidiary of Citadel which files on or about the date hereof (the "Petition Date") a case under chapter 11 ("*Chapter 11 Case(s)*") of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to pursue a pre-negotiated chapter 11 plan of reorganization containing the terms set forth herein ("Plan") to be supported by the Agent and the Participating Lenders (each as defined in the Plan Support Agreement to which this Term Sheet is attached ("Plan Support Agreement")).

## **Transaction Overview**

**Debtors:**                    Citadel and its subsidiaries identified in the footnote below
(collectively, "Debtors").[1]

**Creditors:**                  • Senior Secured Claims: of the (i) approximately
$2,010,680,710 in unpaid principal, plus accrued interest
and fees[2], arising under or in connection with that certain
Credit Agreement, dated as of June 12, 2007, among
Citadel, the Agent, the lenders from time to time party
thereto, and the other agents party thereto (as amended,
restated, supplemented or otherwise modified from time to
time) (the "Pre-Petition Credit Facility"), (which includes
$136,000,000 in principal amount outstanding under the
Revolving Credit Facility (which amount does not include
the Letters of Credit); $2,927,541 in letters of credit (the
"Letters of Credit"); $527,156,222 in principal amount
outstanding under the Tranche A Term Loan;
$1,347,524,488 in principal amount outstanding under the
Tranche B Term Loan); and (ii) claims arising upon
termination of (a) the Interest Rate Swap Transaction
Agreement between JPMorgan Chase Bank, N.A. and
Citadel Broadcasting Corporation, dated June 27, 2007 and
(b) the ISDA 2002 Master Agreement between JPMorgan
Chase Bank, N.A. and Citadel, dated June 26, 2007, in the
notional amount of $970.0 million (the "Pre-Petition
Hedges"; together with the Pre-Petition Credit Facility, the
"Pre-Petition Senior Obligations" (it being understood that
all Pre-Petition Hedges between Citadel and any signatory
(or any affiliate of a signatory) to the Plan Support

---

[1]    The Debtors will include the following entities:    Alphabet Acquisition Corp.; Atlanta Radio, LLC;
Aviation I, LLC; Chicago FM Radio Assets, LLC; Chicago License, LLC; Chicago Radio Assets, LLC;
Chicago Radio Holding, LLC; Chicago Radio, LLC; Citadel Broadcasting Company; Citadel Broadcasting
Corporation; DC Radio Assets, LLC; DC Radio, LLC; Detroit Radio, LLC; International Radio, Inc.; KLOS
Radio, LLC; KLOS Syndications Assets, LLC; KLOS-FM Radio Assets, LLC; LA License, LLC; LA Radio,
LLC; Minneapolis Radio Assets, LLC; Minneapolis Radio, LLC; Network License, LLC; NY License, LLC;
NY Radio Assets, LLC; NY Radio, LLC; Oklahoma Radio Partners, LLC; Radio Assets, LLC; Radio License
Holding I, LLC; Radio License Holding II, LLC; Radio License Holding III, LLC; Radio License Holding IV,
LLC; Radio License Holding V, LLC; Radio License Holding VI, LLC; Radio License Holding VII, LLC;
Radio License Holding VIII, LLC; Radio License Holding IX, LLC; Radio License Holding X, LLC; Radio
License Holding XI, LLC; Radio License Holding XII, LLC; Radio Networks, LLC; Radio Today
Entertainment, Inc.; Radio Watermark, Inc.; San Francisco Radio Assets, LLC; San Francisco Radio, LLC; SF
License, LLC; WBAP-KSCS Acquisition Partner, LLC; WBAP-KSCS Assets, LLC; WBAP-KSCS Radio
Acquisition, LLC; WBAP-KSCS Radio Group, Ltd.; and WPLJ Radio, LLC.

[2]    *Note:* Due to the fact that the amount of accrued interest and fees changes on a daily basis, exact figures for
these items are not provided herein.

Agreement shall be terminated promptly following the Petition Date)) (which termination claims were estimated as of November 18, 2009 to be approximately $90,000,000)[3], approximately $1,100,000,000[4] shall be deemed, pursuant to section 506(a) of the Bankruptcy Code and solely for purposes of, and in the context of, the expeditious confirmation of the Plan, to be the amount supported by the value of the collateral securing such obligations, which value shall be allocated pro rata across all such obligations (the "Senior Secured Obligations"). Each holder of Senior Secured Obligations is referred to herein as a "Secured Lender."

- Unsecured Claims: all remaining pre-petition claims – (approximately $1,000,000,000[5] of Pre-Petition Senior Obligations; 8% Convertible Subordinated Notes due February 15, 2011 ($47,835,000); 1.875% Convertible Subordinated Notes due February 15, 2011 ($475,000); claims under leases and executory contracts that are rejected in the Chapter 11 Cases; and outstanding trade and other obligations related to the day to day operations of the Company ("Ordinary Course Obligations"), to the extent such Ordinary Course Obligations are not otherwise satisfied pursuant to an order of the Bankruptcy Court, including, without limitation, any appropriate "first-day" order.

**Transaction Summary:** It is expected that, pursuant to the Plan, Citadel will directly or indirectly transfer all of its assets to one or more entities, the stock of which, after the Effective Date, will be controlled by the Lenders ("Reorganized Citadel"), or another structure agreeable to the Agent and the Requisite Participating Lenders; provided that the entity issuing stock under the Plan shall be a C corporation for U.S. income tax purposes.

---

[3]    *Note:* An exact amount cannot be determined until the swap is terminated and the termination calculation is prepared.

[4]    *Note:* This number is an estimate for illustrative purposes only and shall be adjusted to conform to the valuation being prepared by the Debtors' financial advisor, which valuation shall ultimately be included in the Debtors' Disclosure Statement.

[5]    *Note:* This number is an estimate for illustrative purposes only and shall be adjusted to conform to the valuation being prepared by the Debtors' financial advisor, which valuation shall ultimately be included in the Debtors' Disclosure Statement.

The Senior Secured Obligations will be exchanged on a *pro rata*[6] basis for (i) a new senior secured term loan to Reorganized Citadel in the initial principal amount of $762.5 million and having the other terms and subject to the conditions precedent specified in Annex A hereto (the "New Term Loan"), and (ii) a combination of shares of Class A Common Stock in Reorganized Citadel, par value $.001 per share, and limited-voting Class B Common Stock in Reorganized Citadel, par value $.001 per share, which shall have the limited voting rights and other material terms set forth in Annex B hereto (the Class A Common Stock and Class B Common Stock, collectively, the "New Common Stock") and/or warrants ("Special Warrants") to purchase shares ("Warrant Shares") of Class B Common Stock, which New Common Stock (inclusive of such Warrant Shares) will constitute, in the aggregate, 90% of the New Common Stock of Reorganized Citadel issued on the Effective Date (together with the Special Warrants corresponding to such Warrant Shares, the "Secured Claim Equity Distribution"), with the remaining 10% of the New Common Stock (also inclusive of Warrant Shares) issued on the Effective Date to be allocated to the holders of unsecured claims (together with the Special Warrants corresponding to such Warrant Shares, the "Unsecured Claim Equity Distribution"; together with the Secured Claim Equity Distribution, the "Equity Distribution"), in each case subject to (x) the allocation mechanism described on Annex I hereto and (y) dilution for the Equity Incentive Program described herein.

The "Special Warrants" shall have the material terms and conditions specified in Annex C hereto.

The Debtors' use of cash collateral pursuant to Section 363 of the Bankruptcy Code shall be under the condition that such use shall be consistent with (i) a 13-week rolling cash flow projection acceptable to the Agent in consultation with the Participating Lenders (the "Forecast"), (ii) with a budget based on the Forecast acceptable to the Agent in consultation with the Participating Lenders, and (iii) with an interim cash collateral order (the "Interim Cash Collateral Order") and a final cash collateral order (the "Final Cash Collateral Order"; together with the Interim Cash Collateral Order, the "Cash Collateral Order") (a) providing for customary replacement liens and for adequate protection payments in the form of (I) current cash

---

[6] As used herein "pro rata" is the ratio of the principal amount of any holder's claim to the aggregate principal amount of all claims in such class.

payment of interest on the Pre-Petition Senior Obligations at the non-default rate applicable to the Tranche B Term Loan (for the avoidance of doubt, the Facility Fee shall not be paid during the chapter 11 cases) and of the reasonable fees and costs of legal and financial advisors to the Agent under the Pre-Petition Credit Facility and (II) payments to the Agent and the Lenders of all funds on deposit in the Excess Cash Account under the Pre-Petition Credit Facility, and (b) otherwise in form and substance acceptable to the Agent in consultation with the Participating Lenders.

## Classification and Treatment of Claims and Interests

**Administrative, Priority Tax, and Other Priority Claims:**

On or as soon as practicable after the Plan has been consummated (the "Effective Date"), each holder of an administrative, priority tax or other priority claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**Senior Secured Claims:**

On or as soon as practicable after the Effective Date, in full satisfaction of and in exchange for the Senior Secured Obligations, each holder of Senior Secured Obligations shall receive its pro rata share of the New Term Loan and the Secured Claim Equity Distribution; provided that for any Secured Lender to receive New Common Stock, it must deliver to the Debtors and the Agent a completed FCC worksheet by a date certain to be specified by the Agent (but no earlier than the deadline fixed by the Bankruptcy Court for creditors to vote to accept or reject the Plan and no later than 30 days before the anticipated Effective Date of the Plan); provided that individual holders of Senior Secured Claims may transfer their Secured Claim Equity Distributions to affiliates, subsidiaries and/or trusts for tax, compliance or internal policy reasons.

The definitive documents for the New Term Loan shall also provide for the maintenance of the Letters of Credit on a fully cash collateralized basis, as well as participating interests therein and reimbursement obligations in respect thereof.

All reasonable expenses, compensation and other such amounts owing to the Agent in respect of the Pre-Petition Credit Facility (including all reasonable fees and expenses of outside professionals) shall be paid in a timely fashion under the Cash Collateral Order and, to the extent accrued but unpaid as of the Effective Date, shall be paid in full by the Company, in cash, on the Effective Date.

Notwithstanding the foregoing, nothing shall prevent holders of Senior Secured Obligations from transferring as between themselves some or all of their respective shares of the Secured Equity Claims Distributions or New Term Loan obligations or the rights to receive such securities or indebtedness.

**Other Secured Claims:**

To the extent that any other secured claims exist, on or as soon as practicable after the Effective Date, all such secured claims of the Debtors allowed as of the Effective Date, if not previously, shall be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to section 1124 of the

Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

**Unsecured Claims:**

On or as soon as reasonably practicable after the Effective Date, each holder of Unsecured Claims will receive at its option, subject to the Cash Cap as hereinafter defined, (x) its pro rata share of New Common Stock or Special Warrants exercisable for Warrant Shares, with such New Common Stock and Warrant Shares constituting 10% of the New Common Stock of Reorganized Citadel issued on the Effective Date, subject to the allocation mechanism described on Annex I hereto and dilution for the Equity Incentive Program described herein; provided that for any holder of an Unsecured Claim to receive New Common Stock, it must deliver to the Debtors and the Agent a completed FCC Worksheet by a date certain to be specified by the Agent (but no earlier than the deadline fixed by the Bankruptcy Court for creditors to vote to accept or reject the Plan and no later than 30 days before the anticipated Effective Date of the Plan); or (y) cash in an amount equal to 5% of the allowed amount of its Unsecured Claim, provided that the aggregate amount of cash distributed pursuant to this clause (y) shall not exceed $2,000,000 the ("Cash Cap") and such cash shall be distributed among electing holders in inverse order of the respective dollar amounts of their allowed claims (i.e., first to the smallest in dollar amount of any such claim and last to the largest in dollar amount of any such claim); provided, further, that once the Cash Cap is exhausted, any electing holders that did not receive cash shall be treated like all non-electing holders and receive their pro rata share of the Unsecured Claims Equity Distribution pursuant to clause (x) above. If the holders of Convertible Subordinated Notes vote to accept the Plan and do not object to, or otherwise oppose, confirmation of the Plan, the Agent and the Lenders will not enforce their contractual rights to compel Debtors to turn the distribution to such holders over to the Agent for pro rata distribution to the Lenders.

**Intercompany Claims:**

All intercompany claims will be paid, adjusted, reinstated or discharged to the extent reasonably determined to be appropriate by the Company, subject to the consent of the Agent and the Requisite Participating Lenders.

| | |
|---|---|
| **Section 510(b) Claims:** | Any holder of a claim against any of the Debtors that is described in section 510(b) of the Bankruptcy Code shall not receive a distribution under the Plan and such section 510(b) claims shall be extinguished. |
| **Equity Interests:** | On the Effective Date, all equity interests in the Debtors, including common stock, preferred stock and any options, warrants or rights to acquire any equity interests, shall be cancelled and extinguished and the holders thereof shall not receive a distribution on account of such equity interests under the Plan. |

### Other Principal Plan Terms

| | |
|---|---|
| **Executory Contracts and Unexpired Leases:** | The Company intends to reject those executory contracts and unexpired leases identified on Annex D hereto, on or soon after the Petition Date. All talent and affiliate contracts not otherwise rejected on the Petition Date shall be honored in the ordinary course of business. Executory contracts and unexpired leases not otherwise addressed on the Petition Date (or otherwise rejected postpetition), including affiliate and talent contracts not otherwise rejected during the course of the Chapter 11 Cases, shall be assumed at the time of confirmation of the Plan. |
| **Management Agreements:** | The Agent, on behalf of, but subject to approval of, the Requisite Participating Lenders, will negotiate in good faith new agreements with the members of the current management team, with the form of all such agreements to be included in the Plan Supplement (to be filed at least 10 days before the hearing on confirmation of the Plan) and acceptable to the Agent. No change-in-control provisions under existing employment agreements shall be honored in respect of the transfer of control to the Lenders under the Plan, without express written consent of the Agent, which shall only be given with the approval of the Requisite Participating Lenders. |
| **Equity Incentive Programs for Directors and Management:** | On or promptly after the Effective Date, no less than 7.5% and no more than 10.0% of the New Common Stock (on a fully diluted basis) shall be reserved for issuance as options in connection with the reorganized Debtors' management equity incentive program and/or director equity incentive program (each, an "Equity Incentive Program"). Three-quarters of such options shall have a per share exercise price equal to the fair market value of a share of New Common Stock on the Effective Date (which is expected to be equal to the Plan Share Value (as defined below)), and shall vest ratably over a three- |

year period; the remaining quarter shall have a strike price set by the New Board (as hereinafter defined) at a significant premium to such Effective Date value, and shall vest over a three year period. The other material terms of each Equity Incentive Program may be negotiated with the Agent and the Requisite Participating Lenders prior to filing the Plan Supplement (and included therein) or may be left to the discretion of the New Board.

As used herein "Plan Share Value" means the value of Reorganized Citadel as prepared by the Debtors' financial advisor and included in the Debtors' Disclosure Statement minus the aggregate principal amount of the New Term Loans, with such difference being divided by the total number of shares of New Common Stock.

**Director and Officer Liability Policy:**    As of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Petition Date (the "D&O Liability Insurance Policies") in full force) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

To the extent, if any, the Company plans to extend existing insurance coverage or purchase new insurance coverage covering the Company, Reorganized Citadel, the Estates, and the Company's current and former officers and directors from claims and causes of action of any third party (including without limitation any holder of a claim) that remain unreleased as of the Effective Date, such extended or newly purchased insurance shall be in such amounts, for such terms or periods of time, and placed with such insurers as are determined by the Agent to be reasonable under the circumstances or as specified and ordered by the Bankruptcy Court in the Confirmation Order.

| | |
|---|---|
| **Board of Directors:** | Reorganized Citadel shall have a seven-person board of directors (the "New Board"), which shall consist of six independent directors recommended by the Requisite Participating Lenders and Reorganized Citadel's Chairman & Chief Executive Officer. The Agent shall retain a nationally recognized executive search firm (at the expense of the Debtors) to assist in the identification of qualified candidates.[7] Current directors will be included among the candidates to be considered for the New Board. |
| | No individual person or entity receiving an Equity Distribution under the Plan shall have the right to appoint any director to the New Board. |
| | All directors of the New Board shall meet the criteria set forth in the NYSE or Nasdaq, as applicable, listing requirements and FCC requirements. |
| **Charter; Bylaws:** | The charter and bylaws of each of the Debtors shall have been restated in a manner reasonably satisfactory to the Agent and the Requisite Participating Lenders and consistent with section 1123(a)(6) of the Bankruptcy Code. |
| **Company as a Public Reporting Company:** | For certain purposes, including requiring Reorganized Citadel to become a public reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Plan shall require Reorganized Citadel as promptly as practicable following the Effective Date to file with the SEC a registration statement on Form 10 under the Exchange Act registering its Class A Common Stock under the Exchange Act (the "Form 10"), and Reorganized Citadel shall use reasonable best efforts to have such registration statement declared effective by the SEC as promptly as reasonably practicable. |
| | The Plan shall provide for Reorganized Citadel to use its reasonable best efforts to obtain a listing for the Class A Common Stock on NYSE or Nasdaq as soon as reasonably practicable following the effectiveness of the Form 10 (e.g., after listing requirements are satisfied). |
| **FCC Matters:** | The Company shall file with the FCC as soon as practicable the requisite applications seeking FCC consent to the transfer of control of the subsidiaries of the Company that hold FCC |

---

[7]    This retention will be effectuated pre-petition and a retainer provided to the search firm before the filing.

licenses ("FCC Applications"). After such filing is made, any person who thereafter acquires Senior Secured Claims or Unsecured Claims may be treated, in the judgment of the Company, as an alien owner for purposes of the distribution of equity under the Plan, in which case such person shall be classified in Group 2 (as defined in Annex I hereto). In addition, the Company may, subject to the consent of the Agent, in consultation with the Participating Lenders but otherwise in its sole discretion, request the Bankruptcy Court to implement restrictions on trading of claims that might adversely affect the FCC approval process. The Company shall diligently prosecute the FCC Applications seeking the FCC approval and shall promptly provide such additional documents or information requested or needed by the FCC in connection with its review of the FCC Applications. In the event that Citadel and the Agent determine that the FCC approval process of the transfer of control to the Lenders is causing unwanted delay in consummation of the Plan, they shall, subject to the consent of the Requisite Participating Lenders, promptly establish and pursue diligently approval of, an interim voting trust to hold the New Common Stock, of which the trustees shall be the persons currently serving on Citadel's existing Board of Directors.

| | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates and Other Documents:** | On the Effective Date, all notes, instruments, certificates, and other documents evidencing debt to, or equity interests in, the Company shall be cancelled and obligations of the Company thereunder shall be discharged. |
| **Vesting of Assets:** | On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all operating assets of the Company's estates shall vest in Reorganized Citadel free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |
| **Compromise and Settlement:** | The Plan shall contain customary provisions for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of allowed claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such claims and interests. |
| **Releases:** | The Plan will contain language substantially to the effect of the following: |

"**Released Party**" means each of: (a) the Secured Lenders; (b)

the Agent, (c), such entities' subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; and (d) the Debtors' and the Reorganized Debtors' subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, shareholders, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

***Releases by the Debtors***. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties and the Debtors' former officers and directors are deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the Debtors' restructuring, the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party or a former officer or director of the Debtors that constitutes willful misconduct (including

fraud) or gross negligence.[8]

***Releases by Holders of Claims and Interests***.  As of the Effective Date, each holder of a claim or an interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of claims and interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors taking place on or before the Confirmation Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Exculpation:**    The Plan will contain language substantially to the effect of the following:

"***Exculpated Party***" means each of:    (a) the Debtors, the Reorganized Debtors and their Affiliates, (b) the Secured Lenders; (c) the Agent; and (d) with respect to each of the foregoing entities in clauses (a) through (c), such entities'

---

[8]    Capitalized terms used but not otherwise defined shall have the meanings commonly associated with such terms in chapter 11 plans of reorganization.

subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

***Exculpation***.  Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, cause of action, or liability for any claim, except for gross negligence or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.

| | |
|---|---|
| **Discharge of Debtors:** | Except as otherwise provided and effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all claims and interests shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the Debtors or any of their assets, property, or estates; (ii) the Plan shall bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (iii) all claims and interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all entities shall be precluded from asserting against the Debtors, the Debtors' estates, the reorganized Debtors, their successors and assigns, and their assets and properties any other claims or interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. |
| **Injunction:** | From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order. |
| **Definitive Documents and Due Diligence:** | This Term Sheet is indicative, and any final agreement shall be subject to definitive agreements, pleadings, court submissions, offering memoranda and other documents ("Definitive Documents"), which Definitive Documents shall be substantially consistent with the terms of this Term Sheet and the Plan Support Agreement and otherwise in form and substance acceptable to the Agent and the Requisite Participating Lenders (as defined in the Plan Support Agreement) in their sole discretion, except as otherwise provided herein. The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet and otherwise acceptable to the Agent and the Requisite Participating Lenders, except as otherwise provided herein. |

**Tax Structure:**  The Company shall consult with the Agent and the Requisite Participating Lenders on tax issues and matters of tax structure relating to the Restructuring, and such matters shall be consistent herewith and otherwise reasonably satisfactory to the Agent and the Requisite Participating Lenders.

**Avoidance Actions:**  Reorganized Citadel shall retain all rights to commence and pursue any causes of action that are expressly preserved and not released under the Plan.

**Retention of Jurisdiction:**  The Plan shall provide for a broad retention of jurisdiction by the Bankruptcy Court including for (a) resolution of Claims, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings, or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements, (e) entering and implementing such orders as are necessary or appropriate to sell, dispose of, liquidate or abandon any assets or properties of the FCC trust, to the extent applicable and subject to the provisions of the New Term Loan documentation and (f) other purposes.

**Resolution of Disputed Claims:**  The Plan shall provide customary terms for the resolution of disputed claims and any reserves therefor.

## Mechanics of Allocation of New Common Stock and
## Special Warrants on the Effective Date

The allocation of New Common Stock and Special Warrants among the Secured

Lenders and holders of Unsecured Claims on the Effective Date shall be based on the results of

the following exercise:

1.      First, the Secured Claim Equity Distribution shall be deemed made pro rata among the holders of Senior Secured Obligations and the Unsecured Claim Equity Distribution shall be deemed made pro rata among the holders of Unsecured Claims; provided that each Equity Distribution shall be deemed to have been made initially in the form of Special Warrants. .

2.      Second, all deemed holders of Special Warrants that (i) have timely provided an FCC Worksheet, and (ii) have provided therewith certification to the Debtors and the Agent that their respective alien ownership, as calculated in accordance with FCC rules, is at or below 20% ("Group 1") shall be deemed to have exercised their Special Warrants to the fullest extent possible for the corresponding number of shares of Class B Common Stock; provided that any holder who has not requested in writing at least 30 days prior to the Effective Date to receive Class B Common Stock (the "Class B Election Notice") shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, and provided, further, that, for any holder that would be entitled to receive shares constituting more than 4.99% of the outstanding Class A Common Stock, the number of shares exchanged by such holder shall be limited so that such holder receives shares of Class A Common Stock constituting no more than 4.99% of the outstanding Class A Common Stock.  The alien ownership certification requirement may result in a non-pro rata distribution of New Common Stock.

3.      Third, the aggregate alien ownership percentage of New Common Stock after such deemed exercises shall be determined by the Debtors and the Agent.  To the extent such percentage is less than 20%, all holders of Special Warrants not in Group 1 ("Group 2") who timely provided an FCC Worksheet ("Eligible Group 2 Holders") shall be deemed to exercise their Special Warrants, pro rata among all such Eligible Group 2 Holders, to receive Class B Common Stock, up to the number of shares that causes the aggregate alien ownership percentage of New Common Stock to equal 20%; provided that any holder who has not timely provided a Class B Election Notice shall be further deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock, and provided, further, that, for any holder that would be entitled to shares constituting more than 4.99% of the outstanding Class A Common Stock, the number of shares exchanged by such holder shall be

limited so that such holder receives shares of Class A Common Stock constituting no more than 4.99% of the outstanding Class A Common Stock. Each member of Group 2 shall provide to Citadel and the Agent such information as requested by Citadel or the Agent in order to evaluate alien ownership.

4.      Steps 2 and 3 shall be repeated until the number of shares being issued becomes de minimis in the judgment of Citadel and the Agent. Notwithstanding anything to the contrary herein, a creditor may, by written notice to the Company and the Agent at least 30 days prior to the Effective Date, receive its Equity Distribution entirely in the form of Special Warrants and shall not be deemed to have exercised any Special Warrants. Any such notice shall be binding upon any transferee of the claims held by such creditor.

5.      The distribution of Class A Common Stock, Class B Common Stock and Special Warrants that results from the foregoing steps shall be the distribution made on and as of the Effective Date.

6.      Nothing in the above shall permit any holder to acquire more than 4.99% of the outstanding Class A Common Stock nor shall cause Reorganized Citadel to exceed an aggregate alien ownership percentage of 20% in either the Class A Common Stock or in the New Common Stock. Any distribution in contravention of the preceding sentence shall be adjusted to the minimum extent necessary to comply with these limitations; such adjustments shall be pro rata among Eligible Group 2 Holders to the extent legally permissible. In determining whether any holder would hold more than 4.99% of the outstanding Class A Common Stock, such holder will be attributed with any stock held by another holder under common management or that otherwise would be aggregated under the FCC's ownership attribution rules.

**<u>Exhibit B</u>**

**Organizational Chart**



CITADEL STRUCTURE CHART

15,650,210.2

**<u>Exhibit C</u>**

**Steering Committee of Prepetition Secured Lenders**

**Steering Committee of Prepetition Secured Lenders**

JPMorgan Chase Bank, N.A.
American International Group
Ares Management LLC
Babson Capital Management LLC
CIT Syndicated Loan Group
Deutsche Bank Trust Company Americas
Eaton Vance Management
GE Commercial Finance
ING Capital LLC
Sankaty Advisors, LLC
TPG Partners VI, L.P.
Wachovia Capital Markets, LLC

**<u>Exhibit D</u>**

**Consolidated List of the Holders of the 50 Largest Unsecured Claims**

**Consolidated List of the Holders of the 50 Largest Unsecured Claims**

| Name of Creditor | Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed or subject to set off [1] | Amount of claim (secured also state value of security) |
|---|---|---|---|
| 1.  JPMorgan Chase Bank, N.A. | 270 Park Avenue, 4th Floor<br>New York, NY 10017<br>Attn.: Tina Rutyer<br>Phone: 212-270-4676<br>Fax: 212-270-5127 | | Unknown |
| 2.  Wilmington Trust Company | 50 South Sixth St., Suite 1290<br>Drop Code 7100<br>Minneapolis, MN 55402-1544<br>Attn.: Jane Schweiger<br>Phone: 612-217-5632<br>Fax: 612-217-5651/52 | | $49,163,750.00 |
| 3.  The Walt Disney Company | 500 South Buena Vista St.<br>Burbank, CA 91521<br>Attn.: Kevin Mayer<br>Phone: 818-560-1000<br>Fax: 818-560-5630 | | $11,198,022.00 |
| 4.  American Society of Composers, Authors and Publishers | 1 Lincoln Plaza, Floor 6<br>New York, NY 10133-0043<br>Attn: Kate Owens<br>Phone: 212-621-6462<br>Fax: 212-621-8453 | | $1,113,639.50 |
| 5.  Broadcast Music, Inc. | 10 Music Square East<br>Nashville, TN  37203-4399<br>Attn: Darlene Perry<br>Phone: 615-401-2426<br>Fax: not available | | $1,107,731.02 |
| 6.  John Mitch Dolan | 203 Bald Hill Rd<br>New Canaan, CT  06840<br>Phone: 203-972-1438<br>Fax: not available | | $916,884.20 |
| 7.   HSBC Corporate Trust and Loan Agency | 10 East 40 St., 14th Floor<br>New York, NY 10016<br>Attn.: Ignazio Tamburello<br>Phone: 212-525-1633<br>Fax: 212-525-1300 | | $478,092.45 |
| 8.  SoundExchange, Inc. | 1121 14th St. NW, Suite 700<br>Washington, D.C. 20005<br>Phone: 202-640-5858<br>Fax: 202-640-5859 | | $136,035.22 |

---

[1] The Debtors reserve their rights to dispute the claims on this schedule on any basis.

| Name of Creditor | Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed or subject to set off [1] | Amount of claim (secured also state value of security) |
|---|---|---|---|
| 9.  Dish Network Corporation | 9601 S Meridian Blvd<br>Englewood, CO  80112-5905<br>Phone: 303-723-1000<br>Fax: 303-723-1999 | | $96,335.47 |
| 10.  FK South, LLC | 3011 W Grand Blvd<br>Detroit, MI  48202-3096<br>Phone: 313-972-4000<br>Fax: not available | | $87,649.00 |
| 11.  Wirtz Realty Corporation | 680 N Lake Shore Drive<br>Suite 1900<br>Chicago, IL  60611-3084<br>Phone: 312-943-7001<br>Fax: 312-943-9017 | | $85,642.23 |
| 12.  AT&T Inc. | Attn: Remittance<br>4513 Western Avenue<br>Lisle, IL  60532<br>Phone: 877-212-7900<br>Fax: not available | | $87,195.55 |
| 13.  Verizon Business Global LLC | [PO Box 371322<br>Pittsburgh, PA  15250-7322]<br>Phone: not available<br>Fax: not available | | $68,725.68 |
| 14.  Radio Advertising Bureau Inc. | 1320 Greenway Dr., Suite 500<br>Irving, TX 75038<br>Attn.: Beverly Fraser<br>Phone: 972-753-6721<br>Fax: not available | | $59,806.00 |
| 15.  Entertainment Communications Network, Inc. | 4370 Tujunga Avenue<br>Studio City, CA  91604<br>Phone: 818-752-1400<br>Fax: 818-752-1444 | | $49,256.25 |
| 16.  Ascent Media Network Services, Inc. | 520 Broadway<br>5th Floor<br>Santa Monica, CA  90401-2420<br>Phone: 310-434-7000<br>Fax: 310-434-7111 | | $42,000.00 |
| 17.  Girgner, Inc | Alpenstrasse 2 ZUG<br>Zurich, Switzerland  6304<br>Phone: not available<br>Fax: not available | | $38,098.17 |
| 18.  CSM Corporation | 500 Washington Ave S<br>Suite 3000<br>Minneapolis, MN  55415<br>Phone: 612-395-7000<br>Fax: not available | | $37,070.68 |

7

| Name of Creditor | Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed or subject to set off [1] | Amount of claim (secured also state value of security) |
|---|---|---|---|
| 19.  Los Angeles Dodgers LLC | 1000 Elysian Park Avenue<br>Los Angeles, CA  90012-1199<br>Phone: 323-224-1500<br>Fax: 323-224-1269 | | $35,300.00 |
| 20.  Coleman Research Group, Inc. | 280 Park Avenue<br>12th Floor East<br>New York, NY  10017<br>Phone: 212-223-0185<br>Fax: 212-898-0160 | | $35,000.00 |
| 21.  Controlware Communications Systems Inc | 1 Industrial Way W<br>Building D Suite F<br>Eatontown, NJ  07724<br>Phone: (732) 919-0400<br>Fax: (732) 919-7673 | | $32,973.74 |
| 22.  Verizon Wireless | 365 State St<br>Springfield, MA  01103<br>Attn: Linda Shedd<br>Phone: 413-731-8606<br>Fax: not available | | $32,611.80 |
| 23.  Duebler Electric Inc | 5143 River Road<br>New Orleans, LA  70123<br>Phone: 504-733-1990<br>Fax: not available | | $27,416.00 |
| 24.  DMR | 200 W Pike St<br>Covington, KY  41011<br>Phone: 859-655-9200<br>Fax: 859-655-3480 | | $27,045.00 |
| 25.  Paul Miles Advertising & Productions | 25 Jefferson Place SE<br>Grand Rapids, MI  49503-4385<br>Phone: 616-459-6660<br>Fax: 616-459-5522 | | $24,000.00 |
| 26.  New York Yankees Baseball Club | 1 East 161 Street<br>Bronx, NY  10451<br>Phone: 718-293-4300<br>Fax: 718-293-8414 | | $22,753.00 |
| 27.  Wilmington Trust Corporation. | Rodney Square North<br>1100 North Market Street<br>Wilmington, DE  19890<br>Phone: 302-651-1000<br>Fax: not available | | $22,700.00 |
| 28.  Cheyenne Propagation Inc. | 830 Tenderfoot Hill Road<br>Suite 200<br>Colorado Springs, CO  80906<br>Phone: 719-576-4424<br>Fax: not available | | $19,687.63 |

| Name of Creditor | Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed or subject to set off [1] | Amount of claim (secured also state value of security) |
|---|---|---|---|
| 29.  Katz Media Group | 125 W 55th Street Floor 8<br>New York, NY  10019-5369<br>Attn: Diane Marchetti<br>Phone: 212-424-6000<br>Fax: not available | | $19,640.31 |
| 30.  Office Depot, Inc. | 6600 North Military Trail<br>Boca Raton, FL  33496<br>Phone: 561-438-4800<br>Fax: not available | | $16,510.09 |
| 31.  CDW Direct, LLC | 200 N. Milwaukee Avenue<br>Vernon Hills, IL  60061<br>Phone: 847-465-4000<br>Fax: 847-465-6800 | | $16,128.74 |
| 32.  Mid South Public Communications Foundation | 900 Getwell Road<br>Memphis, TN  38111-7494<br>Phone: 901-458-2521<br>Fax: not available | | $14,475.98 |
| 33.  Rocky Mountain Erection Inc. | 10601 Laramie Road<br>Yukon, OK  73099<br>Phone: 405-722-7447<br>Fax: not available | | $13,270.00 |
| 34.  Merrill Corporation | One Merrill Circle<br>St. Paul, MN  55108<br>Phone: 651-646-4501<br>Fax: not available | | $13,215.15 |
| 35.  Liberty Square, Inc. | 14 E Main Street<br>Mendham, NJ  07945<br>Phone: 973-543-2200<br>Fax: not available | | $12,905.97 |
| 36.  National Grid plc | 280 Melrose Street<br>Providence, RI  02907-2152<br>Phone: 401-784-7000<br>Fax: not available | | $12,884.18 |
| 37.  Hanco, Inc. | 115 Linden Street<br>Reno, NV  89502<br>Phone: 724-745-1700<br>Fax: 724-745-1700 | | $12,430.92 |
| 38.  District of Columbia Joint Tower Venture | 4100 Wisconsin Ave NW<br>Washington, DC  20016<br>Phone: not available<br>Fax: not available | | $12,361.64 |
| 39.  Efficio Solutions Inc. | 52 Westerville Square<br>Suite 244<br>Westerville, OH  43081<br>Phone: 614-895-9584<br>Fax: 614-895-9050 | | $11,555.00 |

9

| Name of Creditor | Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed or subject to set off [1] | Amount of claim (secured also state value of security) |
|---|---|---|---|
| 40.  Greater Flint Building Services, LLC | 3297 Associates Drive<br>Burton, MI  48529<br>Phone: 810-232-0665<br>Fax: not available | | $11,370.00 |
| 41.  DEG Associates Inc. | 155 Wade Street<br>Fall River, MA  02721<br>Attn: David Gauthier<br>Phone: 508-676-8272<br>Fax: 508-676-1523 | | $11,210.28 |
| 42.  AD-Fax Media Marketing, Inc. | 149 Madison Avenue<br>Room 801<br>New York, NY  10016-6713<br>Phone: 212-684-9665<br>Fax: not available | | $11,022.17 |
| 43.  Bythedale Children's Hospital | 95 Bradhurst Avenue<br>Valhalla, NY  10595-1697<br>Phone: 914 592-7555<br>Fax: not available | | $10,424.37 |
| 44.  Bay Craft Printing Inc. | 21403 Sharp Street<br>Rock Hall, MD  21661<br>Phone: 410-778-2715<br>Fax: not available | | $10,044.44 |
| 45.  Hispanic USA Inc. | 3001 Ponce de Leon Blvd<br>Suite 102<br>Coral Gables, FL  33134<br>Phone: 305-441-5334<br>Fax: not available | | $10,000.00 |
| 46.  Media Score Inc. | 3503 Hillrose Drive<br>Richardson, TX  75082<br>Phone: 214-419-2915<br>Fax: not available | | $10,000.00 |
| 47.  Kroma Printing Industries | 875 Avenue of the Americas<br>New York, NY  10001<br>Phone: 212-594-6633<br>Fax: not available | | $9,653.81 |
| 48.  Piper Electrical Co Inc. | 186 Main Street<br>Leominister, MA  01453<br>Phone: 978-537-3520<br>Fax: 978-840-1112 | | $9,270.00 |
| 49.  Granby One LLC | 1430 Richland Street<br>Columbia, SC  29201<br>Phone: not available<br>Fax: not available | | $9,090.00 |

| Name of Creditor | Name, telephone number and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Indicate if claim is contingent, unliquidated, disputed or subject to set off [1] | Amount of claim (secured also state value of security) |
|---|---|---|---|
| 50. WideOrbit Inc. | 2 Harrison Street Suite 600 San Francisco, CA 94105 Phone: 415-675-6700 Fax: 415-675-6701 | | $8,874.04 |

## __Exhibit E__

**Holders of the Debtors' Five Largest Secured Claims**

**Holders of the Debtors' Five Largest Secured Claims**

| Creditor's Name | Address | Amount of Claim | Description of Claim |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | 270 Park Avenue, 4th Floor New York, NY 10017 | $2,075,620,590 | Senior secured credit facility |
| JPMorgan Chase Bank, N.A. | Attn: Legal Derivatives Department 270 Park Avenue New York, NY 10017 | $970,000,000[2] | Interest rate swap |
| Ace American Insurance Company | 436 Walnut Street Philadelphia, PA 19106 | $2,329,545 | Backed by Letter of Credit |
| 260-261 Madison Avenue LLC | c/o The Sapir Organization 384 5th Avenue New York, NY 10018 | $597,996 | Backed by Letter of Credit |
| Pacific Office Automation Inc / CIT Technology Financing Services Inc | 21146 Network Place Chicago, IL 60673-1211 | $143,784 | Secured equipment lease for copiers and printers |

[2]   The amount indicated as of December 20, 2009 represents the current notional amount of the interest rate swap. The termination value of the interest rate swap is calculated based on the present value of the estimated remaining payments under the swap agreement and will be determined as of the termination date, which may be significantly less than the notional amount of the swap agreement.

**<u>Exhibit F</u>**

**Summary of Assets and Liabilities**

**Summary of Assets and Liabilities**

The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated debtors and non-debtors as of October 31, 2009. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value):  $1,400,576,122
Total Liabilities:    $2,464,310,916

## Exhibit G

**Debtors' Property Not in Debtors' Possession**

**Debtors' Property Not in Debtors' Possession**

As of the Petition Date, the Debtors do not have access to certain funds, including: (i) $4 million held by JPMorgan Chase Bank, N.A. in a restricted account that the Debtors cannot draw upon or use; (ii) $2.3 million held by Bank of America, N.A. Merchant Services that the Debtors can only access after satisfying certain requirements; and (iii) $320,000 held by JPMorgan Chase Bank, N.A. in a restricted account pursuant to the terms of an employment agreement.

## Exhibit H

**Debtors' Property**

## Debtors' Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses as of December 2, 2009.

| Debtor | Street | City | State | ZIP | Country |
|---|---|---|---|---|---|
| Atlanta Radio Assets, LLC | 210 Interstate North Parkway | Atlanta | GA | 30339 | USA |
| Atlanta Radio, LLC | 1621 Piney Grove Road | Loganville | GA | 30052 | USA |
| Atlanta Radio, LLC | 1810 Briarcliff Road | Atlanta | GA | 30329 | USA |
| Atlanta Radio, LLC | 210 Interstate North Parkway | Atlanta | GA | 30339 | USA |
| Atlanta Radio, LLC | 5500 Union Church Road | Gainesville | GA | 30542 | USA |
| Chicago Radio Assets, LLC | 190 N. State St. | Chicago | IL | 60601 | USA |
| Chicago Radio Assets, LLC | 233 S. Wacker Drive | Chicago | IL | 60606 | USA |
| Chicago Radio Assets, LLC | 9595 W. 183 St. | Tinley Park | IL | 60477 | USA |
| Citadel Broadcasting Company | Farnsworth Peak Tooele Cnty | Tooele | UT | 84074 | USA |
| Citadel Broadcasting Company | 1 Dexter Road | E. Providence | RI | 02914 | USA |
| Citadel Broadcasting Company | 1 Orange Grove Road | Charleston | SC | 29407 | USA |
| Citadel Broadcasting Company | 100 Front Street | Worcester | MA | 01608 | USA |
| Citadel Broadcasting Company | 1000 Elm Street | Manchester | NH | 03101 | USA |
| Citadel Broadcasting Company | 1000 W. Columbus Ave | Springfield | MA | 01105 | USA |
| Citadel Broadcasting Company | 101 West Street | Springfield | MA | 01104 | USA |
| Citadel Broadcasting Company | 10305 2nd St. NW | Albuquerque | NM | 87113 | USA |
| Citadel Broadcasting Company | 1064 James Street | Syracuse | NY | 13203 | USA |
| Citadel Broadcasting Company | 108 Industrial Drive | Birmingham | AL | 35209 | USA |
| Citadel Broadcasting Company | 111 Ingraham Hill Rd | Binghamton | NY | 13903 | USA |
| Citadel Broadcasting Company | 1134 W. State Road 38 | New Castle | IN | 47362 | USA |
| Citadel Broadcasting Company | 11492 N. HWY 99 | Lodi | CA | 95240 | USA |
| Citadel Broadcasting Company | 1155 Cedar Crest Road | West Blockton | AL | 35184 | USA |

| Debtor | Street | City | State | ZIP | Country |
|---|---|---|---|---|---|
| Citadel Broadcasting Company | 1181 West Bullion Street | Murray | UT | 84107 | USA |
| Citadel Broadcasting Company | 119 Ingraham Hill Rd | Binghamton | NY | 13903 | USA |
| Citadel Broadcasting Company | 11901 N Eeastern | Oklahoma City | OK | 73131 | USA |
| Citadel Broadcasting Company | 12325 Central NW | Albuquerque | NM | 87120 | USA |
| Citadel Broadcasting Company | 1250 E. Main | Lansing | MI | 48911 | USA |
| Citadel Broadcasting Company | 1343 Rifle Rand Road | Mount Pleasant | SC | 29464 | USA |
| Citadel Broadcasting Company | 13465 Alger Road | Grant | MI | 49327 | USA |
| Citadel Broadcasting Company | 136 Indian Trail | St. Matthews | SC | 29135 | USA |
| Citadel Broadcasting Company | 140 Benton Avenue aka Halifax Street | Winslow | ME | 04901 | USA |
| Citadel Broadcasting Company | 1419 W. Bannock Street | Boise | ID | 83702 | USA |
| Citadel Broadcasting Company | 142 Skyland Blvd. | Tuscaloosa | AL | 35405 | USA |
| Citadel Broadcasting Company | 142 West 57th Street - 11th Floor | New York City | NY | 10019 | USA |
| Citadel Broadcasting Company | 14445 Dallas Drive | Denham Springs | LA | 70754 | USA |
| Citadel Broadcasting Company | 14763 NW 86th St | Sheldahl | IA | 50243 | USA |
| Citadel Broadcasting Company | 14788 Jones Camp Road | Tuscaloosa | AL | 35405 | USA |
| Citadel Broadcasting Company | 1491 West Crystal Ave | Murray | UT | 84109 | USA |
| Citadel Broadcasting Company | 1501 NE 85th Street | Oklahoma City | OK | 73131 | USA |
| Citadel Broadcasting Company | 1502 Wampanoag Trail | E. Providence | RI | 02915 | USA |
| Citadel Broadcasting Company | 1551 NE 66th Avenue | Ankeny | IA | 50021 | USA |
| Citadel Broadcasting Company | 1581 Cummins Dr., #135, 127, &133 | Modesto | CA | 95358 | USA |
| Citadel Broadcasting Company | 1614 Druck Valley Road | York | PA | 17402 | USA |
| Citadel Broadcasting Company | 162 Free Hill Road | Gray | TN | 37615 | USA |
| Citadel Broadcasting Company | 1650 Trenor St | Saginaw | MI | 48601 | USA |
| Citadel Broadcasting Company | 1651 Section 28 Road | Catahoula | LA | 70585 | USA |
| Citadel Broadcasting Company | 1703 Walnut Bottom Road | Carlisle | PA | 17013 | USA |
| Citadel Broadcasting Company | 1718 W. Alameda St. | Santa Fe | NM | 87501 | USA |
| Citadel Broadcasting Company | 1725 Champagne | Saginaw | MI | 48604 | USA |
| Citadel Broadcasting Company | 17315 Thompson-house | Colo Spgs | CO | 80908 | USA |
| Citadel Broadcasting Company | 1740 Champagne | Saginaw | MI | 48604 | USA |
| Citadel Broadcasting Company | 1801-J Charleston Hwy | Cayce | SC | 29033 | USA |

| Debtor | Street | City | State | ZIP | Country |
|--------|--------|------|-------|-----|---------|
| Citadel Broadcasting Company | 1815 Lafiton Lane | Port Allen | LA | 70767 | USA |
| Citadel Broadcasting Company | 1850 End of Savercool Avenue | Bethlehem | PA | 18015 | USA |
| Citadel Broadcasting Company | 1895 West Mountain Road | Plymouth Twp. | PA | 18651 | USA |
| Citadel Broadcasting Company | 19000 S. Cloverdale Road Kuna | Boise | ID | 83634 | USA |
| Citadel Broadcasting Company | 1934 Filmore Ave | Buffalo | NY | 14214 | USA |
| Citadel Broadcasting Company | 200 Trader Lane | Churchpoint | LA | 70525 | USA |
| Citadel Broadcasting Company | 2000 North Hills Blvd | North Little Rock | AR | 72116 | USA |
| Citadel Broadcasting Company | 201 St. Charles Ave. | New Orleans | LA | 70170 | USA |
| Citadel Broadcasting Company | 2017 Golden Crest Dr | Birmingham | AL | 35209 | USA |
| Citadel Broadcasting Company | 2030 Millard Beets Road | Knoxville | TN | 37909 | USA |
| Citadel Broadcasting Company | 2065 Elmwood Ave | Buffalo | NY | 14207 | USA |
| Citadel Broadcasting Company | 2071 Katherine | Goodlettsville | TN | 37072 | USA |
| Citadel Broadcasting Company | 2158 Avenue C, Suite 100 | Bethlehem | PA | 18017 | USA |
| Citadel Broadcasting Company | 2182 Gunn Road | Holt | MI | 48842 | USA |
| Citadel Broadcasting Company | 225 A Rossmoor Rd SW | Albuquerque | NM | 87105 | USA |
| Citadel Broadcasting Company | 22 Sconticut Neck Road | Fairhaven | MA | 2719 | USA |
| Citadel Broadcasting Company | 23 Dr. Mann Road | Chelsea | ME | 04330 | USA |
| Citadel Broadcasting Company | 2313 Sylvan Ave. | Modesto | CA | 95355 | USA |
| Citadel Broadcasting Company | 23179 Ronald Quave Road | Covington | LA | 0 | USA |
| Citadel Broadcasting Company | 244 Goodwin Crest Drive | Birmingham | AL | 35209 | USA |
| Citadel Broadcasting Company | 250 Commercial Street | Worcester | MA | 01608 | USA |
| Citadel Broadcasting Company | 2617 White Mountain Highway | North Conway | NH | 03860 | USA |
| Citadel Broadcasting Company | 2619 Fosters Ferry Road | Tuscaloosa | AL | 35401 | USA |
| Citadel Broadcasting Company | 290 Middle Road | Dover | NH | 03820 | USA |
| Citadel Broadcasting Company | 2900 Lincoln Lake NE | Lowell | MI | 49331 | USA |
| Citadel Broadcasting Company | 2908 Mn McArthur | Oklahoma City | OK | 73127 | USA |
| Citadel Broadcasting Company | 292 Middle Road | Dover | NH | 03820 | USA |
| Citadel Broadcasting Company | 29331 Mount Rose Highway | Reno | NV | 89511 | USA |
| Citadel Broadcasting Company | 29563 Dicks Rd. | Vacherie | LA | 70090 | USA |
| Citadel Broadcasting Company | 300 E. Rock Road | Allentown | PA | 18103 | USA |

| Debtor | Street | City | State | ZIP | Country |
|--------|--------|------|-------|-----|---------|
| Citadel Broadcasting Company | 3076 E Bristol Rd | Burton | MI | 48519 | USA |
| Citadel Broadcasting Company | 3190 Christy Way, # 4&5 | Saginaw | MI | 48603 | USA |
| Citadel Broadcasting Company | 3200 Pine Tree | Lansing | MI | 48911 | USA |
| Citadel Broadcasting Company | 3201 145th St | Wrightsville | AR | 72206 | USA |
| Citadel Broadcasting Company | 3202 Pine Tree | Lansing | MI | 48911 | USA |
| Citadel Broadcasting Company | 3210 Blevins Road | Whitescreek | TN | 37189 | USA |
| Citadel Broadcasting Company | 32322 Corral Hollow Rd | Tracy | CA | 95376 | USA |
| Citadel Broadcasting Company | 3375 Merriam Street, Suite 201 | Muskegon | MI | 49444 | USA |
| Citadel Broadcasting Company | 3376 Merriam Street, Suite 201 | Muskegon | MI | 49444 | USA |
| Citadel Broadcasting Company | 342 Horseford Road | Ridgeville | SC | 29472 | USA |
| Citadel Broadcasting Company | 3420 Pine Tree Road | Lansing | MI | 48911 | USA |
| Citadel Broadcasting Company | 35-43-38N 97-52-31W | Okarche | OK | 73 | USA |
| Citadel Broadcasting Company | 36-16-03N 97-57-08W | Crescent | OK | 73028 | USA |
| Citadel Broadcasting Company | 3637 Carman Rd | Binghamton | NY | 13903 | USA |
| Citadel Broadcasting Company | 3685 Garfield Rd | Pinconning | MI | 48650 | USA |
| Citadel Broadcasting Company | 3720 Martin St. | Columbia | SC | 29250 | USA |
| Citadel Broadcasting Company | 375 Montaul Hwy. | Montauk | NY | 11954 | USA |
| Citadel Broadcasting Company | 3895 County Road 31 | Moundsville | AL | 35474 | USA |
| Citadel Broadcasting Company | 390 Sikes Pond Road | St. Matthews | SC | 29135 | USA |
| Citadel Broadcasting Company | 3900 E Broadway Ave | Berwick | IA | 50032 | USA |
| Citadel Broadcasting Company | 3900 Spring Rd. | Carlisle | PA | 17013 | USA |
| Citadel Broadcasting Company | 3960 Pettis NE | Ada | MI | 49301 | USA |
| Citadel Broadcasting Company | 400 E Britton Road | Oklahoma City | OK | 73114 | USA |
| Citadel Broadcasting Company | 400 Garfield Ave, SW | Grand Rapids | MI | 49504 | USA |
| Citadel Broadcasting Company | 4000 W Indian Hills Road | Norman | OK | 73072 | USA |
| Citadel Broadcasting Company | 401 W. Kirkpatrick Street | Syracuse | NY | 13204 | USA |
| Citadel Broadcasting Company | 4021 W. 8th | Little Rock | AR | 72204 | USA |
| Citadel Broadcasting Company | 4043 Geer Road | Hughson | CA | 95326 | USA |
| Citadel Broadcasting Company | 4045 NW 64th Street | Oklahoma City | OK | 73113 | USA |
| Citadel Broadcasting Company | 4055 Faber Place Drive | North Charleston | SC | 29405 | USA |

22

| Debtor | Street | City | State | ZIP | Country |
|--------|--------|------|-------|-----|---------|
| Citadel Broadcasting Company | 4143 109th Street | Urbandale | IA | 50322 | USA |
| Citadel Broadcasting Company | 4210 Coronado Ave. | Stockton | CA | 95204 | USA |
| Citadel Broadcasting Company | 4230 Faber Place Drive Suite 100 | North Charleston | SC | 29405 | USA |
| Citadel Broadcasting Company | 427 Caribou Road | Presque Isle | ME | 04769 | USA |
| Citadel Broadcasting Company | 434 Bearcat Drive | Salt Lake City | UT | 84115 | USA |
| Citadel Broadcasting Company | 4360 Fairview Dr | Pleasant Hill | IA | 50317 | USA |
| Citadel Broadcasting Company | 44 Bethany Rd | Ephrata | PA | 17522 | USA |
| Citadel Broadcasting Company | 4525 Savannah Hwy | Hollywood | SC | 29470 | USA |
| Citadel Broadcasting Company | 4575 W. Walker Rd. | Marana | AZ | | USA |
| Citadel Broadcasting Company | 4643 Quail Lakes Dr. Ste 100 | Stockton | CA | 95207 | USA |
| Citadel Broadcasting Company | 4653 Anderson Road | Knoxville | TN | 37918 | USA |
| Citadel Broadcasting Company | 4699 Old Baker Road | Zachary | LA | | USA |
| Citadel Broadcasting Company | 471 Robison Road | Erie | PA | 16509 | USA |
| Citadel Broadcasting Company | 4711 Old Kingston Pike | Knoxville | TN | 37919 | USA |
| Citadel Broadcasting Company | 475 E. 200 South | Kokomo | IN | 46901 | USA |
| Citadel Broadcasting Company | 4800 Zuber Road | Little Rock | AR | 72206 | USA |
| Citadel Broadcasting Company | 4900 South 550 West | Murray | UT | 84109 | USA |
| Citadel Broadcasting Company | 499 Jessen Lane | Wando | SC | 29492 | USA |
| Citadel Broadcasting Company | 50 James E Casey Drive | Buffalo | NY | 14206 | USA |
| Citadel Broadcasting Company | 500 4th St. NW | Albuquerque | NM | 87102 | USA |
| Citadel Broadcasting Company | 5035 Seewee Road | Awendaw | SC | 29429 | USA |
| Citadel Broadcasting Company | 506 2nd Avenue South | Nashville | TN | 37210 | USA |
| Citadel Broadcasting Company | 5145 West Lake Blvd | Homewood | CA | 96141 | USA |
| Citadel Broadcasting Company | 515 South 32nd Street | Camp Hill | PA | 17011 | USA |
| Citadel Broadcasting Company | 519 North Main Street | Kokomo | IN | 46901 | USA |
| Citadel Broadcasting Company | 5320 Hwy 49 N. #4 | Mariposa Cty. | CA | | USA |
| Citadel Broadcasting Company | 5401 MacDonald Road | Wrightsville | AR | 72206 | USA |
| Citadel Broadcasting Company | 5453 Jug Factory Rd | Tuscaloosa | AL | 35405 | USA |
| Citadel Broadcasting Company | 551 Main St | Presque Isle | ME | 04769 | USA |
| Citadel Broadcasting Company | 5571 Platt Spring Road | Lexington | SC | 29073 | USA |

23

| Debtor | Street | City | State | ZIP | Country |
|---|---|---|---|---|---|
| Citadel Broadcasting Company | 56 Western Avenue Suite 13 | Augusta | ME | 04330 | USA |
| Citadel Broadcasting Company | 561 Bessemer Highway | Birmingham | AL | 35221 | USA |
| Citadel Broadcasting Company | 5629 Murray Road | Memphis | Tn | 38119 | USA |
| Citadel Broadcasting Company | 5650 NW 100th Street | Grimes | IA | 50111 | USA |
| Citadel Broadcasting Company | 5655 Becker Rd | Buena Vista | MI | 48601 | USA |
| Citadel Broadcasting Company | 5672 Clay Palmerdale Rd | Birmingham | AL | 35126 | USA |
| Citadel Broadcasting Company | 575 W. Roger Rd. | Tucson | AZ | 85705 | USA |
| Citadel Broadcasting Company | 5750 NW 100th Street | Grimes | IA | 50111 | USA |
| Citadel Broadcasting Company | 5851 Maplewood SW | Albuquerque | NM | 87121 | USA |
| Citadel Broadcasting Company | 59 Court Street | Binghamton | NY | 13901 | USA |
| Citadel Broadcasting Company | 595 E. Plumb Lane | Reno | NV | 89502 | USA |
| Citadel Broadcasting Company | 60 Monroe Center, NW | Grand Rapids | MI | 49503 | USA |
| Citadel Broadcasting Company | 600 Baltimore Drive | Plains Twp. | PA | 18702 | USA |
| Citadel Broadcasting Company | 600 Old Wyomissing Rd | Reading | PA | 17522 | USA |
| Citadel Broadcasting Company | 605 Crapo | Flint | MI | 48502 | USA |
| Citadel Broadcasting Company | 6050 South Linder Road | Boise | ID | 83642 | USA |
| Citadel Broadcasting Company | 6164 Transmitter Lane | Colorado Springs | CO | 80906 | USA |
| Citadel Broadcasting Company | 6171 Transmitter Lane | Colorado Springs | CO | 80906 | USA |
| Citadel Broadcasting Company | 625 Magestrate Street | Chalmette | LA | 70087 | USA |
| Citadel Broadcasting Company | 6291 Transmitter Lane | Colorado Springs | CO | 80906 | USA |
| Citadel Broadcasting Company | 630 E. Brookside | Colorado Springs | CO | 80906 | USA |
| Citadel Broadcasting Company | 640 Grings Hill Rd | Sinking Springs | PA | 19608 | USA |
| Citadel Broadcasting Company | 640 Radio Way | Blountville | TN | 37617 | USA |
| Citadel Broadcasting Company | 6402 Johnson Chapel Rd | Brentwood | TN | 37027 | USA |
| Citadel Broadcasting Company | 650 Wooddale Blvd. | Baton Rouge | LA | 70806 | USA |
| Citadel Broadcasting Company | 661 Hwy 167 | Washington | LA | 70589 | USA |
| Citadel Broadcasting Company | 6627 Gilead Road | Clinton | LA | 70722 | USA |
| Citadel Broadcasting Company | 675 Dorrance Ave | West Seneca | NY | 14224 | USA |
| Citadel Broadcasting Company | 6805 Corporate Dr, Ste 130 | Colo Spgs | CO | 80919 | USA |
| Citadel Broadcasting Company | 6895 Salem Road | Gordo | AL | 35466 | USA |

| Debtor | Street | City | State | ZIP | Country |
|--------|--------|------|-------|-----|---------|
| Citadel Broadcasting Company | 7 Governor Winthrop Blvd | New London | CT | 06320 | USA |
| Citadel Broadcasting Company | 700 Wellington Hills Road | Little Rock | AR | 72211 | USA |
| Citadel Broadcasting Company | 7120 Lost Canyon Drive | Tucson | AZ | 85745 | USA |
| Citadel Broadcasting Company | 7192 Raliegh-LaGrange | Cordova | Tn | 38018 | USA |
| Citadel Broadcasting Company | 7201 W.  Lake Mead Blvd. Suite 400 | Las Vegas | NV | 89128 | USA |
| Citadel Broadcasting Company | 7340 New Holland St | Zeeland | MI | 49464 | USA |
| Citadel Broadcasting Company | 7504 NE 38th Ave | Altoona | IA | 50009 | USA |
| Citadel Broadcasting Company | 7707 Waco Ave. | Baton Rouge | LA | 70806 | USA |
| Citadel Broadcasting Company | 7725 W Britton Road | Oklahoma City | OK | 73132 | USA |
| Citadel Broadcasting Company | 800 Wellington Hills Road | Little Rock | AR | 72211 | USA |
| Citadel Broadcasting Company | 821 Pineville Road | Chattanooga | Tn | 37405 | USA |
| Citadel Broadcasting Company | 825 Tower Drive | Birmingham | AL | 35214 | USA |
| Citadel Broadcasting Company | 8455 Peach Street | Erie | PA | 16509 | USA |
| Citadel Broadcasting Company | 850 West 800 South | Salt Lake City | UT | | USA |
| Citadel Broadcasting Company | 8583 N. Prairie Road | Springport | IN | 47386 | USA |
| Citadel Broadcasting Company | 9045 Heible Road | Greene Twp. | PA | 16509 | USA |
| Citadel Broadcasting Company | 910 Comanchee Trail | W. Columbia | SC | 29169 | USA |
| Citadel Broadcasting Company | 919 Buckingham Blvd. | Elizabethtown | PA | 17022 | USA |
| Citadel Broadcasting Company | 939 Buckingham Blvd. | Elizabethtown | PA | 17022 | USA |
| Citadel Broadcasting Company | 9668 Rock River Road (Tower Site) | Jamestown | CA | 95327 | USA |
| Citadel Broadcasting Company | 9750 Dutcher Rd | Gilford Twp | MI | 48733 | USA |
| Citadel Broadcasting Company | 9801 N Lindsay | Oklahoma City | OK | 73105 | USA |
| Citadel Broadcasting Company | Andrews Road | Dewitt | NY | 13214 | USA |
| Citadel Broadcasting Company | Beacon Pole Road | Cumberland | RI | 02895 | USA |
| Citadel Broadcasting Company | Briar Hill Rd | Groton | CT | 06340 | USA |
| Citadel Broadcasting Company | Buffalo Mountain Road | Johnson City | TN | 37615 | USA |
| Citadel Broadcasting Company | Bumpin Hill, White Rock Rd | Westerly | RI | 2891 | USA |
| Citadel Broadcasting Company | Byhalia Rd. Hwy 304 | Lewisburg | Ms | 38632 | USA |
| Citadel Broadcasting Company | Chase Way | Seabrook | NH | 03874 | USA |
| Citadel Broadcasting Company | Cloverbank | Hamburg | NY | 14075 | USA |

| Debtor | Street | City | State | ZIP | Country |
|---|---|---|---|---|---|
| Citadel Broadcasting Company | Cross Mountain | Briceville | TN | 37710 | USA |
| Citadel Broadcasting Company | Deer Point | Boise | ID | | USA |
| Citadel Broadcasting Company | Delacroix Hwy Box 737 | St. Bernard | LA | 70085 | USA |
| Citadel Broadcasting Company | Eagle Nest Road | Gray | ME | 04039 | USA |
| Citadel Broadcasting Company | East Wolf Valley Road | Clinton | TN | 37716 | USA |
| Citadel Broadcasting Company | Edens View Road | Kingsport | TN | 37662 | USA |
| Citadel Broadcasting Company | End of Goni Rd/McClellan Peak | Carson City | NV | | USA |
| Citadel Broadcasting Company | Ephrata Mountain | Ephrata | PA | 17522 | USA |
| Citadel Broadcasting Company | Farnsworth Peak Tooele Cnty | Tooele | UT | 84074 | USA |
| Citadel Broadcasting Company | G4511 Miller Rd | Flint | MI | 48507 | USA |
| Citadel Broadcasting Company | Gallo Ranch I-5 & Gaffery Road | Vernalis | CA | 95376 | USA |
| Citadel Broadcasting Company | Greentop Mtn | Sevierville | TN | 37876 | USA |
| Citadel Broadcasting Company | Hwy 365 Jefferson County | Redfield | AR | 72079 | USA |
| Citadel Broadcasting Company | Ipswitch Street | Johnston | RI | 02919 | USA |
| Citadel Broadcasting Company | Kadn Road | Churchpoint | LA | 70525 | USA |
| Citadel Broadcasting Company | Lake Mountain Utah County | Springville | UT | | USA |
| Citadel Broadcasting Company | Lemmon Valley, 7800 Chickadee Dr. | Reno | NV | 89506 | USA |
| Citadel Broadcasting Company | Lot 47 on Barrington Town Map | Barrington | NH | 03825 | USA |
| Citadel Broadcasting Company | Ludlow Street | Johnston | RI | 02919 | USA |
| Citadel Broadcasting Company | Mars Hill Mountan, North Peak | Mars Hill | ME | 04758 | USA |
| Citadel Broadcasting Company | Mt. Vision SL County | Salt Lake City | UT | | USA |
| Citadel Broadcasting Company | Mt. Washington | Mt. Washington | NH | 03597 | USA |
| Citadel Broadcasting Company | No address | McKean Twp. | PA | 16426 | USA |
| Citadel Broadcasting Company | North Belfast Road | Augusta | ME | 04330 | USA |
| Citadel Broadcasting Company | Old New London Turnpike | Exeter | RI | 02822 | USA |
| Citadel Broadcasting Company | Old Stonehouse Road | Dewitt | NY | 13214 | USA |
| Citadel Broadcasting Company | Old Wyoming Road | Reading | PA | | USA |
| Citadel Broadcasting Company | One City Center, 3rd flr | Portland | ME | 04101 | USA |
| Citadel Broadcasting Company | Opportunity Farm Road | New Glouster | ME | 04101 | USA |
| Citadel Broadcasting Company | Peavine Peak | Reno | NV | 89506 | USA |

26

| Debtor | Street | City | State | ZIP | Country |
|---|---|---|---|---|---|
| Citadel Broadcasting Company | Penobscot Knob | Hanover Twp | PA | 18707 | USA |
| Citadel Broadcasting Company | Popes Island | New Bedford | MA | 02740 | USA |
| Citadel Broadcasting Company | Quarry Mtn/Summit County | Park City | UT | | USA |
| Citadel Broadcasting Company | Red Peak | Reno | NV | | USA |
| Citadel Broadcasting Company | Sandia Crest, Cibola Forest | Albuquerque | NM | 87102 | USA |
| Citadel Broadcasting Company | Sevier Road | Pompey | NY | 13138 | USA |
| Citadel Broadcasting Company | Shinall Mountain | Little Rock | AR | 72223 | USA |
| Citadel Broadcasting Company | Sourwood Mountain | Jefferson City | TN | 37760 | USA |
| Citadel Broadcasting Company | Stevens Lane | Lenoir City | TN | 37771 | USA |
| Citadel Broadcasting Company | Stone Drive | Kingsport | TN | 37662 | USA |
| Citadel Broadcasting Company | Stor-Mor Equipment Storage | Boise | ID | 83705 | USA |
| Citadel Broadcasting Company | Summit | Mt. Washington | NH | | USA |
| Citadel Broadcasting Company | Taber Street | Fairhaven | MA | 02719 | USA |
| Citadel Broadcasting Company | TableRock Repeater Site | Boise | ID | 83701 | USA |
| Citadel Broadcasting Company | Texter Mountain Rd | Womelsdorf | PA | 19567 | USA |
| Citadel Broadcasting Company | Third Hill off Brixham Road | Eliot | ME | 03903 | USA |
| Citadel Broadcasting Company | Top of Mount Bullion | Mariposa Cty. | CA | | USA |
| Citadel Broadcasting Company | Tower Road | Raymond | ME | 04101 | USA |
| Citadel Broadcasting Company | U.S. Route One | Saco | ME | 04072 | USA |
| Citadel Broadcasting Company | West Evergreen Rd | Falls | PA | 18657 | USA |
| Citadel Broadcasting Company | West Mountain off Sekol Rd | Ransome Twp. (Scranton P.O.) | PA | 18507 | USA |
| Citadel Broadcasting Company | Wilson Peak/Summit County | Heber | UT | | USA |
| DC Radio Assets, LLC | 4010 Chesapeake Street NW | Washington | DC | 20016 | USA |
| DC Radio Assets, LLC | 4400  Jenifer St. NW | Washington | DC | 20015 | USA |
| DC Radio Assets, LLC | 5217 N. 19th ROAD | Arlington | VA | 22207 | USA |
| DC Radio Assets, LLC | 7115 Greentree Road | Bethesda | MD | 20817 | USA |
| DC Radio Assets, LLC | 8101A Lee Hwy. | Falls Church | VA | 22042 | USA |
| Detroit Radio Assets, LLC | 3011 W Grand Blvd. | Detroit | MI | 48202 | USA |
| Detroit Radio, LLC | 1 Radio Plaza | Royal Oak Twp. | MI | 48343 | USA |
| Detroit Radio, LLC | 15725 Sibley Road | Riverview | MI | 48193 | USA |

| Debtor | Street | City | State | ZIP | Country |
|---|---|---|---|---|---|
| Detroit Radio, LLC | 24600 Greenfield | Oak Park | MI | 48237 | USA |
| Detroit Radio, LLC | 3011 W Grand Blvd. | Detroit | MI | 48202 | USA |
| LA Radio, LLC | 3321 S La Cienega Blvd | Los Angeles | CA | 90016 | USA |
| Minneapolis Radio Assets, LLC | 2000 SE Elm St. | Minneapolis | MN | 55414 | USA |
| Minneapolis Radio Assets, LLC | 4272 170th Street | Lakeville | MN | | USA |
| Minneapolis Radio Assets, LLC | 540 Emerson Avenue North | Cambridge | MN | | USA |
| Minneapolis Radio Assets, LLC | 5801 Opus Parkway | Minnetonka | MN | | USA |
| Minneapolis Radio Assets, LLC | 80 South 8th Street | Minneapolis | MN | | USA |
| Minneapolis Radio Assets, LLC | 580 Gramsie Road | Shoreview | MN | 55126 | USA |
| NY Radio Assets LLC | 2 Penn Plaza | New York | NY | 10121 | USA |
| NY Radio Assets, LLC | 2 Penn Plaza, 17th Floor | New York | NY | 10121 | USA |
| NY Radio Assets, LLC | 272 Rt. 17 S | Lodi | NJ | 7644 | USA |
| Radio Networks, LLC | 125 West End Ave. | New York | NY | 10023 | USA |
| Radio Networks, LLC | 13725 Montfort Drive | Dallas | TX | 75240 | USA |
| Radio Networks, LLC | 1777 N.E. Loop 410 | San Antonio | TX | 78217 | USA |
| Radio Networks, LLC | 2 Alhambra Plaza | Miami | FL | 33134 | USA |
| Radio Networks, LLC | 261 Madison Ave | New York | NY | 10016 | USA |
| Radio Networks, LLC | 333 N. Michigan Ave. | Chicago | IL | 60601 | USA |
| Radio Networks, LLC | 54 Music Square East | Nashville | TN | 37203 | USA |
| San Francisco Radio Assets, LLC | 900 Front St. | San Francisco | CA | 94111 | USA |
| San Francisco Radio Assets, LLC | BM7, Dumbarton Rd | Newark | CA | 94560 | USA |
| San Francisco Radio Assets, LLC | East Bay Hills Repeater site | Berkeley | CA | | USA |
| San Francisco Radio Assets, LLC | MT. Diablo State park | Walnut Creek | CA | | USA |
| San Francisco Radio Assets, LLC | Pier 32, Islais Creek (Seawall Lot 344 SF Port) | San Francisco | CA | 94111 | USA |
| San Francisco Radio Assets, LLC | Mt. Tamalpais | Marin County | CA | | USA |
| San Francisco Radio Assets, LLC | Mc Queen Ridge | Santa Clara | CA | | USA |
| SF Radio Assets LLC | 900 Front Street | San Francisco | CA | 94111 | USA |
| The Last Bastion Station Trust, LLC | 15154 Highway 13 South | Humnoke | AR | 72072 | USA |
| The Last Bastion Station Trust, LLC | 202 Galbert Road | Lafayette | LA | 70506 | USA |
| The Last Bastion Station Trust, LLC | 202A Galbert Road | Lafayette | LA | 70506 | USA |

| Debtor | Street | City | State | ZIP | Country |
|--------|--------|------|-------|-----|---------|
| The Last Bastion Station Trust, LLC | 217 Smitty's Road | Sunset | LA | 70584 | USA |
| The Last Bastion Station Trust, LLC | Hwy. 3002, 5 miles South of I-10 | Ramah | LA | 70757 | USA |
| The Last Bastion Station Trust, LLC | Pickthorn Road | Cabot | AR | 72023 | USA |
| The Last Bastion Station Trust, LLC | Prospect Building, 1501 N. University | Little Rock | AR | 72207 | USA |
| The Last Bastion Station Trust, LLC | Sandia Crest, Cibola Forest | Albuquerque | NM | 87102 | USA |
| The Last Bastion Station Trust, LLC | Sardis Road | Sardis | AR | 72103 | USA |
| WBAP-KSCS Assets, LLC | 1204 West Belt Line Road | Cedar Hill | TX | 75104 | USA |
| WBAP-KSCS Assets, LLC | 2221 East Lamar Blvd. | Arlington | TX | 76006 | USA |
| WBAP-KSCS Assets, LLC | 2790 Nelson Wyatt Road | Mansfield | TX | 76063 | USA |
| WBAP-KSCS Assets, LLC | 660 County Road 2845 | Slidell | TX | 76234 | USA |
| WPLJ Radio, LLC | 350 5th Avenue | New York | NY | 10118 | USA |
| WPLJ Radio, LLC | Alpine Tower, US Rt. 9W | Alpine | NJ | 07620 | USA |

**<u>Exhibit I</u>**

**Location of Debtors' Assets, Book and Records**

**Location of Debtors' Assets, Book and Records**

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

The Debtors' books and records are located at their corporate headquarters at 7201 W. Lake Mead Blvd., Suite 400, Las Vegas, Nevada 89128. The Debtors' also have offices in New York, New York.

In addition the Debtors have assets in every location in which they operate their business, including the locations listed on **Exhibit H**, which is incorporated herein by reference.

## Exhibit J

**Equity Security Holders**

## Equity Security Holders

### **Publicly Held Debentures**

Revolving Credit Facility
*Amount outstanding as of 12/20/09*    140,645,968
*Number of Holders as of 9/2/09*    16

Tranche A Term Loan
*Amount outstanding as of 12/20/09*    544,815,956
*Number of Holders as of 9/2/09*    43

Tranche B Term Loan
*Amount outstanding as of 12/20/09*    1,390,158,666
*Number of Holders as of 9/2/09*    365

8% Convertible Subordinated Notes [1]
*Amount outstanding as of 12/20/09*    49,631,188
*Number of Holders as of 9/2/09*

### **Publicly Held Equity**

#### *Preferred Stock*
*Shares authorized*    200,000,000
*Shares issued or outstanding as of 10/31/09*    0

#### *Common Stock*
*Shares authorized*    500,000,000
*Shares outstanding as of 10/30/09* (not held by Debtors' Officers and Directors)    259,577,927
*Number of Holders (approximately)*    1,106,000

#### *Common Stock held by Debtors' Officers and Directors*

| | |
|---|---|
| Farid Suleman | 4,170,406 |
| Randy Taylor | 81,766 |
| Jacquelyn J. Orr | 37,585 |
| Judith Ellis | 174,202 |
| Patricia Stratford | 56,517 |
| J. Anthony Forstmann | 6,667 |
| Theodore J. Forstmann[2] | - |

---

[1] The Debtors do not currently have an estimate of the holders of the 8% Convertible Subordinated Notes, but it is assumed that they are not widely held. Upon the filing of the petitions, a request will be made to identify the precise number and names of the holders in order to provide services. <u>Exhibit J</u> will be updated at that time.

[2] Mr. Forstmann does not directly own any shares. However, Mr. Forstmann is deemed to be a beneficial owner of the 76,277,703 shares held by Forstmann Little & Co. entities.

| | |
|---|---|
| Michael A. Miles | 510,000 |
| Michael J. Regan | 31,667 |
| Thomas Reifenheiser | 103,334 |
| Herbert J. Siegel | 10,000 |
| Wayne T. Smith | 1,075,000 |
| **Total Common Stock Outstanding as of 10/30/09** | 265,759,192 |

**<u>Exhibit K</u>**

**Litigation**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

A final arbitration award has been entered against the Debtors in favor of John Mitchell Dolan in the amount of $850,000, plus interest in the amount of $61,619.18 as of November 25, 2009, plus interest in the amount of $209 per day thereafter.  Mr. Dolan is seeking relief in the United States District Court for the Southern District of New York (Civil Action No. 09-CIV-9828) to reduce the arbitration award to judgment.

## **Exhibit L**

**Senior Management**

## Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
|------|-------|--------|------------------|
| Farid Suleman | Chairman of the Board of Directors and Chief Executive Officer | Since March 2002 | Mr. Suleman served as President and Chief Executive Officer of Infinity Broadcasting Corp. from February 2001 to February 2002, and Executive Vice President, Chief Financial Officer, Treasurer and director before then. Previous positions held include special limited partner of Forstmann Little & Co. |
| Judith A. Ellis | Chief Operating Officer | Since February 2003 | Ms. Ellis served as Senior Vice President/Market Manager for Emmis Communications Corporation. |
| Jacquelyn J. Orr | Vice President, General Counsel and Secretary | Since May 2006 | Ms. Orr served as Associate Counsel for Entercom Communications Corp. beginning in January 2000. Previous positions held include Litigation Counsel for CBS Inc. |
| Randy L. Taylor | Chief Financial Officer and principal financial and accounting officer (effective as of March 2008) | April 1999 through September 2005 and since September 2006. | Mr. Taylor served as Vice President - Corporate Controller for Bally Technologies, Inc. (September 2005 to September 2006). |
| Patricia Stratford | Senior Vice President - Finance and Administration and Assistant Secretary | Since August 2003 | Ms. Stratford served as Director - Finance Administration and Benefits for Infinity Broadcasting Corporation from January 1999 until July 2003. |

**<u>Exhibit M</u>**

**Payroll**

**Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | Approximately $18,848,000 for 30 days |
| **Payments to Officers, Directors and Stockholders** | **Officers**: Approximately $226,000 for 30 days<br><br>**Directors**: Approximately $80,000 for 30 days<br><br>**Stockholders**: N/A |
| **Payments to Financial and Business Consultants Retained by the Debtors** | All professionals will file fee applications and will not be paid any amounts within 30 days of the commencement of the case. |

**<u>Exhibit N</u>**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the commencement of these chapter 11 cases, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $55.4 million |
| **Cash Disbursements** | $44.9 million |
| **Net Cash Gain** | $10.5 million |
| **Unpaid Obligations** | $28.6 million |
| **Unpaid Receivables** | $51.8 million |

## **Exhibit O**

### **Description of First Day Pleadings**

## THE DEBTORS' FIRST DAY PLEADINGS

As explained in the Declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (each, a "*First Day Pleading*" and, collectively, the "*First Day Pleadings*"), to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and ensure that their restructuring goals can be implemented with limited disruption to operations.[1]  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  In fact, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to use cash on hand and make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.

In my opinion, approval of the relief requested in the First Day Pleadings, each of which is explained herein, will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

## <u>FINANCING MOTIONS</u>

**A.**    **Debtors' Motion for Interim and Final Orders (A) Authorizing the Use of Cash Collateral; (B) Granting Adequate Protection to Prepetition Secured Parties; and (C) Scheduling a Final Hearing.**

1.    The Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures and for other general corporate purposes.  As of the Petition Date, the Debtors have approximately $36 million cash on hand.  An inability to use cash on hand and cash generated from operations during the chapter 11 cases would cripple and ultimately shut-

---

[1]   Capitalized terms used in this Exhibit but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings.

down the Debtors' business operations.  Indeed, the Debtors must use their cash to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs - all of which are necessary to preserve and maintain the Debtors' going-concern value.

2.      As of the date hereof, the Debtors have prepetition indebtedness of approximately $2.126 billion, including $2.076 billion of secured debt (collectively, the "**Secured Debt**").  The Debtors' Secured Debt consists of: (a) a $200 million[2] six-year revolver due June 2013[3]; (b) a $600 million six-year Tranche A term loan due June 2013; and (c) a $1.535 billion seven-year Tranche B term loan due June 2014.  As of the date hereof, $2.076 billion in Secured Debt is outstanding.  This balance includes $140.6 million outstanding on the Revolver, $544.8 million outstanding on the Tranche A Term Loan, and $1,390.2 million outstanding on the Tranche B Term Loan.[4]

3.      The Secured Debt is memorialized by a Credit Agreement, dated as of June 12, 2007, by and among Citadel Broadcasting Corporation, certain lenders, and JPMorgan Chase Bank, N.A., as administrative agent, as amended, supplemented or otherwise modified as of the Petition Date (the "**Credit Agreement**").

4.      The obligations under the Credit Agreement are unconditionally guaranteed by Citadel's operating subsidiaries, including each of the Debtors (collectively, the "**Subsidiary**

---

[2]    The amount reflects that which was originally available under the Revolving Credit Facility.

[3]    The availability under the Revolver was reduced to $150 million and later to $140 million pursuant to certain amendments to the Credit Agreement (as defined below).

[4]    The outstanding balances as of December 20, 2009 for the Revolving Credit Facility, Tranche A Term Loan and Tranche B Term Loan include accrued paid-in-kind interest through December 20, 2009.

3

*Guarantors*"). The debt issued under the Credit Agreement is secured by a first priority security interest in certain assets and real property of the Debtors.

5.      In addition, the Debtors are party to an amortizing interest swap agreement, which they uses to manage their exposure to the variability of future cash flows related to their floating interest rate obligations under its Credit Agreement. The swap agreement is memorialized by: (a) the ISDA 2002 Swap Master Agreement between JPMorgan Chase Bank, N.A. and Citadel Broadcasting, dated June 26, 2007, which sets forth the terms and conditions by which the swap transaction will be governed; and (b) the Interest Rate Swap Transaction between Chase and Citadel, dated June 27, 2007, whereby Citadel Broadcasting pays a quarterly fixed amount to Chase and Chase pays a quarterly floating amount (derived from LIBOR) to Citadel as per the terms of the agreement and the Master Agreement from the period commencing July 12, 2007 through September 30, 2012. As of the date hereof, the notional amount of the Swap Agreement is $970 million. The Swap-related obligations, including additional amounts in respect of termination payments under the Swaps (to the extent the Swaps are terminated), are secured ratably with the other Prepetition Obligations.

6.      The Prepetition Lenders have consented to the Debtors' use of Cash Collateral in the ordinary course of business pursuant to terms detailed herein and as provided in the Cash Collateral Orders in exchange for the Debtors providing protection against any diminution in value of the Prepetition Lenders' interests in the Prepetition Collateral. Specifically, it is my understanding that the Debtors have agreed to provide the Prepetition Lenders with various forms of "adequate protection," including, certain priority liens and claims, as well as current payment of interest and payment or reimbursement of all reasonable and documented fees, costs and charges incurred by the Agent as contemplated and provided for under the Credit

4

Agreement.   In addition, the Debtors have agreed to pay to the Agent all amounts on deposit in

the Cash Collateral Account (estimated to be approximately $4 million), which shall be applied

to reduce ratably the principal amount of all Prepetition Obligations.

**B.    Debtors' Motion For an Order Authorizing the Debtors to (A) Continue to Operate the Cash Management System; (B) Honor Certain Prepetition Obligations Related to the Cash Management System; (C) Continue to Invest Excess Funds in the Investment Account on an Interim Basis Notwithstanding Section 345(b) of the Bankruptcy Code; (d) Maintain Existing Business Forms and (e) Grant Administrative Priority for Intercompany Claims and Perform Under Certain Intercompany Arrangements and Historical Practices.**

*The Debtors' Cash Management System and Business Forms*

7.      To manage their businesses, the Debtors utilize a centralized cash management

system to collect and transfer funds generated by their operations (the "***Cash Management***

***System***").  Through the use of the Cash Management System, the Debtors are able to collect and

transfer cash efficiently to satisfy their financial obligations.  The Cash Management System

facilitates the Debtors' cash monitoring, forecasting and reporting, and enables the Debtors to

maintain control over the bank accounts (collectively, the "***Bank Accounts***").

8.      The Cash Management System provides well-established mechanisms for the

collection, concentration, management, disbursement and investment of funds used in their

operations.  The Debtors have maintained the Cash Management System in substantially the

same form for a number of years, but over time have streamlined the Cash Management System

to centralize the majority of deposits, disbursements and investments at Bank of America, N.A.

("***BOA***").

9.      The Cash Management System consists of approximately 109 Bank Accounts and

is used to receive incoming payments, deposit checks and make disbursements.  Disbursements

are primarily made through one of three methods:   (a) a traditional written check; (b) wire

5

transfers from the Debtors' Bank accounts; or (c) automatic clearing house payments ("**ACH Payments**").

10.     The vast majority of the Bank Accounts are located in banks, which counsel has informed me, are designated as authorized depositories (the "**Authorized Depositories**") by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") in accordance with the U.S. Trustee Chapter 11 Guidelines for the Southern District of New York. The Debtors maintain six Bank Accounts (the "**Other Depository Accounts**") at banks that are not Authorized Depositories; these Other Depository Accounts, on an individual basis, typically hold less than $250,000 at any given time and do not represent significant components of the Cash Management System. The Other Depository Accounts are located in markets where larger national banks did not have a branch at the time the Debtors opened the accounts. As discussed below, funds in the Other Depository Accounts regularly are swept into the Debtors' Bank Accounts located at Authorized Depositories.

11.     The principal components of the Cash Management System, including the concentration accounts, corporation account, investment account, depository accounts, disbursement accounts, payroll accounts and benefit accounts, as well as the flow of funds among the various Bank Accounts, are described below.

12.     The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in economic scope and geographic reach. Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including the ability to (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds. These

controls are particularly important because a total of approximately $50 million to $85 million flows through the Cash Management System on a monthly basis to service operations.

*The Bank Accounts*

*Concentration Account*

13.     The centerpiece of the Cash Management System consists of two concentration accounts maintained at BOA.[5]    One concentration account (the "***Alphabet Concentration Account***") is utilized primarily for the operation of the stations and radio network acquired in connection with the 2007 transaction with The Walt Disney Company (the "***Former ABC Operations***").   The other concentration account (the "***Company Concentration Account***," and together with the Alphabet Concentration Account, the "***BOA Concentration Accounts***") is utilized in the operation of the Debtors' other stations (the "***Legacy Operations***").   The BOA Concentration Accounts are the primary resting place of the Debtors' cash and are used to fund other accounts that satisfy, among other things, payroll, medical expenses.

14.     Funds in the vast majority of the Debtors' other accounts at BOA (described below) are swept into the BOA Concentration Accounts — *i.e.*, funds in each of these other accounts automatically are sent to the BOA Concentration Accounts at the end of each day.   As described below, the Debtors also regularly transfer into the Company Concentration Account funds in Bank Accounts that are not maintained at BOA.   Funds accumulated in the BOA Concentration Accounts typically (a) are transferred to the Debtors' Corporation Account (as defined below) for investment and to satisfy other corporate expenses, (b) are transferred to the Debtors' Disbursement Accounts (as defined below) to pay operating expenses by check and

---

[5]    The Debtors are party to an account control agreement with JPM (as defined below) that governs certain of the Debtors' accounts and relationship with BOA and other Banks.   JPM is the administrative agent for the Debtors' prepetition secured facility.

(c) have wires drawn from them for payment of certain of the Debtors' expenses. In addition, credit card fees, refunds and chargebacks, as well as return checks, are charged against the BOA Concentration Accounts. As of November 1, 2009, the BOA Concentration Accounts held approximately $3 million.

15.     The Debtors also maintain a concentration account (the "*US Bank Concentration Account*") at U.S. Bank, N.A. ("*US Bank*") and a concentration account (the "*JPM Concentration Account*") at JP Morgan Chase Bank, N.A. ("*JPM*"). Funds accumulated in the Debtors' depository accounts maintained at US Bank (depository accounts for the Debtors' Salt Lake City and Colorado Springs markets) automatically are swept into the US Bank Concentration Account at the end of each business day. Periodically, the funds accumulated in the US Bank Concentration Account are wired to the Company Concentration Account. Funds accumulated in the Debtors' depository accounts maintained at JPM (depository accounts for the Debtors' New Orleans, Lafayette and Baton Rouge markets) automatically are swept into the JPM Concentration Account. Periodically, the funds accumulated in the JPM Concentration Account are wired to the Company Concentration Account. As of November 1, 2009, the US Bank Concentration Account held approximately $110,000 and the JPM Concentration Account held approximately $265,000.

#### *Corporation Account and Share Repurchase Account*

16.     The Debtors maintain an account (the "*Corporation Account*") at BOA for the payment of certain expenses, including interest payments and interest swap payments. The Corporation Account also acts as a conduit for funds to flow from the BOA Concentration Accounts to the Debtors' Investment Account (as defined below). In addition, redemptions of investments are deposited into the Corporation Account. As needed, funds in the Corporation

Account are transferred back to the BOA Concentration Accounts.  As of November 1, 2009, the Corporation Account had a balance of approximately $6.2 million.

17.    The Debtors also maintain an account (the "***Share Repurchase Account***") at Credit Suisse Securities (USA) LLC for the purpose of repurchasing shares of common stock. As of November 1, 2009, the Share Repurchase Account had a balance of approximately $300.

*Investment Account*

18.    The Debtors maintain an investment account (the "***Investment Account***") at Bank of America Securities, LLC ("***BOA Securities***").  Funds in the Corporation Account are swept into and out of the Investment Account at the beginning of each day according to the daily cash needs of the Debtors.  The funds in the Investment Account are invested into the Treasury Instruments Portfolio (the "***Treasury Portfolio***") managed by Goldman Sachs Asset Management, L.P. ("***GSAM***").  The Treasury Portfolio is a liquid investment, as there is daily access to funds.

19.    GSAM's Treasury Portfolio invests only in securities issued by the U.S. Treasury and repurchase agreements relating to such securities.  The focus of this policy is to preserve capital and maintain liquidity, as funds placed into the Investment Account frequently are returned to the BOA Concentration Accounts as necessary for the Debtors' normal business operations.  The amount of funds invested with GSAM's Treasury Portfolio ranges from $17 million to $50 million.    As of November 1, 2009, the Investment Account held approximately $17.9 million.

*Depository Accounts*

20.    The Debtors maintain local depository accounts (the "***Depository Accounts***") for each market in which they operate.  The vast majority of these Depository Accounts are

9

maintained at BOA (the "***BOA Depository Accounts***").[6]    These accounts are used for the depositing of local receipts and credit card deposits.  The BOA Depository Accounts are set up as zero balance accounts (the "***Zero Balance Accounts***"), which means that the net position of the account at the end of the day is zeroed out and any funds in the account are swept to the BOA Concentration Accounts.    BOA Depository Accounts associated with the Former ABC Operations are swept into the Alphabet Concentration Account and BOA Depository Accounts associated with the Legacy Operations are swept into the Company Concentration Account.

21.    To the extent that there is not a local BOA branch in each market, the Debtors have established accounts at various local banks (the "***Non-BOA Depository Accounts***"), including US Bank and JPM (as described above).[7]  Like the BOA Depository Accounts, the Non-BOA Depository Accounts also are used for the depositing of local receipts and credit card deposits.    The Non-BOA Depository Accounts, however, do not function as Zero Balance Accounts.    Funds in the Non-BOA Depository Accounts are transferred to the Company Concentration Account at least once per week.[8]    As of November 1, 2009, the Non-BOA Depository Accounts held approximately $800,000.

*Disbursement Accounts*

22.    The Debtors also maintain three disbursement accounts (the "***Disbursement Accounts***") at BOA.  The Former ABC Operations utilize two of these Disbursement Accounts

---

[6]    The Debtors also maintain two certificate of deposit accounts at BOA that serve as security deposits for certain of the Debtors' utility providers.

[7]    Four of the Non-BOA Depository Accounts are not Authorized Depositories.    As mentioned above, these accounts typically are located in markets where larger national banks did not have a branch at the time the Debtors opened the Bank Account.

[8]    The Depository Accounts located at US Bank and JPM automatically are swept on a daily basis into the US Bank Concentration Account and JPM Concentration Account, respectively.  As described above, funds in the US Bank Concentration Account and JPM Concentration Account are transferred to the Company Concentration Account on a regular basis.

and the Legacy Operations utilize the third. The Disbursement Accounts are used for the issuance of checks in payment of vendor invoices and other expenses. The Debtors generally maintain a small balance in each of the Disbursement Accounts and a funds transfer is completed within a day of when a check run is conducted from the BOA Concentration Accounts to each of the Disbursement Accounts in a dollar amount equal to the dollar amount of the checks issued from each of the Disbursement Accounts. As of November 1, 2009, the Disbursement Accounts held approximately $800,000.

*Payroll Accounts*

23.    The Debtors also maintain two accounts (the "***Payroll Accounts***") at BOA for the payment of employee net pay and payroll taxes — one for the Former ABC Operations and another for the Legacy Operations. The Payroll Accounts are prefunded by transfers from the appropriate BOA Concentration Account. On the day before payroll, Ceridian Corporation, the Debtors' payroll service provider, issues a reverse wire to the Payroll Accounts in the amount of the Debtors' payroll liabilities. As of November 1, 2009, the Payroll Accounts held approximately $151,000.

*Benefits Accounts*

24.    The Debtors also maintain an account (the "***Benefits Account***") at BOA for the payment of self insured medical claims through Blue Cross and Blue Shield Association, prescription payments through Express Scripts, Inc. and flexible spending account medical benefits and commuter benefits through Automatic Data Processing, Inc.[9] The Benefits Account is funded on a weekly basis from the Company Concentration Account based on invoices

---

[9]    Payments related to other benefits programs involving the Debtors, including dental and vision benefits, are processed through the Disbursement Accounts.

provided by Blue Cross and Blue Shield Association, Express Scripts, Inc. and Automatic Data Processing, Inc. As of November 1, 2009, the Benefits Account held approximately $15,000.

### *Other JPM Accounts*

25.     The Debtors also maintain four other accounts at JPM for various purposes.[10] The first account is used to fund bank fees related to various JPM accounts used by the Debtors and has a balance of approximately $1,500 as of November 1, 2009. A second account is used to hold restricted cash that is swept into a collateral account pursuant to the terms of the fourth amendment to the Debtors' secured credit facility and has a balance of approximately $4 million as of November 1, 2009. A third account was established to hold funds that are in escrow pursuant to the terms of one of the Debtors' employment agreements and has a balance of approximately $320,000 as of November 1, 2009. Finally, the fourth account is used to fund the run-off an employee medical plan that was terminated by the Debtors and has a balance of approximately $7,000 as of November 1, 2009.

### *Trust Accounts*

26.     Through their integrated Cash Management System , the Debtors also fund transfers to and from certain accounts formally owned by the Last Bastion Trust, LLC (the "***Last Bastion Trust***) and Wasatch Radio, LLC (the "***Wasatch Trust***") – non-Debtor entities in which the Debtors hold a beneficial interest. Pursuant to Federal Communications Commission ("***FCC***") ownership rules, the Debtors were required to divest stations in certain markets, which stations were assigned to the Last Bastion Trust and Wasatch Trust. Notwithstanding their transfer to the trusts, the Debtors maintain a beneficial interest in the stations until they are sold to a third party.

---

[10]   The Debtors also maintain a number of additional accounts at JPM, which were opened at a time when the Debtors intended to further consolidate their Cash Management System at a single bank.

27.    The Last Bastion Trust maintains four depository accounts (the "***Last Bastion Depository Accounts***"), one investment account (the "***Last Bastion Investment Account***") and one disbursement account (the "***Last Bastion Disbursement Account***"), all at BOA.  The trustee for the Last Bastion Trust, and not the Debtors, have control over the movement of cash at these Bank Accounts.

28.    The Wasatch Trust maintains one disbursement account (the "***Wasatch Trust Disbursement Account***") at Greenville First Bank, which is funded by a regular transfer from the Company Concentration Account.

*The Debtors' Existing Business Forms and Checks*

29.    The Debtors use a number of checks and other business forms.  To minimize expenses, the Debtors would like to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date — without reference to the Debtors' status as debtors in possession — rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.  With respect to any electronic checks issued after the Petition Date, however, the Debtors will bear the designation "debtor in possession" pursuant to the request of the U.S. Trustee.

*The Debtors' Intercompany Claims*

30.    Various of the Debtors maintain business relationships with each other, resulting in intercompany receivables and payables (the "***Intercompany Claims***").  For example, funds are transferred from Citadel Broadcasting Company to Citadel Broadcasting Corporation for investment purposes, and cash transfers are made between the two entities for payment of interest on intercompany loans.  In addition, Citadel Broadcasting Company and Alphabet

13

Acquisition Corp. also pay certain overhead costs and operating expenses and collect vendor payables and accounts receivables on behalf of the Debtors' subsidiaries. These costs and revenues, as well as income taxes and management fees, are then allocated among the legal entities resulting in Intercompany Claims. Indeed, in connection with the daily operation of the Cash Management System (including transactions by subsidiaries without their own bank accounts), at any given time there may be Intercompany Claims owing by one Debtor to another Debtor (the "*Intercompany Transactions*") in connection with the disbursement of funds. The Debtors track all fund transfers electronically in their accounting system and can ascertain, trace and account for Intercompany Transactions. At the same time, though, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

## OPERATIONS MOTIONS PURSUANT TO RULE 6003

**C.    Debtors' Motion for an Order Authorizing, but not Directing, the Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses; (B) Pay and Honor Employee Medical and Other Benefits; and (C) Continue Employee Benefits Programs.**

*Overview of the Debtors' Workforce and Employee Obligations*

31.    The Debtors employ approximately 4,200 employees, 2,700 of which are employed by the Debtors on a full-time, salaried basis and 1,500 of which are employed by the Debtors on a part-time basis (collectively, but specifically excluding On-Air Talent (as defined below), the "*Employees*").

32.    The Employees perform a variety of critical functions inherent to the operations of commercial radio stations and the production of syndicated radio broadcasts that are distributed to the Debtors' network of affiliates. These tasks include, among others, radio broadcast production and engineering, sales, promotions, customer service, market research,

14

accounting, finance, human resources and general management. The Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' businesses.

33.    The Debtors supplement their workforce with independent contractors and temporary personnel, some of which are retained through third party employers and agencies. These independent contractors comprise some of the Debtors' most important workforce relationships, including some of the Debtors' key on-air talent.

34.    I believe that certain prepetition amounts owed on account of the Employee Obligations remain outstanding due to a number of factors, including (a) the fact that certain accrued obligations may not have become due and payable as of the Petition Date and (b) discrepancies that exist between amounts paid and the amounts that should have been paid prepetition. Among other things, I believe that certain prepetition amounts related to the Employee Obligations have accrued before the Petition Date, but may remain unpaid for a number of reasons including policy-based delays (such as specified dates for compensation payments). Additionally, certain prepetition Employee Obligations may have accrued but remain outstanding because they are pending approval or they have not yet been submitted.

*Employee Compensation*

*Employee Payroll Obligations*

35.    The Debtors incur payroll obligations for wages and salaries to the Employees. The Debtors pay the majority of their Employees twice each month; the remainder of the Employees are paid on a bi-weekly basis. The Debtors' payroll obligations generally include base wages and salaries, overtime compensation and bonuses, as applicable (collectively, the "*Employee Payroll Obligations*"). On average, the Debtors' gross payroll totals approximately $14.5 million per month, net of Payroll Taxes (as defined below).

15

36.    The Debtors' payroll is administered by Ceridian Employer Services ("**Ceridian**"), a third party service provider, who debits the Debtors' payroll account and then funds paychecks, direct deposits and various wages and attachments.  Ceridian generally administers the Debtors' payroll by depositing funds into Employees' bank accounts by electronic transfer or, in more limited circumstances, by providing checks.  The services of Ceridian are crucial to the smooth functioning of the Debtors' payroll system.

37.    The Debtors pay Ceridian approximately $7,000 per month on account of its payroll services.  As of the Petition Date, I believe the Debtors owe Ceridian approximately $5,000 on account of prepetition payroll services.

*Wages*

38.    Because the Employees are paid in arrears, as of the Petition Date, some of the Employees have not been paid all of their prepetition wages.  In addition, I believe that certain checks will not have cleared before the Petition Date.  As a result, the Debtors estimate that approximately $3.4 million in prepetition payroll amounts may remain unpaid and outstanding as of the Petition Date (the "**Unpaid Wages**").

39.    I do not believe that any of the Debtors' Employees will have outstanding Unpaid Wages in an amount in excess of the $10,950 cap imposed by section 507(a)(4) of the Bankruptcy Code (the "**Priority Cap**").

*Commissions*

40.    The Debtors utilize a commission program for Employees in the Debtors' sales department, which serves as an integral component of these Employees' compensation (the "**Commission Program**").  Indeed, eligible Employees count on the commissions earned under the Commission Program as part of their overall compensation, and the commission-based pay

16

structure motivates sales personnel to meet defined sales targets. Commissions are paid on account of billings or collections.

41.    Approximately 900 Employees in the sales department are eligible to receive commissions. Commission payments are made on either the 15th day or the last day of the month that follows the month in which the commission is earned. For this reason, as of the Petition Date, the Debtors estimate that approximately $2.7 million in commissions owing to these Employees have accrued but remain unpaid (collectively, the "***Unpaid Commissions***"). I do not believe that any of the Debtors' Employees will have outstanding commissions that exceed the Priority Cap.

### *Independent Contractor Compensation*

42.    As described above, the Debtors employ over 1,100 independent contractors, of which approximately 330 are on-air talent, leaving approximately 770 non-on-air talent independent contractors, including certain announcers, sports and news anchors, writers, directors, managers and producers (collectively, but not including the on-air talent, the "***Independent Contractors***"). Independent Contractors comprise an extremely valuable segment of the Debtors' workforce, rendering artistic and professional services in connection with the Debtors' radio programming. Most of the Independent Contractors are not owed any amounts by the Debtors as of the Petition Date. Specifically, as of the Petition Date, the Debtors owe the Independent Contractors approximately $260,000 (the "***Unpaid Independent Contractor Obligations***").

### *Temporary Personnel*

43.    The Debtors employ approximately 50 part-time, temporary personnel (the "***Temporary Personnel***"), primarily in the promotion and programming departments. Temporary Personnel are hired by the Debtors on an as-needed basis, particularly during the

17

summer to assist with station events and promotions.  The Debtors estimate that the total amount

of obligations relating to the Temporary Personnel is approximately $55,000 per month.

Records with respect to the Temporary Personnel are typically maintained on a decentralized

basis (at the station level) and the number of Temporary Personnel employed at a given time is

subject to fluctuation.  As of the Petition Date, the Debtors estimate that approximately $25,000

is outstanding on account of compensation due and owing to Temporary Personnel (the "***Unpaid***

***Temporary Personnel Compensation***," and collectively, with the Unpaid Wages, Unpaid

Commissions and Unpaid Independent Contractor Obligations, the "***Unpaid Employee***

***Compensation***").  I do not believe that any Temporary Personnel are owed more than the Priority

Cap.

### *Deductions and Withholdings*

44.      During each applicable pay period, the Debtors routinely deduct certain amounts

from paychecks, including, without limitation, (a) garnishments, child support and similar

deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain of the

Employee benefit plans discussed herein (such as 401(k) contributions, flexible spending

accounts (the "***FSA Plans***") and premiums for supplemental life and disability insurance)

(collectively, the "***Deductions***").  The Debtors forward the amount of the Deductions to the

appropriate third-party recipients.  Due to the commencement of the chapter 11 cases, however,

certain Deductions that were deducted from Employees' earnings were not forwarded to the

appropriate third-party recipients before the Petition Date.  I believe that, as of the Petition Date,

approximately $300,000 in Deductions have not been remitted to the appropriate third-party

recipients.

45.      As previously noted, approximately 270 of the Debtors' Employees are unionized

(the "***Union Employees***").  In the ordinary course of business, the Debtors withhold certain

amounts from the Union Employees' compensation for union-related expenses such as union dues, and also remit the Debtors' employer share of such expenses as required under the applicable collective bargaining agreement (the "**Union Expenses**").  The Debtors pay these amounts to third parties, including unions, on a monthly basis.  On average, the Debtors withhold and transfer an aggregate of approximately $160,000 per month in Union Expenses.  The Debtors estimate that they owe approximately $236,000 on account of Union Expenses that were withheld but unpaid as of the Petition Date (the "**Unpaid Union Expenses**").  I believe that the Unpaid Union Expenses are likely held in trust by the Debtors and are not property of the Debtors' estates.

46.    Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "**Withheld Amounts**").  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "**Employer Payroll Taxes**," and together with the Withheld Amounts, the "**Payroll Taxes**").  On average, the Payroll Taxes are approximately $6.8 million per month.

*Reimbursable Expenses*

47.    The Debtors reimburse Employees, Temporary Personnel, Independent Contractors and members of Citadel's board of directors (the "**Directors**") for approved, legitimate expenses incurred on behalf of the Debtors in the scope of their employment (the "**Reimbursable Expenses**").  The Reimbursable Expenses include, without limitation, certain business-related travel expenses such as meals, hotels, flights and car rentals.

48.     Employees, Temporary Personnel, Independent Contractors and Directors must submit an expense report with appropriate supporting documentation for all Reimbursable Expenses.  Expense reports are processed on a weekly basis.  Although the Debtors request that reimbursement requests be submitted promptly, often requests are submitted several days or weeks after incurrence.  Accordingly, the Debtors are unable to provide a detailed amount of unpaid prepetition Reimbursable Expenses at this time because it is likely that Employees, Temporary Personnel, Independent Contractors and Directors will submit requests for expenses incurred prepetition after the Petition Date.  Based on historical figures, I estimate the Debtors pay approximately $365,000 on account of Reimbursable Expenses on a monthly basis.

49.     In addition, certain Employees pay for the Reimbursable Expenses with their American Express corporate credit cards.  American Express then invoices the Debtors directly for these charges and, following the Debtors' review of such invoices, such charges are paid directly by the Debtors to American Express (the "***Credit Card Program***").  Although the Debtors directly pay the invoices for the corporate credit cards of certain Employees, the accounts are held in the names of the Employees.  Therefore, to the extent the Debtors fail to remit payment to American Express for valid and legitimate Reimbursable Expenses, American Express may seek to collect such unpaid amounts directly from the Employees, which may negatively impact the Employees' credit.

50.     The Reimbursable Expenses were all incurred as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  I understand that any Reimbursable Expenses in excess of $1,000 per Employee will require consultation with the U.S. trustee before payment.

20

### Employee Bonus Programs

51.     To encourage and incentivize certain key Employees, the Debtors have historically maintained several employee bonus programs. These programs (collectively, the "**Employee Bonus Programs**"), which serve as an important component of compensation for certain of the Debtors' Employees, are directly tied to the achievement of financial performance goals and have always been an integral component to preserving and increasing the Debtors' enterprise value. From January 1, 2009 through November 30, 2009, the Debtors paid approximately $4.2 million to Employees pursuant to the Employee Bonus Program.

### Sales Bonuses

52.     The Debtors' primary revenue source is advertising. Employees in the Debtors' sales department are responsible for attracting, cultivating and maintaining the Debtors' advertising accounts. To incentivize these Employees, and to attract and retain talented individuals to fill these positions, the Debtors offer bonuses to key individuals in the sales department from the account executive level to the sales manager or director of sales level (the "**Sales Bonuses**").[11] Sales Bonuses typically may be earned by achieving specific revenue performance at a particular radio station or cluster of stations, and may vary considerably depending on the market. Sales Bonuses may be earned on a quarterly, semi-annual or annual basis. I estimate that as of the Petition Date, no Sales Bonuses have been earned and not paid.

### Management Level Bonuses

53.     The Debtors also offer bonuses to management level personnel across the Debtors' businesses (the "**Management Level Bonuses**"). Specifically, the Debtors offer

---

[11]   Similarly, the Debtors offer a limited number of *de minimis* bonuses to Employees in the Debtors' accounts receivables department who are responsible for collections on the Debtors' customer accounts. These bonuses are typically based on criteria such as number of days outstanding and the frequency or size of bad debt write-offs.

incentive-based Management Level Bonuses to regional presidents, general managers and presidents of individual radio markets and the radio network, as well as to business managers in each market and the radio network.  Management Level Bonuses are typically performance based and are triggered by achieving a targeted EBITDA level in the region or specific radio market, or by outperforming a prior year's EBITDA or a regional or industry EBITDA average. Management Level Bonuses are typically paid on an annual basis.

54.     In 2008, the Debtors paid approximately $2.7 million in Management Level Bonuses to 186 Employees.  I estimate that as of the Petition Date, no Management Level Bonuses have been earned and remain unpaid.

*Corporate Bonuses*

55.     Finally, the Debtors offer bonuses to its named executive officers ("***EOs***") and general corporate Employees who are not affiliated with a specific radio station or the radio network (the "***Corporate Bonuses***").  The Chief Executive Officer of Citadel has discretion over Corporate Bonuses for all eligible Employees, excluding himself.  To the extent the Chief Executive Officer determines that a bonus pool should be established, the Chief Executive Officer will typically set an overall dollar amount for a bonus pool to be distributed among those eligible Employees on an annual basis.[12]  In contrast to other bonuses offered by the Debtors, Corporate Bonuses paid to EOs are subject to approval by the compensation committee of Citadel's Board of Directors (the "***Comp Committee***") and are fully discretionary.   In determining Corporate Bonuses for EOs, the Comp Committee will generally review, on an annual basis, the individual performance of each EO and the Debtors' overall performance as compared to the marketplace as a whole, as well as a comparison to the Debtors' competitors.

---

[12] If the Comp Committee or the Chief Executive Officer determine that the Debtors' overall performance does not merit a bonus pool to fund Corporate Bonuses, no such bonuses are paid.

### *Severance Obligations*

56.     The Debtors maintain a severance policy for terminated Employees pursuant to an existing severance policy (the "***Severance Policy***").   Under the terms of the Severance Policy, the Debtors have, at their discretion, made severance payments to terminated full-time Employees who do not otherwise have contractual severance rights, which payments generally equal one week base salary for Employees terminated in the first two years of service; two weeks base salary for Employees terminated in years two through ten of service; and four weeks severance for Employees terminated after ten years of service.  Notably, the Debtors also provide severance payments to terminated Employees pursuant to certain individualized employment contracts and in some cases pursuant to applicable collective bargaining agreements (these severance payments, together with payments made under the Severance Policy, collectively, the "***Severance Payments***").

57.     I believe it is critical that the Debtors be authorized, in their discretion, to continue to honor their severance obligations in the ordinary course of business after the Petition Date.  If Severance Payments are not honored, current Employees will become more concerned about the Debtors' employment practices and may seek new employment to the detriment of the Debtors' business and their estates. As of the Petition Date, the Debtors do not have any Severance Payments due and owing.

### *Employee Benefits*

58.     The Debtors offer all of their full-time Employees certain benefits, including medical, dental and vision benefits, short- and long-term disability, life insurance, retirement savings plans and other miscellaneous company benefits, as described below (collectively, and as more fully described below, the "***Employee Benefits***").

23

*Medical, Vision and Dental Plans*

59.    The Debtors offer health care coverage, including prescription drug coverage and dental and vision care, to approximately 2,630 Employees and their dependents.  The Debtors pay approximately $1.0 million per month to fund these health care benefits.  On an annual basis, the Debtors spend approximately $12.7 million on Employee health care benefits, equal to approximately $4,800 per eligible Employee.  This coverage is described below:

(i)    **Medical Plans**: The Debtors offer their eligible Employees and their dependents health care coverage in a Blue Cross Blue Shield PPO or in-network plan, which includes prescription drug coverage (collectively, the "***Medical Plans***").  The Medical Plans are self-insured.  As of the Petition Date, approximately $1,900,000 is owed on account of the various Medical Plans, net of premiums collected from Employees.

(ii)    **Dental Plan**: The Debtors offer dental coverage to their eligible Employees and dependents (the "***Dental Plan***") through Metropolitan Life Insurance Company ("***MetLife***").  The Dental Plan provides benefits based on reasonable and customary charges up to an annual individual maximum benefit of $1,000, with individual deductibles ranging from $50 to $150.  As of the Petition Date, approximately $100,000 is owed on account of the Dental Plan, net of premiums collected from Employees.

(iii)    **Vision Plan**: The Debtors also offer their eligible Employees vision coverage through a vision service plan operated and administered by EyeMed Vision Care (the "***Vision Plan***").  The Vision Plan is self-insured.  The Vision Plan offers coverage for eye exams, frames, lenses and contacts, as well as discounts and savings on anti-reflective coatings, progressive and prescription glasses and sunglasses.  As of the Petition Date, approximately $16,000 is owed on account of the Vision Plan, net of premiums collected from Employees.

60.    Currently, the Debtors provide coverage under the Consolidated Omnibus Budget Reconciliation Act ("***COBRA***") through Automatic Data Processing ("***ADP***").  Continuation of health insurance benefits after separation of employment is based on qualifying events and the term of continuation.  ADP is responsible for all notifications and billings for the Debtors' COBRA program.  Fees are based on the number of notices and participants

### *Workers' Compensation*

61.     The Debtors provide workers' compensation coverage for their Employees at the statutorily-required level for each state in which the Debtors have business operations (the "***Workers' Compensation Program***").   The Debtors' Workers' Compensation Program is administered through ESIS, Inc. and covers workers' compensation claims through an incurred loss program with a $1 million liability limit per accident per each Employee injury/claim.  The Debtors' annual insurance premium and fees for the Workers' Compensation Program total approximately $365,000, which premium and fees were paid in full before the Petition Date.

62.     Based on historical activity, I believe that certain of the benefits under the Workers' Compensation Program have been incurred prepetition but have yet to be fully paid, certain other claims were filed prepetition but have yet to be resolved and certain claims may have accrued prepetition but have not been submitted (the "***Prepetition Workers' Compensation Claims***").  I believe the Debtors may owe up to approximately $170,000 as of the Petition Date under the Workers' Compensation Program.

### *Paid Time Off and Leaves of Absences*

63.     The Debtors provide paid time off to their Employees to cover, among other things, vacation, sick days and holidays (collectively, the "***Paid Time Off***").  The amount of Paid Time Off available to a particular Employee is generally determined by a specific policy and/or statutory requirements and/or provisions of applicable collective bargaining agreements.  For example, pursuant to the Debtors' current vacation policy, full-time Employees accrue 0.83 days per month up to a maximum of 10 vacation days per year.  Vacation is paid for salaried Employees only; however, non-salaried full-time Employees, such as commissioned Employees, are entitled to unpaid vacation on the same accrual schedule.  Unused vacation time at the end of each calendar year is forfeited, except as required by local law or pursuant to the terms of any

applicable collective bargaining agreement.   Salaried full-time Employees who leave the

Debtors' employ will be paid earned but unused Paid Time Off, if any, in a final paycheck, or

otherwise as required by local law.  The Debtors' Paid Time Off obligations include the award of

five Paid Time Off days to certain full-time Employees who had their salaries reduced in 2009,

which Paid Time Off days will be forfeited if not used by the end of the calendar year, and which

are not payable to the Employee upon termination, in addition to other restrictions.  Finally, the

Debtors' Paid Time Off obligations include unpaid leaves of absence to the extent that unpaid

leave is legally required over and above the Paid Time Off pursuant to the Debtors' policies

described above, and a discretionary 30-day unpaid leave of absence policy (collectively, the

"*Leaves of Absence*").

64.    As of the Petition Date, I estimate that the Debtors may owe a total of

approximately $2.6 million in earned but unpaid Paid Time Off that had accrued for salaried,

non-salaried and unionized Employees.

*401(k) Plan*

65.    The Debtors maintain the Citadel Broadcasting Company 401(k) Savings and

Retirement Plan (the "*401(k) Plan*"), administered through Merrill Lynch Trust Co., for the

benefit of eligible Employees.  The 401(k) Plan is a tax qualified plan within the meaning of, and

administered in accordance with, the requirements of section 401(k) and other applicable

sections of the Internal Revenue Code.  A total of approximately $650,000 is withheld each

month from Employees' paychecks for Employee contributions to the 401(k) Plan (the

"*Employee 401(k) Contributions*").

66.    The 401(k) Plan also includes a discretionary employer matching component,

pursuant to which the Debtors may opt to match a certain percentage of the Employee 401(k)

26

Contributions.  No employer match was made in 2008 and no employer match is expected in 2009.

67.     The Debtors remit Employee 401(k) Contributions withheld from Employees' paychecks to the 401(k) Plan at the time they are withheld.  Accordingly, I believe that there are no Employee 401(k) Contributions that have been withheld but not contributed.

### Union Plans

68.     As noted above, approximately 270 Employees are unionized, and belong primarily to (a) the American Federation of Television and Radio Artists; (b) the National Association of Broadcast Employees and Technicians; and (c) the Studio Transportation Drivers Union.  Under the terms of the collective bargaining agreements to which these unionized Employees are party, the Debtors are required to make contributions to the health and welfare plans and the pension/retirement plans of their Union Employees.  The Debtors typically remit such amounts to the appropriate unions one month in arrears, as part of the Union Expenses described above.

### Insurance and Disability Benefits

69.     The Debtors provide all active full-time Employees with term life insurance and accidental death and dismemberment insurance (collectively, the "***Basic Insurance***") through MetLife.  The Debtors estimate that the Basic Insurance coverage costs approximately $13,000 per month.  As of the Petition Date, the Debtors estimate they owe approximately $20,000 on account of premiums for the Basic Insurance (the "***Unpaid Basic Insurance Expenses***").

70.     In addition to the Basic Insurance, the Debtors offer eligible Employees the opportunity to purchase additional insurance for themselves and their dependants, including supplemental life insurance, spousal life insurance, dependent life insurance, supplemental accidental death and dismemberment insurance and long-term and short-term disability through

27

MetLife (collectively, "**Supplemental Insurance**"), the premiums for which are paid entirely by the electing Employee. The Debtors withhold approximately $80,000 per month in Employee contributions on account of Supplemental Insurance. The Debtors estimate that they have withheld, but not yet paid, approximately $80,000 in Employee contributions to Supplemental Insurance as of the Petition Date (the "**Unpaid Supplemental Insurance Expenses**").

### *Flexible Benefit Plans*

71.     The Debtors offer eligible Employees the ability to contribute a portion of their pre-tax compensation (collectively, the "**FSA Contributions**") to FSA Plans, which contributions are deducted by the Debtors from the participating Employees' paychecks. The FSA Contributions accumulate in participating Employees' flexible spending accounts and are available for Employees to use to pay for eligible out-of-pocket health care (up to a maximum of $5,000 per year) and dependent care expenses (up to a maximum of $5,000 per year). FSA Contributions also may be dedicated to commuter expenditures (up to $230 per month for parking and up to $230 per month for public transportation or gas for carpooling). Approximately 630 Employees participate in the FSA Plans and, on a monthly basis, the Debtors withhold approximately $100,000 in FSA Contributions.

72.     As of the Petition Date, the Debtors estimate they have collected approximately $250,000 in FSA Contributions from Employees' paychecks that have not yet been reimbursed to the Employees (the "**Unreimbursed FSA Contributions**"). The Debtors estimate that they do not owe ADP any plan administration expenses as of the Petition Date.

**D.      Debtors' Motion for Entry of an Order Authorizing, but not Directing, the Debtors to Pay or to Honor Prepetition Claims and Obligations of (A) On-Air Talent and (B) Station Affiliates.**

73.     Citadel Media is one of the largest radio networks in the country. Citadel Media produces, syndicates and distributes its own radio programming to the radio market, including

28

competitors of the Debtors' owned and operated radio stations.  Notably, Citadel Media owns and broadcasts several of the top 10 programs in network radio.  Citadel Media distributes its programming through Station Affiliates, which are local broadcasters that carry some or all of the program line-up of a radio network such as Citadel Media, and are generally owned by entities other than Citadel.

*On-Air Talent*

74.    Citadel Media's syndicated programming features well-known radio personalities, talk show and other program hosts, as well as disc jockeys, including, among others, Don Imus, Mike Huckabee, Joe Scarborough, Mark Levin and Michael Baisden (collectively, the "***Network On-Air Talent***").  In addition, Citadel Radio utilizes the services of many high-profile talent who contribute to the daily programming of Citadel Radio's owned radio stations, which programming may, in some instances, be syndicated to broader audiences (the "***Citadel Radio On-Air Talent***," and, together with the Network On-Air Talent, the "***On-Air Talent***").  The On-Air Talent consists of employees of the Debtors, independent contractors and individuals who are employed by third party companies who contract with the Debtors to provide the services of certain talent.

75.    On-Air Talent is critical to the Debtors' business and viability.  And the importance of the On-Air Talent to the Debtors' business cannot be overstated.  Many listeners tune in to the Debtors' radio stations and the Debtors' syndicated programs specifically to listen to certain On-Air Talent.  Accordingly, advertisers are willing to pay a premium to advertise during these programs.  In addition, network advertising air time is priced based, in part, on how many listeners a particular radio program has the potential to reach.  Thus, if the On-Air Talent does not perform services for the Debtors, causing a loss in listener volume, advertising pricing

will drop or advertisers will choose not to advertise with the Debtors, resulting in a direct impact on the Debtors' revenues to the detriment of all parties in interest.

76.    Most of the On-Air Talent have contracts with the Debtors (the "***Talent Contracts***") with terms generally ranging from one to five years.  The Talent Contracts provide for payment to the On-Air Talent on a salary or fixed fee basis, which is paid as part of the Debtors' normal compensation cycle (the "***Talent Payments***").  In addition, many of the Talent Contracts entitle the On-Air Talent to bonuses based on (i) the ratings that the applicable program generates within a particular demographic audience in the relevant geographic area, as measured by Arbitron, Inc. (a media and market research firm) ("***Arbitron***") or (ii) other performance-based milestones as outlined in the Talent Contracts (collectively, the "***Talent Bonuses***").  Some of the Talent Contracts provide for payments for other services, including, without limitation, appearance fees and commercial endorsements (the "***Service Fees***"), and some of the Talent Contracts provide for payments to be made to the On-Air Talent on account of the Debtors' achievement of certain financial milestones (the "***Revenue Sharing Payments***").  In 2008, the Debtors paid the On-Air Talent approximately $102 million in Talent Payments, $1.7 million in Talent Bonuses, $650,000 in Service Fees and $19.1 million in Revenue Sharing Payments.

77.    The Debtors owe the On-Air Talent approximately $3.8 million on account of prepetition Talent Payments and Service Fees.  In addition, the Debtors owe the On-Air Talent for Talent Bonuses that were earned prepetition, but that the Debtors will not be in a position to calculate until the end of the current quarter, after Arbitron publishes ratings.  Based on results from previous quarters, I estimate that the Talent Bonuses owed to the On-Air Talent as of October 31, 2009, will be approximately $360,000.  The Debtors also may owe some of the

On-Air Talent for Revenue Sharing Payments that accrued prepetition but that the Debtors will not be able to measure until the end of the fiscal year.  The Debtors have accrued approximately $2.3 million as potentially being owed on account of Revenue Sharing Payments as of the Petition Date.

*Station Affiliate Contracts*

78.    Citadel Media produces and syndicates programming that features the Network On-Air Talent.  The Network On-Air Talent and the program producers provide their services to Citadel Media in exchange for either a fixed fee or a portion of net revenues or net profits.  Citadel Media also provides Station Affiliates with various content such as ABC News and nine different 24-hour music formats.  Citadel Media also is the exclusive sales representative for ESPN Radio Network, which produces programming such as ESPN SportsCenter, Mike & Mike In The Morning, hosted by Mike Greenberg and former NFL player Mike Golic, and national broadcasts of Major League Baseball, the National Basketball Association and the Bowl Championship Series.  All programming produced or otherwise provided by Citadel Media is collectively referred to herein as the "***Citadel Programming***."

79.    The Citadel Programming is typically offered on an exclusive basis to one station in a particular market in exchange for advertising air time.  As stated above, many listeners tune in to the Debtors' radio stations and the Debtors' syndicated programs specifically to listen to the Citadel Programming.  Accordingly, advertisers are willing to pay a premium to advertise during certain programs.  Network commercials are broadcast over several hundred stations (sometimes several thousand stations), and the broadcast of a commercial on more than 90% of the stations as ordered by the advertiser is considered in the radio network industry to be an acceptable "clearance" rate.  If an advertiser expects a commercial to air during a particular radio program

or at a particular time of day, and the commercial is not aired by at least 90% of the Station Affiliates, the advertiser may seek to (a) recoup the cost of such advertising time, which is occasionally paid for in advance, (b) re-schedule the broadcast of the commercial or (c) adjust the amount owed to Citadel Media as a credit or adjustment.

80.    To distribute the Citadel Programming to the radio marketplace, including to competitors of the Debtors' owned and operated radio stations who contract to air the Citadel Programming, Citadel Media enters into contractual agreements with the owners of radio stations for the broadcast of some or all of the Citadel Programming (each, an "***Affiliate Programming Contract***").  Citadel Media is party to approximately 8,500 Affiliate Programming Contracts.

81.    Under a standard Affiliate Programming Contract, Citadel Media will provide the particular Citadel Programming, as described in the Affiliate Programming Contract, on an exclusive basis to one station in a particular market for a term of three months to up to four years.[13]  Typically, Affiliate Programming Contracts are barter arrangements where no money is exchanged.  Instead, in exchange for the right to broadcast the Citadel Programming, a Station Affiliate will remit a portion of their advertising air time, which Citadel Media can then sell to national advertisers as part of a network.  Thus, when Citadel Programming is broadcast by a Station Affiliate, it includes commercials sold by Citadel Media to its national advertisers as part of a larger network of stations.  The commercials could be broadcast in conjunction with the Citadel Programming or during the broadcast of other programs.  At the end of each month, and as contemplated under the Affiliate Programming Contracts, the Station Affiliates must submit affidavits to Citadel Media indicating that they have complied with the Affiliate Programming

---

[13] In certain limited circumstances, Affiliate Programming Contracts may have a term of up to ten years.

Contracts and aired the Citadel Programming, and the commercials, at the required dates and times.

82.    In addition, certain Affiliate Programming Contracts contain additional payment arrangements.  Specifically, certain smaller Station Affiliates, for instance, pay Citadel Media for access to the Citadel Programming because their broadcasts do not reach as many listeners, resulting in less valuable advertising time.  On the flip side, in some circumstances Citadel Media pays certain Station Affiliates to air the Citadel Programming, including commercials sold by Citadel Media, because these Station Affiliates have the potential to reach a wide range of listeners, making their advertising time far more valuable.

83.    Citadel and the Station Affiliates are also party to contracts whereby Citadel purchases commercial advertising time units but does not provide any programming to the Station Affiliate (the "***Affiliate Non-Programming Contracts***" and collectively with the Affiliate Programming Contracts, the "***Affiliate Contracts***").  At the end of each month, and as contemplated under the Affiliate Non-Programming Contracts, the Station Affiliates must submit affidavits to Citadel Media indicating that they have complied with the Affiliate Non-Programming Contracts and aired the required commercials at the required dates and times. Because the stations are not paid until after the submission of the affidavits, Citadel pays the Station Affiliates for the broadcast of commercials, under all Affiliate Contracts, in arrears.

84.    The Debtors owe approximately $2.7 million to certain Station Affiliates on account of the Affiliate Contracts.

85.    I believe that payment of the Talent Obligations and Affiliate Obligations is not only essential to the Debtors' day-to-day operations, but vital to ensure that the value of the Debtors' enterprise is preserved through the pendency of these chapter 11 cases.  Absent

authorization to honor the Talent Obligations and Affiliate Obligations, there is a significant danger that operations will be interrupted to the detriment of all parties in interest.  Specifically, any interruption in service from On-Air Talent or Station Affiliates will immediately jeopardize Citadel's cash generating abilities and potentially sacrifice scarce advertising revenues that Citadel has worked extremely hard to maintain in a difficult and nearly unprecedented economic climate.

86.    Citadel Programming draws radio listeners and advertisers because it features unique On-Air Talent, such as Mike Huckabee, Joe Scarborough, Mark Levin, Don Imus and Michael Baisden.  Station Affiliates, meanwhile, provide the Debtors with a vehicle to distribute the content created by the On-Air Talent to the radio marketplace.  I believe that any interruption, however temporary, in the distribution and continuity of Citadel Programming — by either the refusal of any of the On-Air Talent to provide their services or the refusal of the Station Affiliates to air the Citadel Programming — could cause a loss of listeners and a concomitant drop in advertising revenues.  Advertising air time is priced, in part, based on how many listeners a particular radio program has the potential to reach.  Thus, if the On-Air Talent does not perform their services, causing a loss in listener volume, advertising pricing will drop or advertisers will choose not to place ads with the Debtors.  In addition, if an advertiser expects an advertisement to play during a particular radio program and the program is not aired by the Debtors or a Station Affiliate, the advertiser will seek to recoup the cost of such advertising time, which in some circumstances is paid for in advance.  Under either scenario, the Debtors' advertising revenues will drop precipitously.

**E.    Debtors' Motion for an Order Authorizing, but not Directing, Debtors to Honor Certain Prepetition Obligations to Customers and Otherwise Continue Certain Customer Programs and Practices in the Ordinary Course of Business.**

*The Debtors' Customers*

87.    The Debtors, like their competitors in the radio industry, generate substantially all of their revenue from the sale of advertising.  The Debtors' advertising segments are diversified, with no one industry or customer group accounting for more than approximately 15 percent of their advertising.    Approximately two-thirds of the Debtors' consolidated gross revenue is generated by local advertisers (the "***Customers***").

88.    The Customers are essential to the Debtors' business.    Maintaining strong relationships with their Customers is important because the Debtors face increasing pressure and competition from other radio broadcasters and advertising media, as well as an inability to increase pricing in the present economic environment.  The competitive challenges the Debtors face will inevitably be exacerbated by the filing of these chapter 11 cases, and the Debtors will need to assuage Customer anxieties that the filings might in some way interfere with the Debtors' ability to fully meet their Customers' needs.

*Customer Obligations*

89.    Due to the nature of the Debtors' advertising sales to their Customers, the Debtors continually have accrued but unsatisfied Customer Obligations, in both cash and non-cash varieties.    Approximately $940,000 in cash Customer Obligations are outstanding and approximately $2.0 million in non-cash Customer Obligations remains outstanding.  To preserve valued customer relationships and minimize the disruption to their operations, I believe the Debtors will need to honor their existing Customer Obligations, as described below.

*Cash in Advance Ad Sales*

90.    In the ordinary course of business, due to credit concerns or based on a client's

cash payment schedules, the Debtors often receive cash in advance for advertising (the "***Cash in Advance Ad Sales***"). These amounts are recorded as credits in the Debtors' accounts receivable ledger until the advertisement is aired and an invoice is applied against it. Some of these Cash in Advance Ad Sales are the result of overpayments made by the advertiser that ultimately need to be repaid or otherwise applied against future invoices. The Debtors will continue to owe or be required to perform advertising obligations based on prepetition Cash in Advance Ad Sales, since the Debtors have already received the cash for advertisements that have yet to run. As of the last monthly close, the Debtors owed approximately $780,000 to Customers based upon Cash in Advance Ad Sales.

### Barter Obligations

91.     In certain markets, bartering — or the exchange of services in lieu of cash — is utilized by the Debtors. More specifically, the Debtors will provide advertising in exchange for goods or services, including, but not limited to, the usage of automobiles, computers and computer repair services, network hosting and other advertising-related services (the "***Barter Obligations***"). The Debtors have certain outstanding Barter Obligations that will require the Debtors to provide Customers with advertising air time in the future in connection with goods or services previously bartered for.[14]  Approximately $2.0 million in Barter Obligations exist.

### Prepaid Events

92.     At various market levels and depending on the time of year, the Debtors often produce events, including listener appreciation concert series, promotional events, job fairs and other public events (the "***Prepaid Events***"). The production of Prepaid Events includes costs

---

[14] In connection with Barter Obligations, transactions are entered into on a one-off basis with Customers and there is no set agreed upon advertisement allotment provided in return for certain goods and services; instead, the Debtors will engage in negotiations with individual Customers dependent upon the facts and circumstances associated with the barter in question.

associated with equipment and venue rentals, as well as payment to attending performers.  The

Debtors generally receive sponsorship money in advance of the Prepaid Event from advertisers,

which affords the advertisers the ability to co-produce the Prepaid Event or be included in any

promotional advertisements related to the Prepaid Event.  In addition, certain Prepaid Events

result in the sale of tickets in advance of the event in question.  As a result, the Debtors currently

have obligations to produce Prepaid Events and honor sponsorship and advance ticket payments

related thereto.  I estimate that the Debtors prepetition obligations relating to Prepaid Events total

approximately $164,000.

### *Unclaimed Prizes*

93.     To promote listenership, the Debtors frequently offer their listeners prizes, which

include, among other things, cash rewards, local merchant gift certificates, out-of-town-travel

trips, and in some instances boats and automobiles.  These types of prize programs vary in length

and prize amounts among the Debtors' stations.  Specifically, the Debtors' local station manager

or general manager determines the frequency of prize promotions and the budget for the amount

of prizes to be awarded in any given period.

94.     Depending on the type of prize awarded, listeners have a certain number of days

to claim their prizes.  Certain prizes (the "***Unclaimed Prizes***") have not yet been claimed by

winning listeners.  The Debtors do not maintain a record of amounts owed based on such

Unclaimed Prizes.  I believe, however, that any amount owed in connection with any Unclaimed

Prizes is *de minimis*.

**F.     Debtors' Motion for Entry of an Order Authorizing, But not Directing, the Debtors
        to Pay Taxes and Fees.**

95.     The Debtors:  (a) collect and incur taxes, including certain use, gross receipts,

franchise, income, property, business and other taxes in connection with the operation of their

business (collectively, the "***Taxes***"); (b) charge fees and other similar charges and assessments (collectively, the "***Fees***") on behalf of the Authorities (as defined below); and (c) pay Fees to such Authorities for licenses and permits required to conduct the Debtors' businesses. The Taxes and Fees are paid monthly, quarterly, annually or biennially to the respective taxing, licensing and other governmental authorities, including, but not limited to, the Federal Communications Commission (collectively, the "***Authorities***"), in accordance with all applicable laws and regulations.

96.    I believe the failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways. The Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the tasks required by the reorganization process at a critical time for the Debtors' businesses. The Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will be administratively burdensome to the Debtors' estates. Furthermore, I am informed that certain directors and officers could be subject to personal liability for failure to make certain payments, which would distract such key personnel from their duties related to the Debtors' restructuring. Moreover, with respect to the Fees, I am informed that the Debtors' failure to pay such Fees to the Authorities and other relevant third parties would cause the Debtors to incur late fees, penalties and other charges in addition to the Fees. The Debtors' various tax obligations are explained below.

*Use and Gross Receipts Taxes*

97.    The Debtors are responsible for remitting sale and use taxes (the "***Sale and Use Taxes***") on account of the purchase of various capital equipment, supplies or other goods. The Sale and Use Taxes typically arise if a supplier does not have business operations in the state in

which it is supplying goods and does not charge state taxes. Additionally, the Debtors must remit gross receipts taxes which are levied upon the total gross revenues of the Debtors in a particular jurisdiction (the "**Gross Receipts Taxes**," and together with the Sale and Use Taxes, the "**Use and Gross Receipts Taxes**").

98.    The Debtors remit Use and Gross Receipts Taxes on a monthly, quarterly or semi-annual basis, depending upon the requirements of the taxing jurisdiction. I estimate that the Debtors will remit approximately $500,000 in Use and Gross Receipts Taxes in 2009 to certain of the Authorities. The Debtors may owe approximately $95,000 to the Authorities on account of prepetition Use and Gross Receipts Taxes.

*FCC Fees*

99.    In the ordinary course of conducting their business operations, the Debtors pay fees (the "**FCC Fees**") to the FCC. FCC Fees are assessed by license and are due annually, in arrears. The Debtors paid $942,790 in FCC Fees in 2009 for the period of October 1, 2008 to September 30, 2009. I estimate that there are no unpaid FCC Fees outstanding.

*Franchise and Income Taxes*

100.    The Debtors pay certain franchise taxes (the "**Franchise Taxes**") and income taxes (the "**Income Taxes**") to the Authorities. Franchise Taxes may be based on a flat fee, net operating income or capital employed. The Franchise Taxes are remitted in accordance with the requirements of the particular taxing jurisdiction. Generally, the Franchise Taxes are paid in quarterly or annual installments of varying sizes. Certain jurisdictions assess both Franchise Taxes and Income Taxes, while others assess either Franchise Taxes or Income Taxes depending on which results in a higher tax assessed. In addition, some jurisdictions require estimated

Franchise Tax payments to be remitted on a quarterly basis if the estimated Franchise Taxes exceed a certain threshold.

101.    The Debtors make estimated payments relating to Franchise Taxes and Income Taxes.  The Debtors estimate that they will remit to certain of the Authorities approximately $2.8 million in Franchise Taxes and Income Taxes in 2009.  I estimate that there will be no estimated payments due to the Authorities on account of Franchise and Income Taxes that accrued before the Petition Date.

*Property Taxes*

102.    State and local laws in jurisdictions where the Debtors operate generally grant Authorities the ability to levy property taxes against the Debtors' real and personal property (the "***Property Taxes***").  The Debtors typically pay Property Taxes on their real and personal property as such taxes are invoiced to avoid the imposition of statutory liens on their real and personal property.  I estimate that the Debtors will remit approximately $2.4 million in Property Taxes in 2009.  I estimate that approximately $1.5 million is due on account of Property Taxes.

*Business Taxes and Business License Fees*

103.    Certain states require the Debtors to pay various business taxes.  These taxes may be based on gross receipts or other bases determined by the applicable taxing jurisdiction.  Further, certain states require the Debtors to pay business license fees to remain in good standing for purposes of conducting business within the state.  I estimate that the Debtors owe approximately $90,000 to the Authorities on account of prepetition business taxes and business license fees.  The Debtors acknowledge that some of these business taxes may, under applicable law, be entitled to priority as a secured claim.  To the extent there are any prepetition amounts

outstanding with respect to prepetition business taxes and business license fees, the Debtors are requesting the authority to pay such amounts.

*Miscellaneous Taxes and Fees*

104.    Various state and local laws require the Debtors to obtain and pay fees for a wide range of licenses and permits from a number of local, state and federal regulatory agencies.  The amount owed, if any, for prepetition miscellaneous taxes and fees is de minimis.

**G.    Debtors' Motion for Entry of an Order Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness With Respect to, Common Stock.**

105.    Citadel has incurred, and is currently incurring, significant net operating losses ("**NOLs**").  Citadel's NOLs are currently estimated to be in excess of $100 million as of the Petition Date, which, based on a combined federal and state income tax rate of approximately 40%, are worth in excess of $40 million in potential tax savings. [15]

**H.    Debtors' Motion for Entry of an Order Authorizing, but not directing, the Debtors to (a) Maintain Prepetition Insurance Policies and (b) Enter into New Insurance Policies**

*The Debtors' Insurance Policies*

106.    The Debtors maintain a comprehensive insurance program that provides them with coverage for, among other things, directors' and officers' liability, fiduciary liability, commercial crime, general liability, business automobile, foreign commercial liability, umbrella liability, media liability, film and entertainment liability, commercial property, boiler and machinery, a hot air balloon and an individual life insurance policy (collectively, the "**Policies**").

---

[15]    Citadel's NOLs for alternative minimum tax ("**AMT**") purposes were estimated in excess of $100 million as of the Petition Date.  These NOL estimates (for regular and AMT purposes) include the portion of the NOL that Citadel expects to generate in its 2009 taxable year that is attributable to the portion of its 2009 taxable period ending on the Petition Date.

The Policies are provided by several third-party insurance carriers (collectively, the "***Insurance Carriers***").

107.    I believe that the Policies are essential to the preservation of the value of the Debtors' businesses, properties and assets.    I am informed that, in many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities.

108.    The premiums for the Policies are prepaid at the commencement of the policy periods.    Moreover, some of the Policies require the Debtors to pay a per incident deductible. The Debtors are current on all obligations under the Policies.    Going forward, however, to the extent not already prepaid, the Debtors will need to continue to make per incident deductibles to preserve the coverage provided under the Policies.    The Debtors are not in default with respect to any payments due under the Policies.

*Insurance Brokers and Agents*

109.    The Debtors employ AON Risk Services ("***AON***") to assist with the procurement and negotiation of their Policies.    AON provides services to the Debtors for which they receive compensation (the "***Broker's Fees***") pursuant to certain contracts.    In 2009, the Debtors incurred and paid $4.1 million (inclusive of approximately of $416,500 in Broker's Fees) to AON for insurance coverage premiums from June 12, 2009 to June 12, 2010.    Additionally, the Debtors incurred and paid less than $20,000, inclusive of Broker's Fees, for insurance on a hot air balloon, film and entertainment liability coverage and whole life insurance for a former employee.    As of the Petition Date, all Broker's Fees for all prepetition services have been satisfied.

110.    The Debtors also employ ESIS, Inc. ("***ESIS***") as their third-party claims administrator to handle claims and litigation against their businesses including, but not limited to, general liability claims, automobile liability claims, personal injury claims, workers' compensation and other litigation-related claims.  On account of such claims, the Debtors pay ESIS, in arrears, a monthly fee (the "***ESIS Fees***" and together with the Broker's Fees, "***Third-Party Fees***") depending on how many claims are asserted against the Debtors.  I believe that the Debtors owe ESIS approximately $35,000 on account of prepetition services.

*Description of the Policies*

111.    Each of the Policies is summarized below:

- Directors' and Officers' Liability.  The Debtors maintain directors' and officers' liability insurance through National Union Fire Insurance Company, XL, Beazley, Axis and Travelers.  These policies run from June 12, 2009 to June 12, 2010.

- Fiduciary Liability.  The Debtors maintain fiduciary liability insurance through National Union Fire Insurance Company.  This policy runs from June 12, 2009 to June 12, 2010.

- Commercial Crime.  The Debtors maintain commercial crime insurance through the Federal Insurance Company.  This policy runs from June 12, 2009 to June 12, 2010.

- Commercial General Liability.  The Debtors maintain commercial general liability coverage through Lexington Insurance Company.  This policy runs from June 12, 2009 to June 12, 2010.

- Business Automobile.  The Debtors maintain business automobile insurance through ACE American Insurance Company.  This policy runs from June 12, 2009 to June 12, 2010.  The Debtors also maintain self-insurance for physical damage to owned or leased vehicles.

- Foreign Commercial Liability.  The Debtors maintain five separate policies for foreign commercial liability through Insurance Company of the State of Pennsylvania.  The policies run from June 12, 2009 to June 12, 2010, and include (i) general liability coverage; (ii) auto liability coverage; (iii) accidental death and dismemberment coverage; (iv) voluntary workers' compensation and employers liability coverage; and (v) kidnap and ransom/extortion coverage.

- <u>Umbrella Liability</u>.  To the extent existing insurance coverage is exhausted, the Debtors maintain three layers of umbrella liability insurance through the National Union Fire Insurance Company of Pittsburgh, PA, St. Paul Fire Marine Insurance Company and Great American Insurance Co. of New York. The policies run from June 12, 2009 to June 12, 2010.

- <u>Media Liability</u>.  The Debtors maintain media liability insurance for publishing and broadcasting operations through the Illinois National Insurance Company.  The policy runs from June 12, 2009 to June 12, 2010.

- <u>Film & Entertainment Liability</u>.  The Debtors maintain film and entertainment liability insurance through AXIS Insurance Company.  This policy runs from July 28, 2009 to July 28, 2010.

- <u>Commercial Property</u>.  The Debtors maintain commercial property insurance through Lexington Insurance Company.  This policy runs from June 12, 2009 to June 12, 2010, and covers real and personal property.

- <u>Boiler & Machinery</u>.  The Debtors maintain boiler and machinery insurance through Continental Casualty Company, which covers production machines and equipment breakdowns.  This policy runs from June 12, 2009 to June 12, 2010.

- <u>Master Balloon Policy</u>.  In connection with their use of an owned hot air balloon at certain promotional events, the Debtors maintain balloon liability and physical damage insurance through Tudor Insurance Company.  The coverage runs from May 25, 2009 to May 25, 2010.

- <u>Whole Life</u>.  In connection with a former acquisition, the Debtors contribute to a life insurance policy for a former employee.  The Debtors are the named beneficiary in the event of the employee's death.  The policy is currently paid-up and all premiums are funded through the excess cash surrender value of the policy.

## <u>OPERATIONS MOTIONS REFERRED TO A LATER HEARING</u>

I.    **Debtors' Motion for an Order Determining Adequate Assurance of Payment for Future Utility Services.**

*The Debtors' Utility Providers*

112.    The Debtors obtain gas, water, sewer, electric, telecommunications and other similar utility services from approximately 350 utility companies (collectively, the "***Utility Providers***").

113.    On average, the Debtors spend approximately $1.4 million each month on utility costs.  The Debtors estimate that approximately $1.4 million in utility costs may be outstanding.

114.    The Debtors propose to pay postpetition obligations owed to the Utility Providers in a timely manner.  To that end, as of the Petition Date, the Debtors have approximately $36 million of cash on hand.  The Debtors expect that their available cash, together with cash flows from operations, will be sufficient to pay postpetition obligations related to utility services.

115.    Furthermore, the Debtors propose to deposit approximately $675,000 — the estimated aggregate cost for two weeks of utility service calculated as a historical average over the past 10 months — into a newly created, segregated, interest-bearing account (the "***Adequate Assurance Deposit***").  The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business (together, the "***Proposed Adequate Assurance***"), constitutes sufficient adequate assurance to the Utility Providers.

116.    I believe that preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  The Debtors depend on the reliable delivery of power and other utility services to operate their business.  Indeed, I believe any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, business relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value of the Debtors' estates and creditor recoveries.  Thus, I believe it is critical that utility services continue uninterrupted during the chapter 11 cases.

## PROFESSIONAL RETENTION AND COMPENSATION MOTIONS

**J.      Debtors' Application for Entry of an Order Authorizing and Approving the Employment and Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtors.**

117.     The Debtors estimate they have more than 10,000 potential creditors.  Although the office of the Clerk of the United States Bankruptcy Court for the Southern District of New York (the "***Clerk's Office***") ordinarily would serve notice on the Debtors' creditors and other parties in interest and administer claims against the Debtors, the Clerk's Office may not have the resources to undertake such tasks, especially in light of the sheer magnitude of the Debtors' creditor body and the tight timelines that frequently arise in chapter 11 cases.  Accordingly, the Debtors propose to engage Kurtzman Carson Consultants LLC to act as the notice and claims agent in these chapter 11 cases.

**K.      Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date**

118.     The Debtors seek to retain Kirkland & Ellis LLP ("***K&E***") as their attorneys because K&E has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the bankruptcy code.  K&E has been working with the Debtors since June 2003 with respect to various matters.

**L.      Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Lazard Frères & Co. LLC as Investment Banker and Financial Advisor *Nunc Pro Tunc* to the Petition Date.**

119.     The Debtors seek to retain Lazard Frères & Co. LLC ("***Lazard***") as their investment banker  and financial advisor because, among other things, (a) the Debtors' need to retain a financial advisory firm to provide advice with respect to the Debtors' restructuring activities and (b) Lazard's recognized expertise and extensive experience in providing advisory services to media and other companies in connection with the restructuring of distressed

companies in complex chapter 11 cases and out-of-court restructurings. Lazard has been working with the Debtors since May 20, 2009.

**M.    Debtors' Application For Entry of Entry of an Order Authorizing the Employment of Alvarez & Marsal North America, LLC as their Financial Advisor *Nunc Pro Tunc* to the Petition Date**

120.    The Debtors seek to retain Alvarez & Marsal North America, LLC ("*A&M*") as their financial advisor because A&M's resources and capabilities, together with its prepetition experience advising the Debtors, complements the services offered by the Debtors' other restructuring professionals and render its retention integral to the Debtors' success in these chapter 11 cases. Lazard has been working with the Debtors since June 18, 2009.

121.    As a result of the prepetition work performed on behalf of the Debtors, A&M has developed a significant reserve of institutional knowledge of the Debtors and their business and is now intimately familiar with the Debtors' affairs, operations, organizational and capital structure and other related material information.

**N.    Debtors' Application For Entry of An Order Authorizing and Approving the Retention of Deloitte & Touche LLP and Deloitte Tax LLP as their Auditors and Accounting and Tax Advisors *Nunc Pro Tunc* to the Petition Date**

122.    The Debtors seek to retain Deloitte & Touche LLP ("*Deloitte Accounting*") and Deloitte Tax LLP ("*Deloitte Tax*", together with Deloitte Accounting, "*Deloitte*") as their auditor and accounting and tax advisor. Deloitte is a firm of independent public accountants and an independent registered public accounting firm. Deloitte has significant qualifications and experience as tax advisors and accountants.

123.    In connection with its previous employment by the Debtors, Deloitte has garnered considerable knowledge concerning the Debtors, its businesses, capital structure and financial profile, and is already familiar with the Debtors' business affairs to the extent necessary for the scope of the proposed and anticipated services.

**O.      Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

124.    The Debtors employ various attorneys in the ordinary course of their business (each, an "*OCP*" and, collectively, the "*OCPs*").  The OCPs provide services for the Debtors in a variety of matters unrelated to these chapter 11 cases, including legal services in specialized areas such as media law, labor and FCC regulations.

125.    The Debtors also employ, in the ordinary course of business, professional service providers such as public relations, communications and general business consultants, financial advisors, regulatory compliance consultants, and administrative service providers (collectively, the "*Service Providers*").  Although not all of the Service Providers have professional degrees and certifications, they all provide services to the Debtors that are integral to the day-to-day operation of the Debtors' businesses and do not directly relate to or materially affect the administration of these chapter 11 cases.

126.    The Debtors submit that the continued employment and compensation of the OCPs and Service Providers is in the best interests of their estates, creditors and other parties in interest.  Although the Debtors anticipate that the OCPs and Service Providers will wish to continue to represent the Debtors during these chapter 11 cases, many would not be in a position to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise and familiarity that the OCPs and Service Providers have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals.  Accordingly, the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

48

## PROCEDURAL MOTIONS

**P.    Debtors' Motion for an Order Directing Joint Administration of Related Chapter 11 Cases.**

127.    The 50 Debtors in these chapter 11 cases include Citadel and 49 of its direct and indirect subsidiaries.  The Debtors operate as an integrated business with common ownership and control, and they share key financial and operational systems.  Citadel is the direct or indirect owner of each of the other 49 Debtors.   Accordingly, the Debtors are "affiliates" within the meaning of the Bankruptcy Code.

128.    Given the complex and interlinked commercial relationships among the Debtors, joint administration of these chapter 11 cases will afford significant administrative convenience.  Many of the motions, hearings and orders that will arise in these chapter 11 cases will affect each and every Debtor.  Thus, the entry of an order directing joint administration of these cases will reduce fees and costs by, among other things, avoiding duplicative filings and objections.  Joint administration also will allow all parties in interest to monitor these cases with greater ease.  Furthermore, joint administration will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files for each of the Debtors, thereby simplifying administrative supervision of these cases by the U.S. Trustee.

129.    The joint administration of these chapter 11 cases will not give rise to any conflict of interest among the Debtors' estates, nor will joint administration adversely affect the Debtors' respective creditors since the Debtors seek only administrative, not substantive, consolidation of their estates.  Intercompany claims among the Debtors also will be preserved and the Debtors will maintain separate records of assets and liabilities.  Thus, the relief requested will not harm individual creditors' rights; to the contrary, non-debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

49

**Q.   Debtors Motion for an Entry of an Order Authorizing the Debtors to (A) Prepare a
List of Creditors In Lieu of Submitting a Formatted Mailing Matrix; (B) File a
Consolidated List of the Debtors' 50 Largest Unsecured Creditors; and (C) Mail
Initial Notices.**

130.   There are 50 Debtor entities involved in these chapter 11 cases.  The Debtors hold

an aggregate of approximately $2.5 billion in liabilities as indicated in their balance sheet dated

as of October 31, 2009.   The Debtors estimate that they have thousands of creditors on a

consolidated basis.

131.   The Debtors are seeking to retain Kurtzman Carson Consultants LLC as their

notice and claims agent in these chapter 11 cases (the "***Proposed Notice and Claims Agent***").  If

such application is granted, the Proposed Notice and Claims Agent will, among other things, (a)

assist with the consolidation of the Debtors' computer records into a creditor database and (b)

complete the mailing of notices to the parties in such database.  I believe that using the Proposed

Notice and Claims Agent for this purpose will maximize efficiency in administering these cases

and will ease administrative burdens that otherwise fall upon the Court and the U.S. Trustee.

Additionally, the Proposed Notice and Claims Agent will assist the Debtors in preparing creditor

lists and mailing initial notices.

132.   After consultation with the Proposed Notice and Claims Agent, I believe that

preparing the consolidated list will be sufficient to permit the Proposed Notice and Claims Agent

to promptly provide notices to all applicable parties.  Accordingly, I believe that it will maximize

efficiency and accuracy and reduce costs, to maintain electronic-format lists of creditors rather

than preparing and filing separate matrices.

**R.   Debtors' Motion for an Order Establishing Certain Notice, Case Management and
Administrative Procedures.**

133.   The Debtors propose to establish the Case Management Procedures to govern

noticing and related administrative actions in these chapter 11 cases, in an effort to minimize

administrative burden and costs for the Court, the Debtors' estates and all parties in interest.  The

Debtors expect there to be thousands of parties in interest in these cases and anticipate that

hundreds of parties will file requests for service of filings pursuant to Bankruptcy Rule 2002(i).

The Debtors also expect that numerous motions and applications will be filed in these chapter 11

cases.  The costs and burdens that might arise absent adoption of the proposed procedures – such

as, for example, those associated with multiple hearings per month, plus the costs associated with

copying, mailing, shipping by overnight delivery service or otherwise serving paper copies of all

such documents – could impose significant economic and administrative burdens on the Debtors'

estates, the Court and all other parties in interest.

134.    Given the size and scope of these cases, I believe that implementation of the Case

Management Procedures will facilitate their efficient administration of these cases.  Specifically,

the Case Management Procedures will benefit the Debtors, the Court and all parties in interest

by, among other things:

(i)      reducing the need for emergency hearings and requests for expedited relief;

(ii)     providing for omnibus hearings for the Court to consider motions, pleadings, applications, objections and responses thereto;

(iii)    fostering consensual resolution of important matters;

(iv)     assuring prompt receipt of appropriate notice affecting parties' interests;

(v)      allowing for electronic notice pursuant to the Court's electronic filing system;

(vi)     providing ample opportunity to parties in interest to prepare for and respond to matters before this Court;

(vii)    reducing the substantial administrative and financial burden that would otherwise be placed on the Debtors' and parties in interest who file documents in these chapter 11 cases; and

(viii)   reducing administrative burdens on the Court and the Clerk's office.

51

**S.      Debtors' Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs.**

135.    The scope and complexity of the Debtors' businesses, coupled with the limited time and resources available to the Debtors to marshal the information necessary to complete the Schedules and Statements, make it unlikely for the Debtors to complete the Schedules and Statements in this mandated timeframe.  Thus, the Debtors are requesting to extend the deadline to file the Schedules and Statements for an additional 30 days, with the ability to request additional time should it become necessary.

**T.      Debtors' Motion for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals**

136.    As discussed above, the Debtors have or will file applications to retain the following professionals in connection with the prosecution of these chapter 11 cases:  (a) K&E, as their general restructuring counsel; (b)  Lazard, as their financial advisor and investment banker; (c)  A&M, as their restructuring advisor and (d) Deloitte, as their auditors and tax consultants.  The Debtors anticipate they may also retain other professionals during the course of these chapter 11 cases as the need arises (collectively, the "***Professionals***").

137.    The Debtors believe that establishing orderly procedures for payment of the Professionals will streamline the administration of these chapter 11 cases and otherwise promote efficiency for the Court, the U.S. Trustee and all parties in interest.  Specifically, a streamlined process for serving interim fee applications and notice thereof will facilitate efficient review of the Professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.

## Exhibit C

**FCC Considerations**

## EXHIBIT C

### FCC Considerations

Citadel's radio operations are subject to significant regulation by the FCC under chapter 5 of title 47 of the United States Code (as amended, the "***Communications Act***") and FCC rules and regulations promulgated thereunder.[11]  A radio station may not operate in the United States without the authorization of the FCC.  Approval of the FCC is required for the issuance, renewal, transfer, assignment or modification of station operating licenses. In connection with the Debtors' emergence from chapter 11, FCC Approval must be obtained.

The following is important information concerning the FCC Approval process and the ownership requirements and restrictions that must be met in order for parties to hold Reorganized Citadel's New Common Stock.  **THE FOLLOWING SUMMARY OF CERTAIN FCC RULES AND POLICIES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO FCC OWNERSHIP ISSUES AND OTHER CONSEQUENCES OF THE PLAN.**

### 1.      Required FCC Consents

Both the Debtors' entry of the Debtors into chapter 11 and the emergence of the Reorganized Debtors from chapter 11 require consent of the FCC.  Following Citadel's filing of its voluntary petition under chapter 11, the Debtors filed applications seeking the FCC's consent to the pro forma assignment of the Debtors' FCC Licenses from the Debtors to the Debtors as "debtors in possession" under chapter 11.  The FCC granted its consent to this assignment on December 30, 2009.  For Reorganized Citadel to continue the operation of the Debtors' radio stations, the Debtors will be required to file applications with the FCC (the "***Long Form Application***") to obtain approval of the Transfer of Control.  To expedite the emergence of the Debtors from chapter 11, in the event that FCC Approval of the Long Form Application is delayed and will not be obtained expeditiously, the Plan contemplates that the Debtors may, in their discretion and subject to the consent of the Requisite Participating Lenders, emerge from chapter 11 upon assignment of the FCC Licenses from the Debtors to the Reorganized Debtors and the transfer of the New Common Stock to the FCC Trust subject to the continuing jurisdiction and oversight of the Bankruptcy Court pending the FCC's grant of the Long Form Application.  The FCC's consent also would be required for the FCC Trust to act as an interim holder of the New Common Stock, but because the assignment of the FCC Licenses to the FCC Trust would not constitute a substantial transfer of control of the Debtors, the Debtors could file a Short Form Application seeking FCC consent to this pro forma ownership change (the "***Short Form Application***").  The Short Form Application can be approved by the FCC on a more expedited basis than the Long Form Application and are not subject to formal petitions to deny.

In the event that approval of the Long Form Application is obtained expeditiously, it will not be necessary to implement the FCC Trust.  If the Debtors determine, with consent of the Requisite Participating Lenders, to implement the FCC Trust, the Debtors do not believe that filing the Short Form Application after the Long Form Application will materially delay the timing with respect to the effectiveness of the Confirmation of the Plan because the Short Form Application can be approved on a more expedited basis.

In the event that the FCC Trust is established and becomes effective, the Holders of Senior Secured Claims and General Unsecured Claims who are able to complete the Ownership Certification (discussed below) would receive beneficial interests in the FCC Trust, as opposed to directly holding the New Common Stock (subject to the ownership rules and regulations set forth below).  Upon FCC approval of the Long Form Application, the FCC Trust would be liquidated and holders of beneficial interests that complete the Ownership Certification would receive their pro rata share of the New Common Stock.  The Holders of Senior Secured Claims and General Unsecured Claims who are unable to complete the Ownership Certification would retain Special Warrants.

---

11   All capitalized terms used but not otherwise defined herein will have the meaning ascribed to them in the Plan.

2.        **Information Required from Prospective Stockholders of Reorganized Citadel.**

In processing applications for consent to the transfer of control of FCC broadcast licensees or assignment of FCC broadcast licenses, the FCC considers, among other things, whether the prospective licensee and those considered to be "parties" to the application possess the legal, character and other qualifications to hold an interest in a broadcast station. For the FCC to process and grant the Short Form Application and the Long Form Application, the Debtors will need to obtain and include information about Reorganized Citadel and about the "parties" to the application demonstrating that such parties are so qualified.

As described in the Equity Allocation Mechanism attached as **Exhibit A** to the Plan, Holders of Senior Secured Claims and General Unsecured Claims will be issued Special Warrants which can be exercised for shares of New Common Stock of Reorganized Citadel for nominal consideration, subject to certain conditions, including the provision of an Ownership Certification. Specifically, parties seeking to exercise Special Warrants shall be required to submit a certified response to a questionnaire providing information on the prospective stockholder to establish that issuance of the New Common Stock to that Holder would not result in a violation of law, impair the qualifications of the Reorganized Debtors to hold the FCC Licenses or impede the grant of any FCC Applications on behalf of the Reorganized Debtors. All prospective stockholders and prospective holders of beneficial interests in the FCC Trust, whether or not they would be "parties" to the FCC Applications (as described below), would need to provide information on the extent of their direct and indirect ownership or control by non-U.S. persons to establish that Reorganized Citadel would comply with limitations under the Communications Act relating to the ownership and control of broadcast licenses by non-U.S. persons. Prospective holders of New Common Stock and prospective holders of beneficial interests in the FCC Trust, as the case may be, with direct or indirect ownership or control by non-U.S. persons would not be permitted to exercise the Special Warrants for New Common Stock or hold such beneficial interests in the FCC Trust, if the ownership percentage of such prospective holders, when aggregated with the ownership percentage of all other prospective holders, as calculated in accordance with FCC rules and regulations, would result in Reorganized Citadel having a greater amount of foreign ownership than permitted by the Communications Act. In such situations, prospective holders of New Common Stock or beneficial interests in the FCC Trust would retain Special Warrants. The Special Warrants would be permitted to be sold or assigned, provided that the purchaser or assignee would also be subject to the ownership certification process described above.

3.        **Attributable Interests in Media Under the FCC's Rules.**

A prospective stockholder in Reorganized Citadel would be considered a "party" to the Long Form Application if the prospective stockholder would be deemed to hold an "attributable" interest in Reorganized Citadel under Section 73.3555 of the FCC's rules, 47 C.F.R. § 73.3555. The FCC's "multiple ownership" and "cross ownership" rules prohibit common ownership of "attributable interests" of certain combinations of broadcast and other media properties. "Attributable interests" generally include the following interests in a media company: general partnership interests, non-insulated limited liability company or limited partnership interests, a position as an officer or director (or the right to appoint officers or directors), or a 5% or greater direct or indirect interest in voting stock. The FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in the media-related activities of the partnership. The FCC applies the same attribution and insulation standards to limited liability companies. Attribution traces through chains of ownership. In general, a person or entity that has an attributable interest in another entity also will be deemed to hold each of that entity's attributable media interests except for indirect stock interests that are attenuated below the attribution threshold in the ownership chain.

Combinations of direct and indirect equity and debt interests exceeding 33% of the total asset value (equity plus debt) of a media outlet also may be deemed attributable if the holder has another attributable media interest in the same market or provides more than 15% of a station's total weekly broadcast programming hours in that market. Also, a person or entity that provides more than 15% of the total weekly programming hours for a radio station and also has an attributable interest in another radio station in the same market is deemed to hold an attributable interest in the programmed station.

As described in the Equity Allocation Mechanism, when the Transfer of Control is effected, no individual or entity (including any individual or entity under common management) shall be permitted to acquire more than

4.99% of Reorganized Citadel's Class A Common Stock thereby precluding any individual or entity from having an attributable interest as a result of stock ownership.

The Equity Allocation Mechanism provides, among other things, that all deemed holders of Class B Common Stock who have not requested in writing at least 30 days prior to the Effective Date to receive Class B Common Stock shall be deemed to have immediately exchanged such shares of Class B Common Stock for a like number of shares of Class A Common Stock up to the 4.99% cap. Post-emergence, Class B Common Stock shall be convertible into Class A Common Stock at the written request of the holder, provided that if such conversion would result in the stockholder having an attributable interest in Reorganized Citadel, such conversion shall be permitted only if prior to the conversion, the stockholder has provided satisfactory assurance to Reorganized Citadel that its ownership of Class A Common Stock would not result in Reorganized Citadel's violation of applicable rules and regulations of the FCC or the Communications Act. Class B Common Stock is intended to be non-cognizable for purposes of determining whether a holder is attributable under the FCC's rules. Accordingly, holders of Class B Common Stock shall not be permitted to vote on matters submitted to a vote of the stockholders of Reorganized Citadel, provided that such stockholders shall be permitted to vote on a limited number of matters that are submitted to a vote. Permitting holders of Class B Common Stock to vote on limited extraordinary corporate actions will not cause the holders of Class B Common Stock to be deemed to have an attributable interest in Reorganized Citadel under FCC rules and regulations. A description of the Class B Common Stock is attached hereto as **Annex 1**.

**4.      FCC Foreign Ownership Restrictions for Entities Controlling Broadcast Licenses**

Section 310(b) of the Communications Act restricts foreign ownership or control of any entity licensed to provide broadcast and certain other services. Among other prohibitions, foreign entities may not have direct or indirect ownership or voting rights of more than 25% in a corporation controlling the licensee of a radio broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to foreign ownership or voting rights. The FCC has interpreted this provision to mean that it must make an affirmative public interest finding before a broadcast license may be granted or transferred to a corporation which is controlled by another corporation more than 25% owned or controlled, directly or indirectly, by foreigners. With very few exceptions, the FCC historically has not made such an affirmative finding in the broadcast field. The FCC calculates the voting rights separately from equity ownership, and both thresholds must be met. Warrants and other future interests typically are not taken into account in determining foreign ownership compliance. In some specific circumstances, however, the FCC has treated non-stock interests in a corporation as the equivalent of equity ownership and has assessed foreign ownership based on contributions to capital. Foreign ownership limitations also apply to partnerships and limited liability companies. The FCC historically has treated partnerships with foreign partners as foreign controlled if there are any foreign general partners. The interests of any foreign limited partners that are not insulated (using FCC criteria) from material involvement in the partnership's media activities and business are considered in determining the equity ownership and voting rights held by foreigners. The interests of limited partners that are properly insulated only count toward the calculation of equity owned by foreigners.

Because direct and indirect ownership of Reorganized Citadel's shares by non-U.S. persons and/or entities will proportionally affect the level of deemed foreign ownership and control rights in Reorganized Citadel, prospective shareholders will be required to provide information to Citadel on their own foreign ownership and control. Citadel shall review such information to assess whether permitting such party to hold such interests could impair the qualifications of Reorganized Citadel to hold FCC broadcast licenses. Upon receipt of the Ownership Certifications, the New Common Stock will be distributed as set forth in the Equity Allocation Mechanism, attached to the Plan as **Exhibit A**.

The Equity Allocation Mechanism reflects that Reorganized Citadel will use a foreign ownership threshold of 20% for the initial distribution of New Common Stock. Because the FCC licenses held by Reorganized Citadel will be assigned to a licensee subsidiary, this threshold will be below the statutory maximum of 25% foreign ownership permitted under FCC law and accordingly will promote the liquidity of Reorganized Citadel's stock. Because the New Common Stock will be widely held and freely transferable, the use of a 20% threshold will permit market purchases by individuals or entities that may have the effect of increasing or decreasing the aggregate foreign ownership levels in small amounts, without causing Reorganized Citadel to exceed the statutory foreign ownership restrictions.

5.        **Media Ownership Restrictions**

The FCC generally applies its ownership limits to "attributable" media interests held by an individual, corporation, partnership, limited liability company or other association, as addressed above. The FCC's rules on media ownership, in turn, limit the number of media properties in which one entity or entities under common control can have an attributable ownership interest. Those rules that could give rise to a prohibited combination for Reorganized Citadel or for a prospective stockholder of Reorganized Citadel are described below.

(i)        *Local Radio Ownership*

The FCC's rules impose specific limits on the number of commercial radio stations in which an entity can have an attributable interest in a particular geographic area.  The local radio ownership rules are as follows:

- in markets with 45 or more radio stations, ownership is limited to eight commercial stations, no more than five of which can be either AM or FM;

- in markets with 30 to 44 radio stations, ownership is limited to seven commercial stations, no more than four of which can be either AM or FM;

- in markets with 15 to 29 radio stations, ownership is limited to six commercial stations, no more than four of which can be either AM or FM; and

- in markets with 14 or fewer radio stations, ownership is limited to five commercial stations or no more than 50% of the market's total, whichever is lower, and no more than three of which can be either AM or FM.

For radio stations that are located in markets rated by Arbitron, the geographic market determinations used by Arbitron are utilized by the FCC to determine the market in which stations are located.  For radio stations located outside of an Arbitron Metro, the FCC uses a signal contour-based methodology to determine markets.

(ii)        *Radio/Television Cross-Ownership Rule*

The FCC's radio/television cross-ownership rule permits the common attributable ownership or control of more than one full-power AM and/or FM radio station and up to two television stations in the same market. The total number of radio stations permitted to be under common attributable ownership is dependent on the number of independently owned media voices in the local market as follows:

- In markets with at least 20 independently owned media voices, a single entity may hold attributable interests in up to two television stations and six radio stations. Alternatively, such an entity is permitted to hold an attributable interest in one television station and seven radio stations in the same market.

- In a market that includes at least 10 independently owned media voices, a single entity may hold attributable interests in up to two television stations if permitted under FCC rules limiting local television ownership and up to four radio stations.

- Regardless of the number of independently owned media voices in a market, a single entity may hold an attributable interest in up to two television stations where the FCC's rules permit common ownership of the two television stations and one radio station in any market.

(iii)        *Newspaper/Broadcast Cross-Ownership Rule*

The newspaper broadcast cross-ownership rule currently in effect prohibits the cross ownership of daily newspapers and broadcast stations serving the same market, absent a waiver from the FCC.  In 2007, the FCC adopted an order that modified this rule to presumptively allow the ownership of attributable interests in a broadcast

4

station and an English-language daily newspaper of general circulation that is published in the market served by the broadcast station only in the 20 largest markets if certain conditions are met.  The modified newspaper/broadcast cross-ownership rule has been appealed to a federal appellate court and the effectiveness of the new rule has been stayed.  The appeal remains pending.

**<u>ANNEX I</u>**

**<u>TERMS OF CLASS B COMMON STOCK</u>**

TERMS OF CLASS B COMMON STOCK

| | |
|---|---|
| Issuance | Upon the written request of any recipient of Class A Common Stock (the "Voting Common Stock") made within 10 days after the Bankruptcy Court enters its order confirming the Plan or upon exercise of Warrants, Reorganized Citadel (the "Company") shall issue Class B Common Stock (the "Limited Voting Common Stock") to any such recipient, which shall have the same economic rights as Class A Common Stock.  Limited Voting Common Stock shall be in substitution for Voting Common Stock that otherwise would have been issued to such recipient. |
| Conversion | Limited Voting Common Stock shall be convertible into Voting Common Stock at the written request of the holder thereof, provided that no Limited Voting Common Stock holder will be permitted to convert Limited Voting Common Stock to the extent that such conversion would result in such holder holding more than 4.99% of the Class A Common Stock outstanding following such conversion unless prior to such conversion the holder has (i) provided assurance satisfactory in form and substance to Reorganized Citadel that such holder does not have an attributable interest in another entity that would cause Reorganized Citadel to violate applicable FCC rules and regulations and (ii) obtained any necessary approvals from the FCC or the DOJ.  No Limited Voting Common Stock holder will be permitted to convert Limited Voting Common Stock to the extent that such conversion would result in violations of the Communications Act of 1934, as amended, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 or rules or regulations promulgated thereunder. |
| Voting Rights | Holders of Limited Voting Common Stock shall have no right to vote any Limited Voting Common Stock beneficially owned or held of record by such holder with respect to any matters submitted to a vote of the stockholders of the Company other than as expressly provided below and in no event shall any holder of Limited Voting Common Stock be entitled to vote any Limited Voting Common Stock beneficially owned or held of record by it with respect to any matters with respect to the board of directors.  For the avoidance of doubt, holders of Limited Voting Common Stock shall not have a separate class vote on any matter submitted to a vote of the stockholders of the Company, except that holders of Limited Voting Common Stock shall be entitled to a separate class vote on any amendment or modification that adversely affects any rights or privileges of the Limited Voting Common Stock and either (a) does not adversely affect the Voting Common Stock or (b) disproportionately affects the Limited Voting Common Stock as compared to  the Voting Common Stock. <br><br> Notwithstanding the foregoing, if and only if any of the following actions are submitted to a vote of the stockholders, holders of Limited Voting Common Stock shall only be entitled to vote on the same basis as holders of Voting Common Stock: <br><br> (i)　　the retention or dismissal of outside auditors; <br><br> (ii)　　any distributions to stockholders; <br><br> (iii)　　material asset sales, recapitalization, merger, business combination, consolidation, exchange or other similar reorganization involving the Company or any of its subsidiaries, including a Drag-Along Transaction; |

|  |  |
|---|---|
| (iv) | the adoption of any new or amended certificate of incorporation of the Company or any of its subsidiaries, other than any amendment that is ministerial in nature; |
| (v) | other than in connection with a management equity plan or similar plan, any authorization or issuance of equity interests, or any security or instrument convertible into or exchangeable for equity interests, in the Company or any of its subsidiaries; and |
| (vi) | the liquidation of the Company or any of its subsidiaries. |

## Exhibit D

## Disclosure Statement Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CITADEL BROADCASTING CORPORATION, *et al.*, | ) | Case No. 09-17442 (BRL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### ORDER (I) APPROVING THE
### DEBTORS' FIRST MODIFIED DISCLOSURE STATEMENT;
### (II) ESTABLISHING A RECORD DATE FOR VOTING ON THE
### DEBTORS' FIRST MODIFIED JOINT PLAN OF REORGANIZATION;
### (III) APPROVING SOLICITATION PACKAGES AND PROCEDURES
### FOR THE DISTRIBUTION THEREOF; (IV) APPROVING THE FORMS
### OF BALLOTS AND MANNER OF NOTICE; (V) ESTABLISHING
### PROCEDURES FOR VOTING ON THE PLAN; AND (VI) ESTABLISHING
### NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PLAN

Upon the motion (the "*Motion*")[1] of Citadel Broadcasting Corporation ("*Citadel*") and its

debtor affiliates, as debtors and debtors in possession (collectively, the "*Debtors*"),[2] for entry of

an order (the "*Order*") pursuant to sections 1125 and 1126 of the Bankruptcy Code, Rules 2002,

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

[2]   The Debtors in these chapter 11 cases are:  Alphabet Acquisition Corp.; Atlanta Radio, LLC; Aviation I, LLC; Chicago FM Radio Assets, LLC; Chicago License, LLC; Chicago Radio Assets, LLC; Chicago Radio Holding, LLC; Chicago Radio, LLC; Citadel Broadcasting Company; Citadel Broadcasting Corporation; DC Radio Assets, LLC; DC Radio, LLC; Detroit Radio, LLC; International Radio, Inc.; KLOS Radio, LLC; KLOS Syndications Assets, LLC; KLOS-FM Radio Assets, LLC; LA License, LLC; LA Radio, LLC; Minneapolis Radio Assets, LLC; Minneapolis Radio, LLC; Network License, LLC; NY License, LLC; NY Radio Assets, LLC; NY Radio, LLC; Oklahoma Radio Partners, LLC; Radio Assets, LLC; Radio License Holding I, LLC; Radio License Holding II, LLC; Radio License Holding III, LLC; Radio License Holding IV, LLC; Radio License Holding V, LLC; Radio License Holding VI, LLC; Radio License Holding VII, LLC; Radio License Holding VIII, LLC; Radio License Holding IX, LLC; Radio License Holding X, LLC; Radio License Holding XI, LLC; Radio License Holding XII, LLC; Radio Networks, LLC; Radio Today Entertainment, Inc.; Radio Watermark, Inc.; San Francisco Radio Assets, LLC; San Francisco Radio, LLC; SF License, LLC; WBAP-KSCS Acquisition Partner, LLC; WBAP-KSCS Assets, LLC; WBAP-KSCS Radio Acquisition, LLC; WBAP-KSCS Radio Group, Ltd.; and WPLJ Radio, LLC.  The principal corporate locations of the Debtors are:  142 West 57th Street, 11th Floor, New York, New York 10019; and 7201 W. Lake Mead Blvd., Suite 400, Las Vegas, Nevada 89128.  The service address for all of the Debtors is 7201 W. Lake Mead Blvd., Suite 400, Las Vegas, Nevada 89128.

3003, 3017, 3018 and 3020 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 3017-1 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") (i) approving the Debtors' Disclosure Statement; (ii) establishing a Record Date for voting on the Debtors' Plan; (iii) approving Solicitation Packages and procedures for the distribution thereof; (iv) approving the forms of Ballots and manner of notice; (v) establishing procedures for voting on the Debtors' Plan; and (vi) establishing notice and objection procedures, for confirmation of the Plan, all as more fully set forth in the Motion; the Debtors having filed with the Court the *First Modified Disclosure Statement for the Joint Plan of Reorganization of Citadel Broadcasting Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 15, 2010 (the "***Disclosure Statement***") and the *First Modified Joint Plan of Reorganization of Citadel Broadcasting Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 15, 2010 (the "***Plan***"); the Court having reviewed the Disclosure Statement, the Motion, the papers in support thereof and the responses thereto, if any; the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C §§ 157 and 1334 and the Standing Order M 61 Referring Bankruptcy Judge for the Southern District of New York of Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; due and proper notice of the Motion being adequate and appropriate under the particular circumstances; a hearing having been held to consider the relief requested in the Motion on March 15, 2010 (the "***Hearing***"); upon the record of the Hearing and all proceedings had before the Court; the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors' estates, their creditors and other parties in interest and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; any

objections to the requested relief having been withdrawn, overruled on the merits, or resolved as

set forth herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED:

1.       The Motion is granted to the extent provided herein.

2.       The Disclosure Statement is hereby approved pursuant to section 1125 of the

Bankruptcy Code, as providing Holders of Claims entitled to vote on the Plan with adequate

information to make an informed decision as to whether to vote to accept or reject the Plan in

accordance with section 1125(a)(1) of the Bankruptcy Code.

3.       The Disclosure Statement (including all applicable exhibits thereto) provides

Holders of Claims, Holders of Interests and other parties in interest with sufficient notice of the

release, exculpation and injunction provisions contained in Article IX of the Plan (including the

third-party releases set forth in Article IX.C of the Plan), in satisfaction of the requirements of

Bankruptcy Rule 3016(c).

4.       The Solicitation Procedures annexed hereto as **Exhibit 1** are incorporated herein

by reference and form an integral and indivisible part of this Order, provide for a fair and

equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

5.       The Disclosure Statement Hearing Notice, attached hereto as **Exhibit 2** and

incorporated by reference herein, filed by the Debtors and served upon parties in interest in these

chapter 11 cases by February 6, 2010, constitutes adequate and sufficient notice of the hearing to

consider approval of the Disclosure Statement, the manner in which a copy of the Disclosure

Statement (and exhibits thereto, including the Plan) could be obtained and the time fixed for

3

filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and is hereby approved.

6.      The Ballots, including the Master Ballots, the forms of which are annexed to this Order as **Exhibit 3** and **Exhibit 4** respectively, (i) are consistent with Official Form No. 14; (ii) adequately address the particular needs of these chapter 11 cases; (iii) are appropriate for each Class of Claims entitled to vote to accept or reject the Plan; and (iv) comply with Bankruptcy Rule 3017(d).  The appropriate Ballots and Master Ballots (as applicable) and the Ownership Certification, the form of which is annexed to this Order as **Exhibit 8**, shall be distributed to Holders of Claims in Classes 3 and 4, which are the Classes entitled to vote to accept or reject the Plan (collectively, the "***Voting Classes***") because these Claims are classified as being impaired by, and entitled to vote under, the Plan.

7.      Ballots need not be provided to Holders of Claims in Class 5 and Holders of Citadel Interests in Class 8 (together, the "***Non-Voting Impaired Classes***") because these Classes are receiving no recovery under the Plan and, therefore, are conclusively presumed to reject the Plan in accordance with section 1126(g) of the Bankruptcy Code.

8.      Ballots need not be provided to Holders of Claims and Interests in Classes 1, 2, 6 and 7 (together, the "***Non-Voting Unimpaired Class***") because these classes are classified as unimpaired by the Plan and are deemed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

9.      With respect to Holders of Claims and Interests not entitled to vote to accept or reject the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code, the Debtors shall mail the appropriate Notice of Non-Voting Status, substantially in the forms of **Exhibit 5** and **Exhibit 6**, respectively, annexed to this Order.

4

10.     Pursuant to Bankruptcy Rule 3018(a), the record date for purposes of determining which Holders of Claims are entitled to receive Solicitation Packages and, where applicable, vote on the Plan, shall be March 5, 2010 (the "***Record Date***").  The Debtors shall specify the Record Date in the Confirmation Hearing Notice.  Only Holders of Claims as of the Record Date shall be entitled to vote to accept or reject the Plan, and where applicable, make any election set forth on the Ballot.

11.     The period during which the Debtors may solicit votes to accept or reject the Plan, as established by this Order, provides sufficient time for (i) creditors to make informed decisions to accept or reject the Plan and submit timely Ballots to the Voting and Claims Agent and (ii) Nominees for Beneficial Owners of the Claims in Class 4 General Unsecured Claims (Subordinated Notes Claims) to distribute the Ballots to Beneficial Owners, for such Beneficial Owners to complete and timely submit such Ballots to the Nominees and for the Nominees to complete and timely submit Master Ballots to the Voting and Claims Agent.

12.     The contents of the Solicitation Packages, including the Confirmation Hearing Notice annexed to this Order as **Exhibit 7**, comply with Bankruptcy Rules 2002 and 3017, constitute sufficient notice to all applicable interested parties in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and are thus hereby approved.

13.     The Solicitation Procedures, annexed hereto as **Exhibit 1**, set forth procedures for the Debtors to solicit, receive and tabulate votes to accept the Plan and are hereby approved in their entirety; *provided*, *however*, that the Debtors reserve the right to amend or supplement the Solicitation Procedures where, in the Debtors' best judgment, doing so would better facilitate the solicitation process.

5

14.     The Debtors are authorized, in accordance with the Solicitation Procedures, to distribute the Disclosure Statement (and exhibits thereto, including the Plan) to the Voting Classes in disc format.

15.     The solicitation timeline is hereby established (subject to modification as needed):

    a. **Record Date** – March 5, 2010, as the Record Date for purposes of determining which creditors are entitled to vote on the Plan.

    b. **Solicitation Date** - the Debtors will distribute Solicitation Packages and the Disclosure Statement to the Voting Classes and other applicable parties as identified in the Motion by no later than March 22, 2010 (the "***Solicitation Date***").

    c. **Voting Deadline** - May 3, 2010 at 5:00 p.m. (Prevailing Eastern Time), as the deadline by which all Ballots and Master Ballots must be properly executed, completed and delivered so that they are actually received by the Voting and Claims Agent (the "***Voting Deadline***").

16.     The Debtors are authorized to distribute the Solicitation Packages without the Plan Supplement and are directed to file the Plan Supplement with the Bankruptcy Court on or before the date which is ten days before the Voting Deadline and serve the Plan Supplement on (i) the U.S. Trustee; (ii) counsel for the Committee; (iii) counsel to the agent under the Debtors' prepetition secured term loan; (iv) the IRS; (v) the SEC; (vi) the FCC; (vii) the Office of the Attorney General in all of the states in which the Debtors operate; and (viii) all other parties in interest that have filed requests for notice pursuant to Bankruptcy Rule 2002 in the Debtors' chapter 11 cases.   After it is filed, the Plan Supplement will be available for review at http://www.kccllc.net/citadel.

17.     With respect to entities at addresses from which Disclosure Statement Hearing Notices were returned as undeliverable by the United States Postal Service, the Debtors are excused from distributing Solicitation Packages or Confirmation Hearing Notices to those entities unless the Debtors are able, using reasonable efforts, to obtain an accurate address for

such entities before the Solicitation Date, and failure to distribute Solicitation Packages or Confirmation Hearing Notices to such entities will not constitute inadequate notice of the Confirmation Hearing, the Voting Deadline, or a violation of Bankruptcy Rule 3017(d).

18.      The Confirmation Hearing will be held on May 12, 2010 at 10:00 a.m. (Prevailing Eastern Time); *provided*, *however*, that the Confirmation Hearing may be adjourned from time to time by the Court or the Debtors without further notice to parties other than an announcement in Court at the Confirmation Hearing or any adjourned Confirmation Hearing; *provided*, *further*, *however*, that notice of any such adjournments will be set forth on (a) the Court's website at www.nysb.uscourts.gov for registered users of the Public Access to Court Electronic Records (PACER) System and (b) the Voting and Claims Agent's website at http://www.kccllc.net/citadel.

19.      Objections, if any, to confirmation of the Plan or proposed modifications to the Plan, if any, must (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (c) state with particularity the basis and nature of any objection to the confirmation of the Plan; and (d) be filed, together with proof of service, with the Court and served so that they are received no later than May 3, 2010 at 5:00 p.m. (Prevailing Eastern Time) (the "***Confirmation Objection Deadline***") by the following parties:

| **Kirkland & Ellis LLP**<br>Attn:  Jonathan A. Henes and Joshua A. Sussberg<br>601 Lexington Avenue<br>New York, New York  10022-4611<br>*Counsel to the Debtors* | **Simpson Thacher & Bartlett LLP**<br>Attn:  Mark Thompson<br>425 Lexington Avenue<br>New York, New York 10017<br>*Counsel to JPMorgan Chase Bank, N.A.* |
|---|---|
| **Stroock & Stroock & Lavan LLP**<br>Attn:  Brett Lawrence<br>180 Maiden Lane<br>New York, New York 10038<br>*Counsel to the Committee* | **Clerk of the Court**<br>Attn: Vito Genna<br>United States Bankruptcy Court<br>Southern District of New York<br>1 Bowling Green<br>New York, New York 10004 |
| **The Office of the United States Trustee for the Southern District of New York**<br>Attn:  Brian Masumoto, Esq.<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004 | **Federal Communications Commission**<br>445 12th St SW<br>Washington, D.C. 20554 |
| **Internal Revenue Service**<br>Centralized Insolvency Operation<br>11601 Roosevelt Blvd<br>Mail Drop N781<br>Philadelphia, Pennsylvania 19255 | **Internal Revenue Service**<br>Centralized Insolvency Operation<br>P.O. Box 21126<br>Philadelphia, Pennsylvania 19114 |
| **Securities & Exchange Commission**<br>Attn: Michael Berman, General Counsel<br>100 F St. NE<br>Washington, D.C. 20549 | **Securities & Exchange Commission**<br>Attn: George S . Canellos<br>3 World Financial Center<br>Suite 400<br>New York, New York 10281-1022 |

20.     Objections must also be served on those parties who have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002.

21.     The Confirmation Hearing Notice, substantially in the form annexed hereto as **Exhibit 7** and incorporated herein by reference, setting forth (a) the Voting Deadline; (b) the time fixed for filing objections to confirmation of the Plan, and the manner in which such objections shall be filed; and (c) the time, date and place for the Confirmation Hearing, provides adequate notice of the Confirmation Hearing and, accordingly, is hereby approved.

22.     In the event that multiple objections to confirmation of the Plan are filed by the Confirmation Objection Deadline, the Debtors and any other party in interest are authorized to file a single, omnibus reply to such objections.

23.     The certification of Ballots shall be filed five days before the date of the Confirmation Hearing.

8

24.     The Debtors are authorized to make non-substantive changes to the Disclosure Statement, Plan, Ballots, Master Ballots, Confirmation Hearing Notice and related documents without further order of the Court.  These non-substantive changes shall include, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan and any other materials in the Solicitation Package before distribution.

25.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

26.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

27.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable upon its entry.

28.     All time periods set forth herein shall be calculated in accordance with Bankruptcy Rule 9006(a).

29.     The requirement set forth in Rule 9013-1(b) of the Local Rules that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

30.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these cases, the terms of this Order shall govern.

31.     The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.


Dated:  New York, New York
         March 15, 2010


                                         /s/Burton R. Lifland___
                                        Hon. Burton R. Lifland
                                        United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**Solicitation Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CITADEL BROADCASTING CORPORATION, *et al.*, | ) | Case No. 09-17442 (BRL) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## SOLICITATION AND TABULATION PROCEDURES

The following procedures (the "***Solicitation Procedures***") are adopted with respect to (a) the distribution of Ballots and other solicitation materials relating to the Plan and (b) the return and tabulation of Ballots and Master Ballots.

**I.    Definitions**

   **A.    Plan** means the *First Modified Joint Plan of Reorganization of Citadel Broadcasting Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 15, 2010 [Docket No. 198].

   **B.    Ballots** means the forms of ballots used to vote for or against the Plan, attached as **Exhibit 3** to the Disclosure Statement Order, approved by the Court in the Disclosure Statement Order.

   **C.    Beneficial Owner** means a beneficial owner of the 1.875% Subordinated Notes and/or the 8% Subordinated Notes (collectively, the "***Subordinated Notes***").

   **D.    Confirmation Hearing** means the hearing to be held by the Bankruptcy Court on the Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

   **E.    Confirmation Hearing Notice** means the notice setting forth (a) the Voting Deadline; (b) the time fixed for filing objections to confirmation of the Plan, and the manner in which such objections shall be filed; (c) the time, date and place for the Confirmation Hearing; and (d) instructions for obtaining copies of the Plan, Disclosure Statement and related documents, attached to the Disclosure Statement Order substantially in the form of **Exhibit 7**.

   **F.    Confirmation Objection Deadline** means no later than May 3, 2010 at 5:00 p.m. (Prevailing Eastern Time).

   **G.    Disclosure Statement** means the *First Modified Disclosure Statement for the Debtors' Joint Plan of Reorganization of Citadel Broadcasting Corporation and*

*Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed on March 15, 2010 [Docket No. 203].

**H.**     **Disclosure Statement Order** means the *Order (I) Approving the Debtors' Disclosure Statement; (II) Establishing a Record Date for Voting on the Debtors' Joint Plan of Reorganization; (III) Approving Solicitation Packages and Procedures for the Distribution Thereof; (IV) Approving the Forms of Ballots and Manners of Notice; (V) Establishing Procedures for Voting on the Plan; and (VI) Establishing Notice and Objection Procedures for Confirmation of the Plan*, entered on _____, 2010 [Docket No. ____].

**I.**     **Master Ballot** means a form of ballot, substantially in the form attached as **Exhibit 4** to the Disclosure Statement Order, approved by the Court in the Disclosure Statement Order, to be submitted by a Nominee on behalf of one or more Beneficial Owners.

**J.**     **Nominees** means the brokers, banks, dealers or other agents, or nominees for certain Beneficial Owners of the Subordinated Notes as identified in the Plan, for purposes of soliciting votes on the Plan.

**K.**     **Notice of Non-Voting Impaired Status** means the notice the Holders of Claims in Class 5 and Holders of Interests in Class 8 (together, the "*Non-Voting Impaired Classes*") who are deemed to reject the Plan will receive. A copy of the Notice of Non-Voting Impaired Status is attached to the Disclosure Statement Order as **Exhibit 5**.

**L.**     **Notice of Non-Voting Unimpaired Status** means the notice of non-voting status that the Holders of Claims and Interests in Classes 1, 2, 6 and 7 (together, the "*Non-Voting Unimpaired Classes*") who are deemed to accept the Plan will receive. A copy of the Notice of Non-Voting Unimpaired Status is attached to the Disclosure Statement Order as **Exhibit 6**.

**M.**     **Ownership Certification** means a written certification, in form attached to the Ballots as **Exhibit 1**, for the purpose of enabling Reorganized Citadel to determine the level of direct and indirect voting and equity interests of a Claims Holder in accordance with 47 U.S.C. § 310(b), as interpreted and applied by the FCC. A copy of the Ownership Certification is attached to the Disclosure Statement Order substantially in the form of **Exhibit 8**.

**N.**     **Record Amount** means the amount of Subordinated Notes Claims held as of the Record Date.

**O.**     **Record Date** means March 5, 2010, the date set for purposes of determining which Holders of Claims are entitled to receive Solicitation Packages and, where applicable, vote on the Plan.

**P.**     **Solicitation Packages** means, and will consist of: (i) the Disclosure Statement Order (excluding the exhibits thereto, but including a copy of these

2

Solicitation Procedures); (ii) the Confirmation Hearing Notice; (iii) the Disclosure Statement (with the Plan annexed thereto as **Exhibit A**, and all other exhibits); (iv) either a form of Ballot and/or Master Ballot, as appropriate, together with a return envelope; and (v) such other materials as the Court may direct.

Q.    **Solicitation Date** means the date by which the Debtors will complete distribution of the Solicitation Packages, which shall be no later than seven days after the Disclosure Statement Order is entered.

R.    **Tabulation Rules** means the rules set forth herein for the temporary allowance of Claims solely for the purposes of voting to accept or reject the Plan.

S.    **Voting and Claims Agent** means the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC.

T.    **Voting Deadline** means no later than May 3, 2010 at 5:00 p.m. (Prevailing Eastern Time), the date set by the Court as the deadline for receipt of Ballots and Master Ballots by the Voting and Claims Agent.

**All other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as appropriate**.

## II.    Publication of Confirmation Hearing Notice

A.    The Debtors shall use their reasonable efforts to publish a notice substantially in the form of the Confirmation Hearing Notice not less than 28 calendar days before the Confirmation Objection Deadline, once each in the national editions of *The Wall Street Journal* and *USA Today*.

B.    Additionally, the Confirmation Hearing Notice will be posted electronically at http://www.kccllc.net/citadel.

## III.    Distribution of Solicitation Packages

A.    **Solicitation Packages.**  The Debtors shall distribute Solicitation Packages to the Voting Classes (as defined in the Disclosure Statement Motion) by the Solicitation Date.  The Disclosure Statement (and exhibits thereto, including the Plan) will be distributed to the Voting Classes in disc format.  The applicable ballot will provide instructions on how to obtain paper copies of these documents from the Voting and Claims Agent should a party wish to receive them in paper format.

B.    **Duplicate Claims.**  With respect to any creditor in a Voting Class who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors), which are classified under the Plan in the same Class, the Debtors shall provide to such creditor only one Solicitation Package and one Ballot for voting their Claims with respect to that class.

3

C. **Other Solicitation Materials.** The Debtors shall distribute or cause to be distributed the Solicitation Package (excluding ballots) by the Solicitation Date to: (i) the U.S. Trustee; (ii) counsel for the Committee; (iii) counsel to the agent under the Debtors' prepetition secured term loan; (iv) the IRS; (v) the SEC; (vi) the FCC; (vii) the Office of the Attorney General in all of the states in which the Debtors operate; and (viii) all other parties in interest that have filed requests for notice pursuant to Bankruptcy Rule 2002 in the Debtors' chapter 11 cases. The Solicitation Packages (excluding ballots) will be provided in disc format.

D. **Procedures for Nominees.** Each Nominee shall (i) forward the Solicitation Package to each Beneficial Owner for voting and include a return envelope provided by and addressed to the Nominee so that the Beneficial Owner may timely return the completed beneficial owner ballot to the Nominee; (ii) upon receipt of the Ballots, summarize the individual votes of its respective Beneficial Owners on the Master Ballot; and (iii) submit the Master Ballot and Ownership Certifications to the Voting and Claims Agent by the Voting Deadline.

E. **Notices of Non-Voting Status.** The Debtors shall mail the appropriate Notice of Non-Voting Status to the Holders of Claims and Interests not entitled to accept or reject the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code.

IV. **Determination of Amount of Claims for Voting Purposes.** Solely for purposes of voting to accept or reject the Plan, and not for the purpose of making distributions on account of a Claim, and without prejudice to the rights of the Debtors or any other party in interest in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be temporarily allowed in an amount equal to the amount of such Claim as set forth in a timely filed Proof of Claim, or, if no Proof of Claim was filed, the amount of such Claim as set forth in the Schedules, in accordance with, and subject to, the Tabulation Rules described below.

V. **General Tabulation Rules**

A. A Claim that is not contingent, unliquidated or disputed, for which a Proof of Claim has been filed, which is not listed on the Schedules and no objection to such Claim has been filed on or before the Voting Deadline, shall be temporarily allowed in an amount equal to the amount of such Claim as set forth in the Proof of Claim, or, if no Proof of Claim was filed, the amount of such Claim as set forth in the Schedules, in accordance with, and subject to, the Tabulation Rules described below.

B. Holders of Claims that are listed in the Schedules in an amount greater than zero, with the exception of those claims that are scheduled as contingent, unliquidated or disputed (excluding such claims that have been superseded by a timely-filed Proof of Claim) shall be temporarily allowed for voting purposes.

C. A Claim for which a Proof of Claim has been filed and asserts both a liquidated and unliquidated amount, shall be temporarily allowed for voting purposes,

4

subject to the other tabulation rules set forth herein, only in the liquidated amount of such Claim.

**D.**     A Claim that by its terms is listed as wholly contingent, unliquidated or disputed, based on a filed Proof of Claim, shall be temporarily allowed for voting purposes only in an amount equal to one dollar ($1.00).

**E.**     If the Debtors have served and filed an objection to a Claim at least ten days before the Voting Deadline, such Claim shall, subject to the procedures set forth in paragraph 38 of the Motion, be temporarily allowed for voting purposes in an amount equal to the undisputed amount of such Claim, if any, as set forth in such objection.

**F.**     Notwithstanding any other Tabulation Rule, if a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim will be allowed temporarily for voting purposes only in the amount so estimated or allowed by the Court.

**G.**     A Claim for which the Claim Holder identifies a Claim amount on its Ballot that is different than the amount otherwise calculated in accordance with the Tabulation Rules, shall be allowed temporarily for voting purposes in the amount calculated in accordance with the Tabulation Rules.

**VI.**     **Allowed Claims.**  Notwithstanding any other Tabulation Rule, a Claim that is deemed allowed in accordance with the Plan shall be allowed for voting purposes in the deemed allowed amount set forth in the Plan.

**VII.**     **Rejection Damages Claims.**  Any Claim filed as a protective Claim for rejection damages related to an Executory Contract or an Unexpired Lease shall be temporarily disallowed for voting purposes, and to the extent that such Claim is solely for rejection damages, any related Ballot shall not be counted as having voted for or against the Plan.

**VIII.**     **Return of Ballots By Voting Deadline.**  For a vote to accept or reject the Plan to be counted, all required information on the Ballot must be completed, the Ballot must be executed and the completed Ballot must be returned as directed on the Ballot so that it (or the Master Ballot) is actually received no later than May 3, 2010 at 5:00 p.m. (Prevailing Eastern Time) by the Voting and Claims Agent at either: (a) Citadel Broadcasting Ballot Processing, c/o Kurtzman Carson Consultants, 2335 Alaska Avenue, El Segundo, California 90245; or (b) with respect to Master Ballots, Citadel Broadcasting Master Ballot Processing, c/o Kurtzman Carson Consultants, LLC, 1230 Avenue of the Americas, 7th Floor, New York, New York 10020.

**IX.**     **Ballots Excluded.**  A Ballot or Master Ballot will not be counted if any of the following applies to the Ballot or Master Ballot, subject to the Debtors' right to waive such defects in accordance with these Solicitation Procedures:

**A.**     The Ballot and Master Ballot is received by the Voting and Claims Agent after the Voting Deadline.

B.    The Ballot partially rejects and/or partially accepts the Plan.

C.    The Ballot or Master Ballot is received by facsimile, e-mail or any other electronic means.

D.    The Ballot or Master Ballot is not timely received by the Voting and Claims Agent, but is sent to the Debtors, any indenture trustee or agent, or the Debtors' financial or legal advisors.

X.    **General Tabulation Procedures and Assumptions.**    The following tabulation procedures for Ballots and Master Ballots shall be utilized:

A.    Creditors (including Beneficial Holders of Claims in Voting Classes) must vote all of their Claims in a particular Class either to accept or reject the Plan and may not split their votes with respect to such Claims within a particular Class.

B.    The method of delivery of the Ballots and Master Ballots to be sent to the Voting and Claims Agent is at the election and risk of each Holder of a Claim and (if applicable) Nominee, and will be deemed made only when the original executed Ballot or Master Ballot is actually received by the Voting and Claims Agent.

C.    If multiple Ballots are received from, or on behalf of, an individual Holder of a Claim with respect to the same Claim before the Voting Deadline, the latest dated Ballot timely received will be deemed to reflect the intent of such Holder and to supersede and revoke any prior Ballot with respect to such Claim.

D.    If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, attorney-at-law or other person acting in a fiduciary or representative capacity, such person shall be required to indicate such capacity when signing, and the Debtors may request proper evidence prior to accepting such Ballot.

E.    The Debtors, in their sole discretion, subject to any contrary order of the Court, may waive any defect in any Ballot or Master Ballot at any time, whether before or after the Voting Deadline.

F.    Any Holder of a Claim entitled to vote who has delivered a valid Ballot may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a).

G.    Subject to any contrary order of the Court, the Debtors reserve the absolute right to reject any and all Ballots or Master Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, not be in accordance with these Solicitation Procedures or the Bankruptcy Code.

H.    Unless waived by the Debtors pursuant to section (E) above, or as ordered by the Court, any defects or irregularities in connection with the deliveries of the Ballots or Master Ballots must be cured by the Voting Deadline, and unless otherwise

6

ordered by the Court, delivery of such Ballots or Master Ballots will not be deemed to have been made until such irregularities have been cured or waived.

**I.**     Except as may be provided by Local Bankruptcy Rule 3018-1(b) and unless otherwise ordered by the Court, with respect to a Ballot or Master Ballot received before the Voting Deadline, neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots or Master Ballots nor will any of them incur liabilities for failure to provide such notification.

## XI.   Ownership Certifications

**A.**     All Holders of Claims must complete and submit an Ownership Certification to the Voting and Claims Agent. The Holders of Claims who do not complete and submit an Ownership Certification may receive Special Warrants in lieu of New Common Stock.

## XII.   Additional Procedures for Master Ballots and Ballots cast by Nominees and Beneficial Owners

**A.**     Tabulation Rules for Master Ballots and Ballots Cast by Nominees and Beneficial Owners:

1.     With respect to the tabulation of Master Ballots and Ballots cast by Nominees and Beneficial Owners, for purposes of voting, the amount that will be used to tabulate acceptance or rejection of the Plan will be the Record Amount, and the following additional rules will apply to the tabulation of Master Ballots and Ballots cast by Nominees and Beneficial Owners:

(i)     Votes cast by Beneficial Owners through Nominees will be applied against the positions held by such Nominees in the Subordinated Notes as of the Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee will not be counted in excess of the Record Amount of such securities held by such Nominee.

(ii)     If conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will attempt to reconcile discrepancies with the Nominees.

(iii)     If over-votes on a Master Ballot are not reconciled before the preparation of the vote certification, the Debtors will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position in the Subordinated Notes.

7

(iv)    For purposes of tabulating votes, each Beneficial Owner will be deemed to have voted only the principal amount of its Subordinated Notes, although the Voting and Claims Agent may be asked to adjust such principal amount to reflect the claim amount, including prepetition interest.

(v)    A single Nominee may complete and deliver to the Voting and Claims Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest dated Master Ballot received before the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior Master Ballot.

## XIII.    Additional Procedures for Secured Senior Claims

A.    The Senior Agent shall provide to the Voting and Claims Agent no later than four business days after the Record Date a copy of its register listing the name, address and Claim amount of each Holder of a Secured Senior Claim as of the Record Date (the "*Class 3 Voting Information*").  The Voting and Claims Agent shall be obligated to and shall maintain the confidentiality of the Class 3 Voting Information (including by removing the Class 3 Voting Information from any certificates or affidavits of service and aggregating the votes of such Holders in any report of the voting of such Holders without listing the Class 3 Voting Information).

## XIV.    Transferred Claim Procedures

A.    **Pre-Record Date Transfers.**  With respect to a transferred Claim, if the Holder of such Claim is entitled to vote with respect to the Plan, the transferee shall be entitled to receive a Solicitation Package and cast a Ballot on account of such Claim only if (a) all actions necessary to effectuate the transfer of the Claim, pursuant to Bankruptcy Rule 3001(e), have been completed by the Record Date or (b) the transferee files and the Court has docketed by the Record Date (i) the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer.

B.    **Post-Record Date Transfers.**  In the event a Claim is transferred after the Record Date, the transferee of such Claim shall be bound by any vote made by the Holder of such Claim as of the Record Date.

8

**XV.**   **3018(a) Motions.**  To the extent a creditor would like to object to Citadel's or one of the Debtor Subsidiaries' chapter 11 plans but not to each of the 50 chapter 11 plans, such creditor will be required to file a motion under Bankruptcy Rule 3018 seeking relief from the Solicitation Procedures.

    **A.**   If any claimant or interest holder seeks to challenge the allowance of its Claim for voting purposes in accordance with the Tabulation Rules, such claimant or interest holder must file with the Court (with a copy to chambers) a motion (a "***Rule 3018 Motion***") for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim in a different amount for purposes of voting to accept or reject the Plan on or before the tenth day after the later of (a) service of the Confirmation Hearing Notice or (b) service of notice of an objection, if any, to such Claim.  A hearing on any Rule 3018 Motions filed will be held before the Court no later than five days before the Voting Deadline.  In accordance with Bankruptcy Rule 3018, as to any creditor filing such a motion, such creditor's Ballot should not be counted in an amount other than that provided by the Tabulation Procedures unless temporarily allowed by the Court in another amount for voting purposes.

9

## **<u>Exhibit E</u>**

### **Financial Projections**

<u>EXHIBIT E</u>

**REORGANIZED DEBTORS' PROJECTIONS**

These notes should be read in conjunction with the Plan and the Disclosure Statement in their entirety.[1] Attached are the consolidated projected financial statements ("***Projections***") for the Debtors and the Reorganized Debtors for the five-year period from 2010 through 2014 (the "***Projection Period***"), which includes a consolidated projected income statement, a consolidated projected balance sheet and a consolidated projected cash flow statement. Also attached is a consolidated projected fresh start balance sheet reflecting the assumed effect of Confirmation, and thereafter Consummation, of the Plan.

THE PROJECTIONS HAVE BEEN PREPARED BY CITADEL'S MANAGEMENT.  SUCH PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS ("***AICPA***"), UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPALS ("***U.S. GAAP***") OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.  IN PREPARING THE PROJECTIONS, CITADEL'S MANAGEMENT RELIED UPON THE ACCURACY AND COMPLETENESS OF FINANCIAL AND OTHER INFORMATION FURNISHED BY THIRD PARTIES, AS WELL AS PUBLICLY-AVAILABLE INFORMATION, AND PORTIONS OF THE INFORMATION HEREIN MAY BE BASED UPON CERTAIN STATEMENTS, ESTIMATES, ASSUMPTIONS AND FORECASTS PROVIDED BY THE DEBTORS AND THIRD PARTIES WITH RESPECT TO THE ANTICIPATED FUTURE PERFORMANCE OF THE REORGANIZED DEBTORS.  CITADEL'S MANAGEMENT DID NOT ATTEMPT INDEPENDENTLY TO AUDIT OR VERIFY SUCH INFORMATION. CITADEL'S MANAGEMENT DID NOT CONDUCT AN INDEPENDENT INVESTIGATION INTO ANY OF THE LEGAL, TAX OR ACCOUNTING MATTERS AFFECTING THE DEBTORS OR THE REORGANIZED DEBTORS AND, THEREFORE, NEITHER MAKES ANY REPRESENTATION AS TO THEIR IMPACT ON THE DEBTORS OR THE REORGANIZED DEBTORS FROM A FINANCIAL POINT OF VIEW.  FURTHER, THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING ACTUAL RESULTS AND PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE AND WILL BE BEYOND THE CONTROL OF THE DEBTORS AND THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, CURRENCY EXCHANGE RATE FLUCTUATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE MADE AND ARE NOT GUARANTEES OF

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the First Modified Joint Plan of Reorganization of Citadel Broadcasting Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.

FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND THE REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE, MODIFY, CLARIFY OR REVISE ANY SUCH STATEMENTS FOR ANY REASON.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY CITADEL'S MANAGEMENT, AT THE TIME WHEN MADE, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE AND WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE HISTORICAL FINANCIAL INFORMATION OR THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS AND THE REORGANIZED DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION WHATSOEVER TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS (OR ANY ASSUMPTIONS, ESTIMATES OR OTHER INFORMATION CONTAINED THEREIN) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE OR RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS.

The Projections should be read in conjunction with the assumptions, qualifications and explanations set forth herein and the historical consolidated financial information of the Debtors reported on Forms 10-K and 10-Q as filed with the Securities and Exchange Commission, including the notes thereto. The Projections should also be read in conjunction with the Plan.

For the year 2009, the Projections include eleven months of unaudited actual results and preliminary results for December 2009. The 2009 audit for the Debtors has not been completed and, therefore, final results for 2009 could be materially different than the amounts presented in this projection.

The projections have been prepared based on assumption that the Effective Date of the Plan is April 30, 2010 and assume the successful implementation of the Reorganized Debtors' business plan. Although the Debtors presently intend to cause the Effective Date to occur as soon as practical following confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things, the following: (a) current and projected market conditions in each of the Reorganized Debtors' respective markets; (b) the ability to maintain sufficient working capital to fund operations; (c) final approval by the FCC to permit the Transfer of Control (as described in the Disclosure Statement); and (d) confirmation of the Plan.

*Projected Pro Forma Consolidated Balance Sheet – April 30, 2010*
(Unaudited)
(Dollars in Millions)

| Balance Sheet | Projected Pre-Confirmation April 30, 2010 Balance Sheet | Recapitalization Adjustments | Pro Forma Reorganized April 30, 2010 Balance Sheet |
|---|---|---|---|
| **ASSETS** | | | |
| | | | |
| Current Assets | | | |
| Cash | $97.9 | (58.1) (a) | $39.8 |
| Net Accounts Receivable | 130.3 | -- | 130.3 |
| Prepaid Expenses & Other Current Assets | 18.9 | (9.0) | 9.9 |
| Total Current Assets | 247.2 | (67.1) | 180.1 |
| | | | |
| Long Term Assets | | | |
| Net Property, Plant & Equipment | 200.0 | -- | 200.0 |
| Net Intangible Assets | 953.4 | 563.8 (b) | 1,517.1 |
| Net Other Assets | 22.4 | (3.0) | 19.4 |
| Total Long Term Assets | 1,175.8 | 560.8 | 1,736.5 |
| | | | |
| **Total Assets** | **$1,422.9** | **$493.7** | **$1,916.6** |
| | | | |
| **LIABILITIES** | | | |
| | | | |
| Current Liabilities | | | |
| Accounts Payable, Accrued Liabilities & Other | 70.7 | (50.2) (c) | 20.4 |
| Existing Debt | | | |
| Revolver | 140.4 | (140.4) (d) | -- |
| Term Loan - Tranche A | 543.8 | (543.8) (d) | -- |
| Term Loan - Tranche B | 1,387.6 | (1,387.6) (d) | -- |
| Convertible Sub. Notes | 48.3 | (48.3) (e) | -- |
| Interest Rate Swap Liability | 72.6 | (72.6) (d) | -- |
| Total Current Liabilities | 2,263.3 | (2,242.9) | 20.4 |
| | | | |
| Long Term Liabilities | | | |
| Deferred Tax Liability | 179.6 | 39.4 | 219.0 |
| New Term Loan | -- | 762.5 (f) | 762.5 |
| Other Long-Term Liabilities | 52.1 | -- | 52.1 |
| Total Long Term Liabilities | 231.8 | 801.9 | 1,033.6 |
| | | | |
| **Total Liabilities** | **$2,495.1** | **($1,441.0)** | **$1,054.1** |
| | | | |
| Equity | | | |
| Existing Equity | (1,072.2) | 1,072.2 (g) | -- |
| New Equity | -- | 862.5 (g) | 862.5 |
| Total Equity | (1,072.2) | 1,934.7 | 862.5 |
| | | | |
| **Total Liabilities and Equity** | **$1,422.9** | **$493.7** | **$1,916.6** |

*Notes to Projected Pro Forma Consolidated Balance Sheet – April 30, 2010*

Upon emergence from chapter 11, the Reorganized Debtors will be required to adopt fresh start accounting in accordance with U.S. GAAP, which requires the Debtors to revalue its assets and liabilities at their estimated fair value. Fresh start reporting reflects the value of the Reorganized Debtors as defined in the Plan. Under fresh start reporting, the Reorganized Debtors' asset values are remeasured using fair value and any excess of reorganization value over the fair value of net tangible and identifiable intangible assets and liabilities is recorded as goodwill in the accompanying statements.

The foregoing estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond control of the Debtors or the Reorganized Debtors. Accordingly, the Debtors or the Reorganized Debtors cannot provide assurance that the estimates, assumptions, and values reflected in the valuations will be realized, and actual results could vary materially. Most assets and liabilities have been shown at book value, which in management's opinion approximated fair value, except where noted. The New Term Loan has been shown at face value, which the Debtors believe to approximate fair value.

(a)     Represents the use of Cash at emergence for the payment of outstanding restructuring costs, interest, payments related to assumed contracts, other administrative expenses and the payment to Holders of Allowed General Unsecured Claims electing to receive their recovery in Cash.

(b)     Represents adjustments to reflect the reorganization value of assets and liabilities in excess of amounts allocable to identifiable assets based on the midpoint of the estimated Enterprise Value (approximately $1,625.0 million). *See* "Exhibit F – Valuation of the Reorganized Debtors". Amounts will be further allocated to identifiable tangible and intangible assets once the values are determined through additional valuations.

(c)     Represents cancellation of pre-petition liabilities in exchange for either (i) the payment of Cash or (ii) the issuance of New Common Stock. In addition, includes the payment of post petition liabilities, professional fess, interest and other costs associated with the transaction.

(d)     Represents cancellation of Senior Claims (including Claims under the Senior Credit Agreement and Swap Agreements) in exchange for the issuance of New Term Loan and New Common Stock.

(e)     Represents the cancellation of the Notes Claims in exchange for (i) the payment of Cash or (ii) the issuance of New Common Stock in the event Holders of Notes Claims vote to accept the Plan; otherwise, the Notes Claims will be cancelled without receiving a distribution.

(f)     Represents the New Term Loan with $762.5 million outstanding principal amount.

(g)     Reflects cancellation of all Interests and the issuance of New Common Stock, based on the midpoint of the estimated Enterprise Value (approximately $1,625.0 million). *See* "Exhibit F – Valuation of the Reorganized Debtors".

***Projected Pro Forma Consolidated Balance Sheets***
(Unaudited)
(Dollars in Millions)

| Balance Sheet | | | | | | |
|---|---|---|---|---|---|---|
| | **For Year Ending December 31,** | | | | | |
| | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** |
| **ASSETS** | | | | | | |
| Current Assets | | | | | | |
| Cash | $60.0 | $120.6 | $123.7 | $144.1 | $165.7 | $190.2 |
| Net Accounts Receivable | 155.0 | 145.8 | 145.9 | 149.2 | 152.7 | 156.2 |
| Prepaid Expenses & Other Current Assets | 19.0 | 9.8 | 1.4 | 1.6 | 1.8 | 2.0 |
| Total Current Assets | 234.0 | 276.3 | 271.0 | 294.8 | 320.1 | 348.4 |
| Long Term Assets | | | | | | |
| Net Property, Plant & Equipment | 201.6 | 196.6 | 192.3 | 188.8 | 186.1 | 184.2 |
| Net Intangible Assets | 960.1 | 1,503.8 | 1,483.8 | 1,463.8 | 1,443.8 | 1,423.8 |
| Net Other Assets | 22.4 | 19.4 | 19.4 | 19.4 | 19.4 | 19.4 |
| Total Long Term Assets | 1,184.1 | 1,719.8 | 1,695.5 | 1,672.0 | 1,649.3 | 1,627.4 |
| **Total Assets** | **$1,418.1** | **$1,996.1** | **$1,966.5** | **$1,966.9** | **$1,969.5** | **$1,975.9** |
| **LIABILITIES** | | | | | | |
| Current Liabilities | | | | | | |
| Accounts Payable, Accrued Liabilities & Other | 68.4 | 28.5 | 29.7 | 30.8 | 32.0 | 32.9 |
| Existing Debt | | | | | | |
| Revolver | 140.4 | -- | -- | -- | -- | -- |
| Term Loan - Tranche A | 543.8 | -- | -- | -- | -- | -- |
| Term Loan - Tranche B | 1,387.6 | -- | -- | -- | -- | -- |
| Convertible Sub. Notes | 48.3 | -- | -- | -- | -- | -- |
| Interest Rate Swap Liability | 72.6 | -- | -- | -- | -- | -- |
| Total Current Liabilities | 2,261.1 | 28.5 | 29.7 | 30.8 | 32.0 | 32.9 |
| Long Term Liabilities | | | | | | |
| Deferred Tax Liability | 179.6 | 219.0 | 219.0 | 219.0 | 219.0 | 219.0 |
| New Term Loan | -- | 758.7 | 671.1 | 608.1 | 542.3 | 472.6 |
| Other Long Term Liabilities | 53.5 | 49.5 | 45.5 | 41.5 | 37.5 | 33.5 |
| Total Long Term Liabilities | 233.1 | 1,027.2 | 935.5 | 868.6 | 798.8 | 725.1 |
| **Total Liabilities** | **$2,494.2** | **$1,055.7** | **$965.2** | **$899.4** | **$830.8** | **$758.0** |
| Equity | | | | | | |
| Existing Equity | (1,076.1) | -- | -- | -- | -- | -- |
| New Equity | -- | 862.5 | 862.5 | 862.5 | 862.5 | 862.5 |
| Retained Earnings | -- | 77.9 | 138.8 | 205.0 | 276.1 | 355.4 |
| Total Equity | (1,076.1) | 940.4 | 1,001.3 | 1,067.5 | 1,138.6 | 1,217.9 |
| **Total Liabilities and Equity** | **$1,418.1** | **$1,996.1** | **$1,966.5** | **$1,966.9** | **$1,969.5** | **$1,975.9** |

*Projected Pro Forma Consolidated Statements of Operations*
(Unaudited)
(Dollars in Millions)

**Income Statement**

| | | For Year Ending December 31, | | | | |
|---|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Net Revenue** | | | | | | |
| Radio Markets | $604.2 | $609.5 | $620.3 | $632.7 | $645.4 | $658.3 |
| Radio Network | 123.8 | 116.1 | 118.4 | 122.0 | 126.0 | 130.2 |
| Eliminations | (4.3) | (4.2) | (4.2) | (4.3) | (4.4) | (4.5) |
| **Total Net Revenue** | **$723.7** | **$721.4** | **$734.5** | **$750.4** | **$767.0** | **$784.0** |
| **Operating Expenses** | | | | | | |
| Radio Markets | (390.0) | (390.0) | (397.8) | (409.8) | (422.1) | (430.5) |
| Radio Network | (120.3) | (105.9) | (106.6) | (108.6) | (110.6) | (112.4) |
| Eliminations | 4.3 | 4.2 | 4.2 | 4.3 | 4.4 | 4.5 |
| Total Operating Expenses | (506.0) | (491.8) | (500.2) | (514.1) | (528.2) | (538.5) |
| **Segment Operating Income** | | | | | | |
| Radio Markets | 214.2 | 219.5 | 222.5 | 223.0 | 223.3 | 227.8 |
| Radio Network | 3.5 | 10.1 | 11.8 | 13.4 | 15.5 | 17.8 |
| **Total Segment Operating Income** | **$217.7** | **$229.6** | **$234.3** | **$236.3** | **$238.8** | **$245.5** |
| Corporate Overhead | (20.4) | (20.0) | (20.4) | (21.0) | (21.4) | (21.9) |
| **EBITDA** | **$197.3** | **$209.6** | **$213.9** | **$215.3** | **$217.4** | **$223.7** |
| Amortization | (20.2) | (20.0) | (20.0) | (20.0) | (20.0) | (20.0) |
| Depreciation | (15.4) | (15.0) | (15.0) | (15.0) | (15.0) | (15.0) |
| **EBIT** | **$161.7** | **$174.6** | **$178.9** | **$180.3** | **$182.4** | **$188.7** |
| Non-Cash Stock Compensation | (10.5) | (3.5) | -- | -- | -- | -- |
| Net Interest Expense | (192.0) | (70.4) | (78.7) | (70.5) | (63.4) | (55.9) |
| Restructuring Expenses & Other | (9.4) | (31.4) | -- | -- | -- | -- |
| Impairment Charges | (985.7) | -- | -- | -- | -- | -- |
| Gain on Extinguishment of Debt | 0.4 | 560.8 | -- | -- | -- | -- |
| Write-off of Deferred Fin. Costs & Other Debt-Related Fees | (0.8) | (4.0) | -- | -- | -- | -- |
| Other | 4.0 | -- | -- | -- | -- | -- |
| **EBT** | **($1,032.2)** | **$626.2** | **$100.2** | **$109.9** | **$119.0** | **$132.8** |
| Taxes | 245.4 | -- | (39.3) | (43.7) | (47.8) | (53.5) |
| **Net Income** | **($786.8)** | **$626.2** | **$60.9** | **$66.2** | **$71.1** | **$79.3** |

***Projected Pro Forma Consolidated Statements of Cash Flow***
(Unaudited)
(Dollars in Millions)

| Cash Flow | | | | | | |
|---|---|---|---|---|---|---|
| | **For Year Ending December 31,** | | | | | |
| | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** |
| **Net Income** | **($786.8)** | **$626.2** | **$60.9** | **$66.2** | **$71.1** | **$79.3** |
| Amortization | 20.2 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| Depreciation | 15.4 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| Non-Cash Stock Compensation | 10.5 | 3.5 | -- | -- | -- | -- |
| Non-Cash Debt-Related Amounts & Facility Fees | 105.3 | -- | -- | -- | -- | -- |
| Impairment Charges | 985.7 | -- | -- | -- | -- | -- |
| Gain on Extinguishment of Debt | (0.4) | (560.8) | -- | -- | -- | -- |
| Write-off of Deferred Fin. Costs & Other Debt-Related Fees | 0.2 | 4.0 | -- | -- | -- | -- |
| Fair Value of Swap Liability | (9.7) | -- | -- | -- | -- | -- |
| Deferred Taxes | (247.1) | -- | -- | -- | -- | -- |
| Change in Working Capital | | | | | | |
| (Inc)/Dec in Net Accounts Receivable | 22.7 | 9.2 | (0.1) | (3.3) | (3.5) | (3.6) |
| (Inc)/Dec in Prepaid Expenses & Other Current Assets | (2.4) | 9.2 | 8.4 | 0.2 | (0.2) | (0.2) |
| Inc/(Dec) in Accounts Payable, Accrued Liabilities & Other | (47.1) | (50.8) | (2.9) | (2.8) | (2.8) | (3.1) |
| **Cash Flow from Operations** | **$66.5** | **$75.4** | **$101.3** | **$94.9** | **$99.6** | **$107.3** |
| Capital Expenditures | (8.4) | (10.0) | (10.7) | (11.5) | (12.3) | (13.1) |
| **Cash Flow from Investing** | **($8.4)** | **($10.0)** | **($10.7)** | **($11.5)** | **($12.3)** | **($13.1)** |
| Drawdown / (Paydown) of Debt | (4.0) | (3.8) | (87.6) | (63.0) | (65.7) | (69.7) |
| Debt Issuance Costs | (12.7) | (1.0) | -- | -- | -- | -- |
| **Cash Flow from Financing** | **($16.7)** | **($4.8)** | **($87.6)** | **($63.0)** | **($65.7)** | **($69.7)** |
| **Net Cash Flow** | **$41.4** | **$60.6** | **$3.0** | **$20.4** | **$21.6** | **$24.5** |
| **Ending Cash** | **$60.0** | **$120.6** | **$123.7** | **$144.1** | **$165.7** | **$190.2** |

7

*Key Assumptions*

**A.      General**

1.      *Plan Consummation and Effective Date:* The Projections assume the Plan will be Confirmed and Consummated and that the Debtors will emerge from chapter 11 on or around April 30, 2010.

2.      *Business as Usual:* The Projections were prepared based on assumptions that the Debtors (and the Reorganized Debtors) remain in its current operating capacity throughout the Projection Period.

**B.      Projected Statements of Operations**

1.      *Revenue:* The Debtors' and the Reorganized Debtors' 2010 revenue projections are based on an analysis of the business prospects by region for the Citadel Legacy stations, by individual station for the ABC Stations and the overall expected network business environment for Radio Network.  The revenue projections were prepared by Citadel's management with the assistance of the regional presidents for the Citadel Legacy stations, market presidents for the ABC stations and the president of Radio Network. Certain adjustments were made based on corporate management's views of the industry and potential new business prospects as well as potential business delays and other risks and contingencies related to the bankruptcy filing.  The projections assume no change in the Company's current owned and operated stations.

From 2010 to 2014, management has forecasted revenues to increase between 1% and 2% at its radio stations.  In the current economic environment, it is difficult to project any significant revenue growth.  The radio stations' revenues are primarily tied to growth in consumer driven products and therefore growth will be dependent, to a large degree, on an overall recovery of the US economy and increased advertising in industries such as automotive, retail, banking and housing.

For 2010, management projects a revenue decline of approximately 6% for the Radio Network and then expects revenue growth for 2011 through 2014 of between 2% and 3%.  Management has made significant changes to the Radio Network in 2009, including the cancellation of unprofitable programs and unprofitable station compensation agreements.  Management expects these changes, as well as the current environment, to result in lower revenues in 2010. However, revenue growth is expected to return in 2011 through 2014 assuming an overall recovery for the U.S. economy.

2.      *Operating Expenses:* Operating expenses consist of costs related to payroll and benefits, programming, news, affiliate relations, technical, sales, research, advertising & promotion, interactive, general and administrative expenses as well as corporate overhead.  For 2010, radio station expenses are projected flat as compared to 2009 and for the years 2011 through 2014, operating expenses are expected to increase between 2% and 3%.  Expenses will be impacted by revenue growth, primarily since commissions are paid as a percentage of revenue.  In addition, management expects upward pressure on salaries, wages and talent costs over the next 5 years as there have been salary reductions imposed during 2008 and 2009.

For 2010, the Radio Network expenses are projected to decline approximately 12% due to the changes in programming and station compensation agreements discussed above.  For 2011 through 2014, operating expenses are expected to increase between 1% and 2%.

3.      *Interest Expense*: Interest expense following the Effective Date reflects the extinguishment of Senior Claims and Notes Claims.  The Projections assume that, immediately after the Effective Date, the Reorganized Debtors will have $762.5 million of debt from the New Term Loan.  Projected interest on the New Term Loan is payable quarterly at LIBOR (3.0% floor) plus an applicable margin of 8.0% and is included in the Projections at 11.0%.  The projections also reflect principal reductions in the New Term Loan based on the cash flow projections and required amortization of the debt.

4.      *Restructuring Expenses*: Restructuring expenses consist principally of legal and other professional fees associated with the administration of the bankruptcy cases.

5.    *Gain on Extinguishment of Debt*: The estimated gain on extinguishment of debt consists of the cancellation of the Senior Claims and Notes Claims and certain pre-petition accounts payable and accrued liabilities reduced by the value of the New Term Loan and New Common Stock.

6.    *Income Taxes:* The Projections assume that the Debtors' Net Operating Loss (NOL) carryforwards will be eliminated at the end of 2010 due to the cancellation of debt related to the reorganization, and as such, will not be available to reduce future taxable income.  In addition, the Projections assume a significant reduction in other tax attributes of the Debtors, primarily reductions in tax basis of depreciable and amortizable assets.  The projected tax expense for 2010 through 2014 is based on the Debtors' estimated cash taxes after considering the elimination of the remaining NOLs starting 2011 and reduced depreciation and amortization in future periods due to the reduction in tax basis of tangible and intangible assets. The cash taxes calculated in the Projections would be reduced if the Debtors were to receive a favorable IRS Private Letter Ruling as described in the Plan. The reduction is not expected to be material to the long term projections made here.

C.    **Projected Balance Sheets and Statements of Cash Flow**

1.    *Cash:* Upon emergence, the Reorganized Debtors are expected to have approximately $39.8 million of Cash on hand which represents the pre-emergence Cash balance adjusted for the payment of outstanding restructuring costs, interest, payments related to assumed contracts, other administrative expenses and the payment to Holders of Allowed General Unsecured Claims electing to receive their recovery in Cash. The estimated Cash balance excludes escrowed cash of $0.6 million related to utility deposits that may be released on the Effective Date. The Projections assume that excess cash generated during the Projection Period will be used to pay down outstanding debt. (*See* Post-Reorganization Debt below.)

2.    *Property and Equipment*: The Projections assume that the net book value approximates fair value post emergence.  The Projections do not include a fair value adjustment for property, plant and equipment or intangible assets as part of the balance sheet, as the determination of fair values are not available at the time of this filing.

3.    *Capital Expenditures*: Capital expenditures are expected to range from $10 to 13 million for the years 2010 through 2014.  Capital expenditures are primarily incurred to maintain the stations and have been projected based on historical data and Management's understanding of the current and future needs of the radio stations and network.

4.    *Post-Reorganization Debt*: The Projections assume that, immediately after the Effective Date, the Reorganized Debtors will have $762.5 million of debt from the New Term Loan and the prepetition Senior Claims and Notes Claims are satisfied and/or extinguished.  Projected interest on the New Term Loan is payable quarterly at LIBOR (3.0% floor) plus an applicable margin of 8.0% and is included in the Projections at 11.0%.  The New Term Loan is assumed to remain outstanding throughout the Projection Period.  The terms of the New Term Loan include mandatory annual amortization of 1% and excess cash flow sweep of 75%.

5.    *Fresh Start Reporting:* The foregoing assumptions and resulting computations were made solely for purposes of preparing the Projections.  The Reorganized Debtors will be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value of its assets as of the Effective Date in accordance with fresh start reporting.  Such determination will be based upon the fair values as of that time, which could be materially higher or lower than the values assumed in the foregoing computations and may be based on, among other things, a different methodology with respect to the valuation of the Reorganized Debtors' reorganization value.  In all events, such valuation, as well as the determination of the fair value of the Reorganized Debtors' assets and the determination of its actual liabilities, will be made as of the Effective Date, and the changes between the amounts of any or all of the foregoing items as assumed in the Projections and the actual amounts thereof as of the Effective Date may be material.

**Exhibit F**

**Valuation Analysis**

**EXHIBIT F**

**VALUATION OF THE REORGANIZED DEBTORS**

**THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS.**

**THE VALUATION INFORMATION SET FORTH HEREIN REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS. THE ESTIMATED VALUE SET FORTH IN THIS SECTION DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATE SET FORTH IN THIS SECTION. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THIS VALUATION.**

      1.     <u>Overview</u>

The Debtors[1] have been advised by their financial advisor, Lazard Frères & Co. LLC ("Lazard"), with respect to the estimated going concern value of the Reorganized Debtors.  Lazard undertook this analysis to determine the value available for distribution to Holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such Holders thereunder.  The estimated total value available for distribution to Holders of Allowed Claims (the "***Enterprise Value***") consists of the estimated value of the Reorganized Debtors' operations on a going concern basis and the value of cash on the Assumed Effective Date.  The valuation analysis herein is based on information as of the date of the Disclosure Statement.  The valuation analysis assumes that the reorganization takes place on April 30, 2010 (the "***Assumed Effective Date***") and is based on projections provided by the Citadel's management ("***Projections***") for 2010 – 2014 (the "***Projection Period***").

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $1,500 million to $1,745 million, with a midpoint estimate of $1,625 million, which consists of the value of the Reorganized Debtors' operations on a going concern basis, which falls within a range from approximately $1,460 million to $1,710 million and the $39.8 million of cash on the Assumed Effective Date.  For purposes of this valuation, Lazard assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date.  Based on an estimated total debt balance of approximately $762.5 million as contemplated in the Plan as of April 30, 2010, this implies a range of value for the New Common Stock of the Reorganized Debtors from approximately $740 million to $985 million, with a midpoint estimate of $860 million.  These values do not give effect to the potentially dilutive impact of any shares issued upon exercise of any warrants or any shares issued upon exercise of options granted under the Equity Incentive Program. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF FEBRUARY 3, 2010.   ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the First Modified Joint Plan of Reorganization of Citadel Broadcasting Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code.

CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THE ESTIMATE.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue growth, EBITDA margins, and cash flows as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value.

In estimating the Enterprise Value and the value to New Common Stock of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Reorganized Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Citadel's management as well as publicly available information.

In addition, Lazard did not independently verify the Debtors' Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to Holders of Allowed Claims thereunder, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

Lazard's estimated Enterprise Value of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any other time. The estimated Enterprise Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally and other factors which generally influence the prices of securities.

    2.    <u>Valuation Methodology</u>

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. An estimate of the Enterprise Value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Lazard made judgments as to the relative significance of each analysis in determining the value of the Reorganized Debtors' operations on a going concern basis and applied 40% weight to

the Comparable Company Analysis, 20% weight to the Precedent Transactions Analysis, and 40% weight to the Discounted Cash Flow Analysis. Lazard did not consider any one analysis or factor to the exclusion of any other analysis or factor. Lazard's estimated Enterprise Value is highly dependent on the Debtors' ability to meet their Projections. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value. In performing the financial analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with the management of Citadel.

   a.  Comparable Company Analysis

The comparable company valuation analysis is based on the enterprise values of publicly traded companies that have operating and financial characteristics similar to the Reorganized Debtors. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value and at current market values) and minority interest less the book value of unconsolidated investments. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly revenue, earnings before interest, taxes, depreciation, amortization and non-cash compensation expense ("**_EBITDA_**") and EBITDA before corporate expenses ("**_Broadcast Cash Flow_**" or "**_BCF_**"). In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Debtors' actual and projected operational performance. Lazard focused mainly on EBITDA and BCF multiples calculated using the current market values of both equity and debt securities of the selected comparable companies to value the Reorganized Debtors.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar scale of businesses, size of markets, growth prospects and asset mix. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size, the availability of meaningful market-based information and updated financial projections from Wall Street research.

Lazard selected publicly traded companies on the basis of general comparability in one or more of the factors described above to the Reorganized Debtors or one of its segments. The following companies were considered comparable to the Radio Markets segment of the Reorganized Debtors (which includes its portfolio of radio stations): Entercom Communications Corporation, Cumulus Media Inc., Radio One, Inc., Emmis Communications Corporation, Beasley Broadcasting Group, Regent Communications, Saga Communications, Inc. and Salem Communications Corporation (collectively, the "**_Radio Companies_**"). In addition, Lazard reviewed financial and market information regarding CBS Corporation and CC Media Holdings, Inc. though they were deemed less comparable given such factors as their diversified asset mix and limited publicly available EBITDA forecasts on their radio segments. Within the universe of Radio Companies, Lazard focused on Entercom Communications Corporation, Radio One, Inc., Saga Communications, Inc., and Salem Communications Corporation (the "**_Peer Group_**") as these companies had active Wall Street research coverage and current estimates for revenues, EBITDA and BCF published within the last 90 days and publicly available. Lazard also evaluated Westwood One, Inc. on the basis of general comparability to the Radio Network segment of the Reorganized Debtors. Lazard used implied multiples for the Peer Group to determine the appropriate range of multiples for the valuation of the Radio Markets segment of the Reorganized Debtors. Lazard used these implied multiples, together with the implied multiples for Westwood One, Inc., to determine the value of the Radio Network segment of the Reorganized Debtors.

Lazard calculated market multiples for the Radio Companies and the Peer Group based on last twelve months as of September 30, 2009 ("**_LTM_**"), 2009 estimated ("**_2009E_**") and 2010 estimated ("**_2010E_**") EBITDA and BCF by dividing the enterprise value of each comparable company as of February 2, 2010, by the LTM, 2009E and 2010E EBITDA and BCF for each of the comparable companies. It is important to note that this analysis was limited by the availability of updated financial projections from Wall Street research for Radio Companies. In determining the applicable EBITDA and BCF multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue, EBITDA and BCF, size, growth, EBITDA and BCF margins, financial distress impacting trading values, similarity in business lines, availability of market valuations and updated financial projections from Wall Street, location of stations and targeted demographic.

Based on this analysis, Lazard selected the low – high multiples ranges of 7.0x – 8.0x 2010E EBITDA for the Comparable Company Analysis, which implies low – high multiples ranges of 7.4x – 8.4x LTM EBITDA, 7.4x – 8.5x 2009E EBITDA, 6.7x – 7.7x LTM BCF, 6.8x – 7.7x 2009E BCF and 6.4x – 7.3x 2010E BCF.

b.    Precedent Transactions Analysis

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Reorganized Debtors.  Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction.  As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as Revenue, EBITDA and BCF.  Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of EBITDA and BCF, for companies in similar lines of business to the Reorganized Debtors.  The derived multiples were then applied to the Reorganized Debtors' operating statistics to determine the Enterprise Value or hypothetical value to a potential buyer.  Similar to the Comparable Company Analysis, Lazard focused mainly on EBITDA and BCF multiples in comparing the valuations of the Reorganized Debtors and the selected companies involved in merger and acquisition transactions.

Unlike the Comparable Company Analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in the assets of a company).  Thus, this methodology generally produces higher valuations than the Comparable Company Analysis.  In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including:  (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; (c) circumstances pertaining to the financial position of the target may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage); (d) perceived synergies; and (e) the structure of the transaction (asset purchase versus stock purchase), tax implications and the impact on pro forma financial results of the buyer.

As with the Comparable Company Analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results.  The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target.  Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition.  The number of completed transactions for which public data is available also limits this analysis.  Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information. As described above, the Precedent Transaction Analysis explains other aspects of value besides the inherent value of a company.  Thus there are limitations as to the use of this methodology in the valuation of the Reorganized Debtors.

In deriving a range of Enterprise Values for the Reorganized Debtors under this methodology, Lazard calculated multiples of total transaction value ("***Transaction Value***") to the current year projected ("***CY***") EBITDA and CY BCF of the acquired targets.  Lazard calculated multiples of the acquired targets by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction less any cash on the target's balance sheet, by disclosed CY EBITDA and BCF.

Lazard evaluated various selected merger and acquisition transactions that have occurred in the U.S. radio broadcasting industry over the last five years (January 2005 through January 2010).  Lazard did not consider these transactions to be directly comparable as they were executed under drastically different fundamental, industry, and financial market conditions from those prevailing in the current marketplace.  These considerations reduce the relevance of the Precedent Transactions Analysis, which consequently results in a reduced weighting as discussed previously for this valuation methodology.

Lazard, in considering the implied valuation of the Reorganized Debtors, also considered the preliminary indications of interest (and the implied multiples) delivered to Citadel and Lazard during the marketing process in July/August 2009.

Based on this calculation and the qualitative factors described above, Lazard selected the multiple range of 7.0x – 8.5x 2010E EBITDA for the Precedent Transactions Analysis.

<div align="center">c.    Discounted Cash Flow Analysis</div>

The Discounted Cash Flow ("**_DCF_**") Analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "**_Discount Rate_**"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by applying a multiple to the Reorganized Debtors' projected EBITDA in the final projected year of the Projection Period and reviewing the implied perpetuity growth rates, and then the terminal value is discounted back to the Assumed Effective Date, by the Discount Rate.

To estimate the Discount Rate, Lazard calculated the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization ratio based on an assumed range of the Reorganized Debtors' pro forma capitalization. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated the blended cost of debt of the Reorganized Debtors based on current capital markets conditions and the financing costs for comparable companies with leverage similar to the Reorganized Debtors' target capital structure. In determining the terminal multiple, Lazard used the 2010E EBITDA multiple range calculated in the Comparable Company Analysis described above.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. Lazard calculated its DCF valuation on a range of Discount Rates of 9.5% – 11.5% and a range of terminal value EBITDA multiples of 7.0x – 8.0x, which implies a perpetuity growth rate of 1.2% – 4.1%.

In applying the above methodology, Lazard utilized detailed Projections for the period beginning April 30, 2010, and ending December 31, 2014, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtors, based on the Projections, are assumed to be a full tax payer at the applicable federal and state corporate income tax rates (the effective tax rate is assumed to be 40% based on a 35% federal tax rate and 5% effective state tax rate). The cash taxes calculated in the DCF would be reduced if the Debtors were to receive a favorable IRS Private Letter Ruling as described in the Plan. The reduction is not expected to be material to the estimated Enterprise Value of the Reorganized Debtors. These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

**<u>Exhibit G</u>**

**Liquidation Analysis**

# ASSUMPTIONS AND FOOTNOTES TO ACCOMPANY HYPOTHETICAL LIQUIDATION ANALYSIS

The Debtors, with the assistance of their restructuring advisors, Alvarez and Marsal, North America LLC, and their financial advisors have prepared this hypothetical liquidation analysis (the "*Liquidation Analysis*") in connection with the Plan and related Disclosure Statement.  Specifically, and as noted in the Plan, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7.  This is often referred to as the "best interests" test.

The Liquidation Analysis indicates the estimated values that may be obtained by Classes of Claims upon disposition of assets, pursuant to a chapter 7 liquidation, as an alternative to continued operation of the Debtors' business under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement. All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Plan and related Disclosure Statement.

To estimate what members of each Impaired Class of Claims would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "*Liquidation Value*").  The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Analysis has been prepared assuming that the Debtors' current Chapter 11 Cases convert to chapter 7 cases on or about February 15, 2010 (the "*Liquidation Date*"), the Debtors' operations are wound down in an orderly manner, their assets are liquidated and that such liquidation would be substantially completed within a seven-month period.  It is presumed that over an additional 18 month period, the chapter 7 trustee (the "*Trustee*") would resolve all claims and other matters involving the Debtors' estates and make additional distributions.  Because the sale of the Debtors' radio stations are subject to regulation by the FCC, the liquidation process could last longer and costs could run higher than estimated.  The Liquidation Analysis does not take any FCC regulatory impediments into account.

The Liquidation Analysis is based on unaudited book values as of November 30, 2009, unless otherwise stated. These book values are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date. The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors if a Trustee were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  **ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. ACTUAL RESULTS COULD VARY MATERIALLY.**

The Liquidation Analysis presents the liquidation of the Debtors on a consolidated basis.  Proceeds realized from each Debtor are aggregated in a common distribution source.  For purposes of distribution, each and every Claim asserted against or Interest in any Debtor is presumed to be entitled to a distribution from the aggregated proceeds.  Any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed to have one right to a distribution from the aggregated proceeds.

The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with section 726 of the Bankruptcy Code.  If a chapter 7 liquidation were pursued, the Liquidation Value available to unsecured creditors would be reduced, first, by the costs of the liquidation, including fees and expenses of the Trustee appointed to manage the liquidation, fees and expenses of other professionals retained by the Trustee to assist with the liquidation and asset disposition expenses, second, by the accrued and unpaid professional fees incurred during the Chapter 11 Cases, limited to the Carve Out Cap as defined in the Cash Collateral Order, third, by the Secured Claims to the extent of the value of their collateral, and fourth, by the priority and administrative costs and expenses of the bankruptcy estates, including unpaid operating expenses incurred during the Chapter 11 Cases.

In preparing the Liquidation Analysis, the Debtors have estimated an amount of Claims that will ultimately become Allowed Claims.  Such Claims have not been evaluated by the Debtors or Allowed by the Bankruptcy Court and, accordingly, the final amount of Allowed Claims against the Debtors may differ from the Claim amounts used to complete this Liquidation Analysis.  The Claims estimated in the Liquidation Analysis are consistent with the estimated Claims reflected in the Disclosure Statement with certain modifications as described herein.

The liquidation would likely prompt certain other events to occur, including the rejection of the remaining executory contracts, unexpired leases and other agreements and defaults under agreements with customers and suppliers.  Such events would create additional General Unsecured Claims.  No attempt has been made to estimate the additional General Unsecured Claims that arise in connection with a liquidation under chapter 7.

The Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon a chapter 7 liquidation and sale events of assets in the manner described above. Such tax consequences may be material. In addition, the Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions.

# Citadel Broadcasting Corporation
## Chapter 7 Liquidation Analysis
(USD in Millions)

| | Note References | Estimated Book Value | Estimated Recovery Rate | | Estimated Liquidation Value | | Midpoint Est. Liquidation Value |
|---|---|---|---|---|---|---|---|
| | | | Low | High | Low | High | |
| **Assets** | | | | | | | |
| Current Assets: | | | | | | | |
| Cash | A | $ 82.7 | 100.0% | 100.0% | $ 82.7 | $ 82.7 | $ 82.7 |
| Accounts Receivable, net | B | 122.0 | 70.0% | 85.0% | 85.4 | 103.7 | 94.5 |
| Prepaid Expenses & Other Current Assets | C | 25.7 | 25.0% | 30.0% | 6.4 | 7.7 | 7.1 |
| **Total Current Assets** | | **230.4** | | | **174.5** | **194.1** | **184.3** |
| Long Term Assets: | | | | | | | |
| Citadel Radio / Media Long Term Assets | | | | | | | |
| (incl. PP&E, FCC Licenses, Intangibles) | | | | | | | |
| Broadcast Stations | D | 1,089.2 | 60.0% | 75.0% | 653.5 | 816.9 | 735.2 |
| Citadel Media | D | 59.1 | 35.0% | 40.0% | 20.7 | 23.6 | 22.2 |
| Total Citadel Radio / Media Long Term Assets | | 1,148.3 | | | 674.2 | 840.6 | 757.4 |
| PP&E, Intangibles and Other Long Term Assets, net - Corporate | E | 21.9 | 0.0% | 5.0% | - | 1.1 | 0.5 |
| **Total Long Term Assets** | | $ 1,170.2 | | | $ 674.2 | $ 841.7 | $ 757.9 |
| **Total Estimated Proceeds from Liquidation of Citadel Broadcasing Corporation** | | | | | **$ 848.7** | **$ 1,035.7** | **$ 942.2** |
| **Chapter 7 Liquidation Costs:** | | | | | | | |
| Wind Down Costs | F | | | | | | |
| Operational Costs Associated with Wind Down | | | | | $ 2.6 | $ 3.5 | $ 3.1 |
| Professional Fees | | | | | 3.5 | 3.5 | 3.5 |
| **Total Wind Down Costs** | | | | | 6.1 | 7.0 | 6.6 |
| Chapter 7 Trustee Fees | G | | 3.0% | 3.0% | 25.5 | 31.1 | 28.3 |
| Chapter 7 Broker Fees for Asset Sales | H | | 2.0% | 3.0% | 13.5 | 25.2 | 19.4 |
| **Total Chapter 7 Liquidation Costs** | | | | | **$ 45.1** | **$ 63.3** | **$ 54.2** |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | **$ 803.6** | **$ 972.4** | **$ 888.0** |

| | Note References | | | | Total Est. Claim | Total Dist. % | Total Est. Distribution |
|---|---|---|---|---|---|---|---|
| **Distributions** | | | | | | | |
| **Chapter 11 Professional Fees** | I | | | | 6.0 | 100.0% | 6.0 |
| **Remaining Distributable Value** | | | | | | | $ 882.0 |
| Secured Claims | | | | | | | |
| Senior Secured Claims | J | | | | $ 2,071.8 | 41.1% | 852.0 |
| Interest Rate Swap | J | | | | 72.6 | 41.1% | 29.9 |
| Letters of Credit and Other Secured Claims | K | | | | 0.3 | 41.1% | 0.1 |
| **Total Secured Claims** | | | | | $ 2,144.7 | 41.1% | $ 882.0 |
| **Remaining Distributable Value** | | | | | | | $ - |
| **Chapter 11 Admin and Priority Claims** | L | | | | $ 35.4 | 0.0% | $ - |
| **Remaining Distributable Value** | | | | | | | $ - |
| **General Unsecured Claims** | M | | | | $ 82.0 | 0.0% | $ - |
| **Residual Value Available for Equity Holders** | | | | | | | $ - |

**Footnotes to Liquidation Analysis**

The following notes describe the significant assumptions that were made with respect to assets and wind-down expenses.

<u>**Asset Recovery**</u>

**Note A – Cash**

The Liquidation Analysis assumes that operations during the liquidation period would not generate additional cash available for distribution except for net proceeds from the disposition of non-cash assets. The cash balance as of February 15, 2010 has been estimated at approximately $82.7 million. It is assumed that cash and cash equivalents of the Debtors would be 100% collectible and available.

**Note B – Accounts Receivable, net**

The accounts receivable balance has been estimated as of February 15, 2010 based on projected revenue and collection estimates. The balance has also been adjusted to remove non-cash barter receivables that are assumed to have no recovery during the liquidation. In all, accounts receivable balance available for collection as of February 15, 2010 has been estimated at approximately $122 million.

The analysis of accounts receivable assumes that the Trustee would retain certain existing staff of the Debtors to handle an aggressive collection effort of outstanding trade accounts receivable from customers. Collections during a liquidation of the Debtors would likely be significantly compromised as customers may attempt to offset outstanding amounts owed to the Debtors against alleged damage and breach of contract claims. The liquidation value of accounts receivable was estimated by applying a recovery factor consistent with the Debtors' experience in collecting accounts receivable and the expectation of additional attempts to offset. The estimates also consider the inevitable difficulty a liquidating company has in collecting its receivables and any concessions that might be required to facilitate the collection of certain accounts. Recoveries of this account are estimated between approximately 70% and 85% of the outstanding balance.

**Note C – Prepaid Expenses & Other Current Assets**

Prepaid Expenses and Other Current Assets include prepaid expenses, prepaid insurance, prepaid rent, prepaid programming and miscellaneous other. It is estimated that in connection with a chapter 7 liquidation, certain prepaid expenses for restructuring fees will be able to be recovered providing for an estimated recovery percentage of 25% to 30%.

**Note D – Citadel Radio / Media Long Term Assets (incl. PP&E, FCC Licenses, Intangibles)**

Typically, upon conversion of a chapter 11 case to one under chapter 7, a business is shut down and ceases all operations. For purposes of this Liquidation Analysis, however, the Debtors have assumed that their operations would not necessarily "go dark" following conversion of their cases to chapter 7, but instead, would continue operations at the Citadel Radio and Citadel Media level and maintain minimal staff at the corporate level pending a sale by the chapter 7 trustee, as this would be more likely to maximize value.

Broadcast Station assets represent the land, station facilities, towers, FCC licenses and other operating assets of Citadel Radio, including the 224 owned and operated radio stations serving more than 50 different markets, located across 27 states and the District of Columbia. Broadcast Stations also include tower operating contracts, employment contracts and other intangibles associated with operating a radio station. Citadel Media assets represent the studio equipment, production facilities, affiliate base contractual agreements and advertiser agreements used to produce and distribute news and talk radio programming to more than 4,000 station affiliates and 8,500 program affiliates.

Recovery from the sale of the Citadel Radio and Citadel Media assets is expected to be low relative to book value due to factors, including but not limited to, the unprecedented nature of a liquidation of this magnitude in the radio and broadcasting industry, difficult credit markets that reduce the potential population of buyers able to purchase radio stations, lack of buyers for the entire portfolio of stations as well as lack of buyers in each individual market and the difficulty in liquidating numerous assets across the country in a constrained time period. Recovery for these assets has been estimated based on an expected segment level EBITDA multiple applied to the projected 2009 segment level

EBITDA for Citadel Radio and the projected 2010 segment level EBITDA for Citadel Media. The multiples utilized in determining this recovery percentage have been discounted to reflect the distressed nature of the transaction as well as the other factors previously described in this footnote.

If the Debtors' business operations were to be shut down in their entirety, as may normally occur upon conversion to chapter 7, the Company believes the liquidation recoveries on Citadel Radio and Citadel Media assets would be substantially lower than those reflected in the Liquidation Analysis.

**Note E – PP&E, Intangibles and Other Long Term Assets, net - Corporate**

The Long Term Assets not affiliated with the Citadel Radio or Citadel Media operating assets represent leasehold improvements, furniture and fixtures and various long term capitalized costs. As such, it is estimated that only minimal recovery of 0% to 5% would be achieved in the liquidation of these assets.

<u>**Chapter 7 Liquidation Costs**</u>

**Note F - Wind Down Costs**

The Liquidation Analysis assumes an orderly wind-down of the Debtors' operations during a seven-month period. The estimated costs associated with the liquidation of the Debtors include operating expenses and other costs associated with liquidation activities including, but not limited to: (i) collection of accounts receivable and accounting, (ii) communication and coordination with station-level and Citadel Media personnel to continue operations during asset sales, (iii) negotiation of the sale of other tangible and intangible assets, and (iv) the resolution of all employee-related issues. These costs include salaries, occupancy costs, certain general and administrative costs and professional fees. If the aforementioned activities or other activities associated with the liquidation of the assets take longer than the assumed liquidation period, actual administrative costs may exceed the estimate included in the Liquidation Analysis.

a) Operational Costs: As previously mentioned in Note D, the Debtors have assumed that operations would continue at the Citadel Radio and Citadel Media level and minimal staff will be maintained at the corporate level pending a sale by the Trustee, as this would be more likely to maximize value. Consistent with current results and projected performance, the Debtors have further assumed that the Citadel Radio and Citadel Media operations will operate on a cash flow break-even basis. Given this assumption, the wind down costs reflected in the Liquidation Analysis represent corporate general and administrative costs necessary to conduct the liquidation.

These estimated expenses are based on an analysis of the run rate of the Debtors' actual corporate general and administrative expenses incurred from January 2009 through November 2009. As compared to normal going-concern operating expense levels, the liquidation scenario assumes expenses at a reduced headcount and level of spending than normal course. A higher level of expense was assumed necessary during the initial months to support the gradual sale of the assets. Thereafter, administrative expenses would be required to principally support other asset sales, collection of receivables and administration of claims. No provision has been made within the operations budget for a formal severance plan, which could increase the wind-down expenses.

b) Professional Fees: chapter 7 professional fees include legal, appraisal and accounting fees expected to be incurred during the liquidation period that are not already deducted from liquidation values. Professional fees are assumed to be $500,000 per month through the liquidation period.

**Note G - Trustee Fees**

The Debtors assume they would pay commissions equal to 3% of gross liquidation sale proceeds for chapter 7 trustee fees.

**Note H – Chapter 7 Broker Fees**

Estimated broker fees and related legal and other professional fees associated with the sale of the Citadel Radio and Citadel Media assets are assumed to be 2% to 3% of total sale proceeds.

**Distributions**

**Note I – Chapter 11 Professional Fees**

The estimated amount of accrued and unpaid chapter 11 professional fees owed by the Debtors as of February 15, 2010 is $6.0 million.  The amount of chapter 11 professional fees to be distributed in advance of the Secured Claims is limited by the Carve Out Cap as defined in the Cash Collateral Order.

**Note J – Secured Claims**

Senior Claims, including accrued interest, include the following:

($ in millions)

| | |
|---|---|
| Revolving credit facility | $140.4 |
| Tranche A | 543.8 |
| Tranche B | 1,387.6 |
| Total Senior Claims | $2,071.8 |

The Senior Claims also include the termination value of the Swap Claims in the amount of $72.6 million.

The Senior Claims and the value of the Swap Claims are assumed to be paid on a pro rata basis from the net liquidation proceeds.

**Note K – Letters of Credit and Other Secured Claims**

In addition to the Senior Secured Claims, there are other secured claims arising from Letters of Credit and capital lease obligations.

The Letters of Credit were cash collateralized at the beginning of the Chapter 11 Cases, so they have been excluded from this recovery analysis.

The capital leases are assumed to be equal to the value in the underlying assets in the leases of financing agreements, and are assumed to recover in a percentage pari passu with the Senior Claims.

**Note L – Chapter 11 Admin and Priority Claims**

The estimated amount of chapter 11 administrative claims owed by the Debtors as of February 15, 2010 is $35.4 million.  This reflects post petition accounts payable and accrued and unpaid expenses incurred during the Chapter 11 Cases.

**Note M – General Unsecured Claims**

For purposes of the Liquidation Analysis, management has assumed that General Unsecured Claims will consist of prepetition unpaid, unsecured obligations owed to holders of Notes Claims, vendors, certain employees and litigation parties, as well as claims for damages arising from the rejection of certain already identified executory contracts.  The Liquidation Analysis does not attempt to estimate any additional General Unsecured Claims that would arise as a result of the rejection of executory contracts (including talent and programming contracts) and leases that would otherwise be assumed under the Debtors' Plan, and the failure of the Debtors to perform under existing contracts.  The amount of such additional claims would likely be substantial in amount.  General Unsecured Claims have been estimated at $82 million.

**<u>Exhibit H</u>**

**Plan Release Provisions**

A.    **Defined Terms.**

All defined terms used in this Exhibit H shall have the meanings ascribed to them in the Plan.

B.    **Compromise and Settlement of Claims, Interests and Controversies.**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.    The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.    In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

All subordination rights that a holder of a Senior Claim or the Senior Agent may have with respect to any distribution to be made pursuant to the Plan with respect to Subordinated Notes Claims will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan to Holders of Subordinated Notes Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subrogation rights.

C.    **Releases by the Debtors.**

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES AND THE DEBTORS' FORMER OFFICERS AND DIRECTORS ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN AND DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OR A FORMER OFFICER OR DIRECTOR OF THE DEBTORS THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE.

FOR THE AVOIDANCE OF DOUBT, AND EXCEPT TO THE EXTENT LISTED IN THE RETAINED CAUSES OF ACTION FILED AS PART OF THE PLAN SUPPLEMENT, ALL AVOIDANCE ACTIONS ARE RELEASED PURSUANT TO THE PLAN.  THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN.

D.    **Releases by Holders of Claims and Interests**.

AS OF THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM OR AN INTEREST SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE DEBTORS' CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

E.    **Releases of Governmental Claims**.

Nothing in the Confirmation Order or the Plan shall effect a release of any direct claim (i.e., a claim that is not brought solely in a derivative capacity in respect of any Debtors and is not an Avoidance Action) (a "***Direct Claim***") by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any Direct Claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any Direct Claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any Direct Claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any Exculpated Party from any liability to the United States Government or any of its agencies or any state and local authority in respect of a Direct Claim whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties.

K&E 16384884.15

F.    **Exculpation.**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN, AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. NOTHING PROVIDED HEREIN SHALL APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN.

G.    **Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

H.    **Injunction.**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

K&E 16384884.15

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO PLAN ARTICLE IX.B, C. OR D., DISCHARGED PURSUANT TO PLAN ARTICLE IX.F., OR ARE SUBJECT TO EXCULPATION PURSUANT TO PLAN ARTICLE IX.E. ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:    (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.    ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

I.      **Release of Liens.**

Except as otherwise provided herein, in the New Term Loan Documents or in any other contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, (a) all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged and (b) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

J.      **Term of Injunctions or Stays.**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the

4

Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**K.**      **Protection Against Discriminatory Treatment.**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

K&E 16384884.15